Gregory L. Diskant
Jeffrey F. Kinkle
Jeffrey C. Skinner
Jake Walter-Warner
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
gldiskant@pbwt.com
jkinkle@pbwt.com
jskinner@pbwt.com
jwalterwarner@pbwt.com

*Attorneys for the Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIVIL RIGHTS CORPS, CYNTHIA GODSOE,          :
NICOLE SMITH FUTRELL, DANIEL S.                         Case No. 21-cv-_____
MEDWED, JUSTIN MURRAY, ABBE SMITH,        :
AND STEVEN ZEIDMAN

                  Plaintiffs,          :

         - against -          :          **COMPLAINT AND DEMAND FOR**
                                           **JURY TRIAL**

GEORGIA PESTANA, Corporation Counsel of the :
City of New York, in her official and personal
capacity; MELINDA KATZ, the District Attorney
for Queens County, in her official and personal
capacity; ANDREA E. BONINA, Chair of the State
of New York Grievance Committee for the Second,
Eleventh, and Thirteenth Judicial Districts, in her
official and personal capacity; DIANA MAXFIELD
KEARSE, Chief Counsel of the State of New York
Grievance Committee for the Second, Eleventh, and
Thirteenth Judicial Districts, in her official and
personal capacity; and HECTOR D. LASALLE,
Presiding Justice of the Second Judicial Department
of the Appellate Division of the Supreme Court of
the State of New York, in his official capacity

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Civil Rights Corps ("CRC"), and Professors Cynthia Godsoe, Nicole Smith Futrell, Daniel S. Medwed, Abbe Smith, and Steven Zeidman (collectively, the "Professors" or "Law Professors"), and Justin Murray, by and through their attorneys, Patterson Belknap Webb & Tyler LLP, for their Complaint against the defendants Georgia Pestana, the Corporation Counsel for the City of New York in her official and personal capacity (the "Corporation Counsel"), Andrea E. Bonina, the Chair of the State of New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts in her official and personal capacity, Diana Maxfield Kearse, Chief Counsel of the State of New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts, in her official and personal capacity (together, the "Grievance Committee"), Melinda Katz, the District Attorney of Queens County, in her official and personal capacity (the "Queens District Attorney"), and Hector D. LaSalle, the Presiding Justice of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York, in his official capacity, (all collectively, the "Defendants"), allege as follows:

## INTRODUCTION

1.      This is a civil rights action seeking redress for Defendants' infringement of Plaintiffs' First Amendment right to speak and advocate freely on a matter of grave public importance—prosecutorial misconduct.  It is also a proceeding to declare unconstitutional under the First Amendment of the United States Constitution and under Article I, § 8, of the New York Constitution, New York State Judiciary Law § 90(10) insofar as it is applied to censor Plaintiffs' speech and to keep confidential the disciplinary proceedings Plaintiffs have requested.

2.      Prosecutorial misconduct is a scourge in New York State, and yet prosecutors are rarely disciplined for their misconduct.  Bar association reports and legislative efforts to make prosecutors accountable for violating the law—and sending innocent people to prison—have failed repeatedly.  So, too, have bar association and legislative efforts to open

disciplinary proceedings to the public.  Even though the consequences of prosecutorial misconduct can be a wrongful conviction and decades spent behind bars, the response of those responsible for attorney discipline has been, in effect, a collective shrug of the shoulders.

        3.        The Plaintiffs are a group of law professors supported by the CRC who have addressed this issue head-on.  They have prepared and filed complaints with relevant New York grievance committees demonstrating repeated violations of law by present and former Assistant District Attorneys in Queens County, and have asked that any resulting disciplinary proceedings take place in public.  The complaints are well-documented and are based on the public record, primarily judicial findings of prosecutorial wrongdoing.  Much of the misconduct was so severe that courts were required to reverse a jury's verdict.  At the same time, Plaintiffs have made their campaign public by publishing their complaints on the website AccountabilityNY.org and urging the public to support reform efforts.  Everything the Plaintiffs have done is in the public interest and is fully supported by the First Amendment.

        4.        Nonetheless, Plaintiffs' activities are threatening to some of the Defendants, who have embraced and relied upon the status quo for many decades.  The Grievance Committee largely ignores the rules of conduct for prosecutors and focuses its attention instead on civil attorneys.  The Queens District Attorney and the Corporation Counsel benefit from the blind eye of the Grievance Committee, which allows prosecutors to run amuck without sanction.  All these Defendants use the confidentiality provisions of Judiciary Law § 90(10) as an excuse for inaction—and as a basis for threats and retaliatory actions against the Plaintiffs for their efforts at reform.  And the People of the State of New York suffer from a system of justice that, too often, means injustice for the downtrodden and immunity for those in power.

5.      These Defendants responded to Plaintiffs' public interest activities with an aggressive campaign of harassment and threats, which included retaliating against Plaintiffs for exercising their First Amendment rights.  Specifically, the Corporation Counsel, on behalf of the City of New York and the Queens District Attorney, wrote to the Grievance Committee attacking the Law Professors for purportedly violating Judiciary Law § 90(10).  He accused the Law Professors of "misus[ing] and indeed abus[ing] the grievance process to promote a political agenda" in a way that "should not be countenanced."  Ex. 1 at 3.  In threatening language, the Corporation Counsel asked the Grievance Committee to take action against the Professors for their complaints, and he promised further interventions in the event any more complaints were filed.  At the same time, seeking to keep secret his baseless accusations, the Corporation Counsel insisted that his letter be kept confidential under Judiciary Law § 90(10) so that the People of New York would never learn about his intemperate attack on those who would try to improve the system.

6.      In direct response to the Corporation Counsel's demand, the Grievance Committee promptly took adverse action against the Law Professors by stripping them of the rights that New York law accords those who complain about attorney misconduct.  A complainant in an attorney misconduct proceeding has the right to learn what is happening to his or her complaint and has the right to appeal adverse decisions.  Thus, as complainants, the Law Professors expected to learn what happened at each step of the review process by the Grievance Committee and why.

7.      Instead, the Grievance Committee decided that it would pretend that the Law Professors were not complainants, and would instead treat any investigation—to the extent any occurs—as something initiated *sua sponte*, *i.e.*, at the Committee's own initiative and thus confidential from virtually all disclosure under Judiciary Law § 90(10).  This action means that

4

the Professors will not learn the results of their complaints, which would remain confidential, and that the Professors would be unable to appeal any adverse decision.

8.     The Grievance Committee's decision is a charade.  If the Grievance Committee does anything in response to the Law Professors' complaints, it would not be an action taken *sua sponte*, but rather, an action taken because the Law Professors have analyzed, marshalled and presented the evidence from a variety of different publicly-available sources to the Grievance Committee.  The Law Professors are complainants as clearly defined in New York law and entitled to all the rights of complainants.

9.     As a consequence of this retaliatory action in violation of the First Amendment and New York law, the Law Professors—and the public—may never learn what, if anything, the Grievance Committee does with their complaints.  The Grievance Committee said as much to the Professors.  It wrote to the Professors that "any investigations into these allegations . . .  would remain confidential pursuant to New York State Judiciary Law § 90" unless they actually resulted in any public discipline.  And in case there was any doubt that the Professors should have no reason to expect any disciplinary action at all to result from their complaints, the Grievance Committee added that its letter "does not constitute confirmation as to whether any investigations will or will not be pursued."  Ex. 2.  Because of the confidentiality provisions of Judiciary Law § 90(10), the public will never learn if, as is now expected, the Grievance Committee simply decides to ignore the Law Professors' complaints and, once again, to let malfeasant prosecutors off the hook.

10.     The pretext for all of these Defendants' actions is Judiciary Law § 90(10), which purports to keep confidential everything associated with a disciplinary proceeding— including even the correspondence between the Law Professors, the Corporation Counsel, and the Grievance Committee.  Judiciary Law § 90(10) is overbroad and unconstitutional both on its

face and as applied to this case. Whatever may be true in other cases, there are simply no privacy interests at stake here to justify either muzzling the Professors' free speech rights or holding any investigation of the accused prosecutors in secret. The prosecutorial misconduct alleged is all documented in the public record, principally in judicial decisions. The prosecutors themselves are public servants engaged in public business. Because Judiciary Law § 90(10) serves no valid interest in this case—let alone a compelling one—its application to the Professors' complaints is unconstitutional.

11.     New Yorkers deserve better than public officials who engage in a campaign of intimidation and retaliation against those who would seek to address prosecutorial misconduct in this State. New Yorkers also deserve to know what wrongs these public officials have committed, and are committing, in their name. The First Amendment demands not only that harassment of the Plaintiffs must stop, but also that any further disciplinary proceedings of the accused prosecutors be open to the public.

## **THE PARTIES**

12.     Plaintiff CRC is a non-profit organization dedicated to challenging systemic injustice in the United States. It engages in advocacy and public education and specializes in innovative civil rights litigation with the goal of sensitizing the legal system and the public to the injustice and brutality that can occur in the contemporary United States legal system.

13.     Plaintiff Cynthia Godsoe is a Professor of Law at Brooklyn Law School. Professor Godsoe teaches courses in family law, criminal law, children and the law, professional responsibility, and public interest lawyering. She is the Director of the Edward V. Sparer Public Interest Law Fellowship and the Marsha Garrison Family Law and Policy Fellowship programs. Professor Godsoe is an active member of the New York bar.

6

14.     Plaintiff Nicole Smith Futrell is an Associate Professor of Law and Co-Director of the Defenders Clinic at CUNY School of Law.  Professor Futrell's teaching and scholarship focus on criminal procedure, legal ethics, post-conviction relief, reentry, and social justice lawyering.  In her clinical practice, she and her students represent clients in a variety of criminal defense-related contexts, including state court misdemeanor cases, parole and clemency petitions, wrongful conviction matters, and civil claims related to criminal convictions. Professor Smith Futrell is an active member of the New York bar.

15.     Plaintiff Daniel S. Medwed is the University Distinguished Professor of Law and Criminal Justice at Northeastern University School of Law.  Professor Medwed teaches criminal law, evidence, and advanced criminal procedure.  His research and pro bono activities revolve around the topic of wrongful conviction.  Professor Medwed is an active member of the New York bar.

16.     Plaintiff Justin Murray is Associate Professor of Law at New York Law School and Co-Director of the Criminal Justice Institute.  He teaches criminal law, criminal procedure, and constitutional law and co-teaches courses covering race, bias, and advocacy in the legal system.  Professor Murray is an active member of the Illinois bar.

17.     Plaintiff Abbe Smith is the Scott K. Ginsburg Professor of Law, Director of the Criminal Defense and Prisoner Advocacy Clinic, and Co-Director of the E. Barrett Prettyman Fellowship Program at the Georgetown University Law Center.  Professor Smith teaches and writes on criminal defense, legal ethics, juvenile justice, and clinical legal education. Professor Smith is an active member of the New York bar.

18.     Plaintiff Steven Zeidman is a Professor of Law and Director of the Criminal Defense Clinic at CUNY School of Law.  He teaches and works in the area of criminal defense.  Professor Zeidman is an active member of the New York bar.

19.     Defendant Georgia Pestana is the Corporation Counsel for the City of New York.  She is sued in her official and personal capacity. The Corporation Counsel leads the New York City Law Department, which comprises approximately 1,000 lawyers and 890 support professionals.

20.     Defendant Andrea E. Bonina is the Chair of the State of New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts (the "Grievance Committee").  She is sued in her official and personal capacity.  The Grievance Committee is an "Attorney Grievance Committee," as defined by 22 N.Y.C.R.R. § 1240.2(d), that is endowed with the power and responsibility to investigate and sanction attorney misconduct and ethical breaches.  As Chair of the Grievance Committee, Defendant Bonina is a member of the Grievance Committee and has special responsibilities and powers beyond those of an ordinary grievance committee member.  *See* 22 N.Y.C.R.R. § 1240.7(e).

21.     Defendant Diana Maxfield Kearse is Chief Counsel of the Grievance Committee.  She is sued in her official and personal capacity.  Ms. Kearse is the "Chief Attorney" of the Grievance Committee.  *See* 22 N.Y.C.R.R. § 1240.5.  As such, she is empowered to investigate professional misconduct complaints, and is obligated to report certain information to a complainant about any disciplinary proceedings resulting from his or her complaint.  *See* 22 N.Y.C.R.R. § 1240.7.

22.     Defendant Melinda Katz is the District Attorney for Queens County.  She is sued in her official and personal capacity.  The District Attorney for Queens County is responsible for conducting all prosecutions for crimes and offenses committed within Queens County.

23.     Defendant Hector D. LaSalle is the Presiding Justice of the of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York

(the "Second Department").  He is sued in his official capacity.  The Second Department, as one of four Appellate Divisions of the Supreme Court of the State of New York, is vested by the New York legislature with the power and ultimate authority to regulate attorney admissions and conduct, including by promulgating rules concerning attorney discipline.  New York Judiciary Law § 90(2).

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (action arising under the Constitution and federal law), 1343(a) (action to redress deprivation of civil rights), and 1367 (supplemental jurisdiction).

25.    This action arises under 42 U.S.C. § 1983.  Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

26.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of New York, or, alternatively, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND

A.    **New York's Grievance Committees Allow Prosecutors to Run Amok**

27.    The fair operation of the criminal legal system is a matter of overriding public importance.  The New York Court of Appeals has recognized that "it is not enough for a District Attorney to be intent on the prosecutions of his case."  *People v. Bailey*, 58 N.Y.2d 272, 276-77 (1983) (cleaned up).  Rather, "his paramount obligation is to the public, [and so] he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness."  *Id.* (internal modifications and citations omitted).  The "public at large," in addition to each defendant, is "entitled to assurance that there shall be full observance

and enforcement of the cardinal right of a defendant to a fair trial." *People v. Crimmins*, 36

N.Y.2d 230, 237-38 (1975).

28.     Central to achieving a fair trial is the obligation of prosecutors to "deal

fairly with the accused and be candid with the courts." *People v. Colon*, 13 N.Y.3d 343, 349

(2009) (internal quotation marks and citation omitted).  Prosecutors have a "heightened duty of

candor to the courts an in fulfilling other professional obligations."  2017 American Bar

Association Standard 3-1.4(a) for the Prosecution Function.

29.     Prosecutorial misconduct can have devastating consequences; it can cause

the imprisonment of innocent people.  A 2020 study of more than 2,000 exonerations found that

prosecutorial misconduct was a factor in 30% of the exonerees' convictions.  National Registry

of Exonerations, *Government Misconduct and Convicting the Innocent* (September 1, 2020),

*available at*

https://www.law.umich.edu/special/exoneration/Documents/Government_Misconduct_and_Con

victing_the_Innocent.pdf.

30.     In New York, Grievance Committees have a crucial—and singular—role

in regulating prosecutorial misconduct.  Unlike other practicing attorneys admitted to the New

York state bar and other law enforcement officials, prosecutors alone have "absolute immunity"

from civil suit.  *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976).  The doctrine of "absolute

immunity" has been justified based on the assumption that "associations of [] peers," like the

New York grievance committees, will regulate prosecutors through "professional discipline,"

such that civil suits are not necessary to deter and punish prosecutorial misconduct.  *Imbler*, 424

U.S. at 429.

31.     Unfortunately, this crucial pillar supporting the doctrine of "absolute

immunity" is illusory.  A 2013 report from the Center for Prosecutor Integrity identified 3,625

cases of prosecutorial misconduct in the 50 years from 1963 to 2013.  Of those, only 63—less

than 2 percent—ever resulted in any public sanction.  Center for Prosecutor Integrity, *White*

*Paper: An Epidemic of Prosecutor Misconduct* (December 2013), *available at*

www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutorMisconduct.pdf.

Neither judges nor fellow lawyers regularly report prosecutorial misconduct to disciplinary

committees, and these committees rarely discipline prosecutors for misconduct when such

reporting occurs.  Bruce Green & Ellen Yaroshefsky, *Prosecutorial Accountability 2.0*, 92 Notre

Dame L. Rev. 51, 65 (2017).

32.     The problem is particularly acute in New York.  An analysis of New York

state and federal court decisions from 2001 to 2011 found 30 decisions overturning convictions

explicitly because of prosecutorial misconduct.  Joaquin Sapien and Sergio Hernandez, *Who*

*Polices Prosecutors Who Abuse Their Authority? Usually Nobody*, ProPublica (April 3, 2013),

*available at* https://www.propublica.org/article/who-polices-prosecutors-who-abuse-their-

authority-usually-nobody.  This analysis revealed that ***only one*** of the prosecutors found by a

court to have committed misconduct was publicly disciplined by a New York grievance

committee; none of the other implicated prosecutors was disbarred, suspended, or publicly

censured.  *Id.*  Some were even promoted and given raises after courts publicly cited them for

their abuses.  *Id.*

33.     In 2019, the most recent year for which statewide data is available, not a

single New York prosecutor was publicly disciplined by a grievance committee for on-the-job

misconduct.  Rory Fleming, *How New York Lets Prosecutors Off The Hook for Misconduct*, New

York Focus (September 1, 2021), *available at* https://www.nysfocus.com/2021/09/01/how-new-

york-lets-prosecutors-off-the-hook-for-misconduct/.

34.     In one isolated instance, in 2021, former prosecutor Glenn Kurtzrock was suspended from practice for two years.  This is the exception that proves the rule—that the disciplinary system for prosecutors is broken.  In 2017, Kurtzrock was fired mid-trial by the Suffolk County District Attorney after the trial judge found he had engaged in extreme misconduct by withholding critical *Brady* material.  The district attorney referred Kurtzrock to the grievance committee.  Even with a referral from the District Attorney and a judicial finding of misconduct, it took the grievance committee more than three full years to resolve the matter. The grievance committee's extraordinary failure to act for years on end was the subject of critical press commentary, Nina Morrison, *What Happens When Prosecutors Break the Law?* New York Times (June 18, 2018), *available at* https://www.nytimes.com/2018/06/18/opinion/kurtzrock-suffolk-county-prosecutor.html, and litigation.  *In the Matter of the Application of The Innocence Project, Inc.*, No. 2019-05674 (N.Y. App. Div. July 12, 2019).

35.     Prosecutorial misconduct—and the failure of New York's grievance committees to serve their crucial role of disciplining prosecutors for misconduct—inflicts devastating consequences on innocent New Yorkers.  Since 1989, at least 234 cases in New York have resulted in the exoneration of a wrongly-convicted defendant.  Eighty-eight of those cases involved prosecutors wrongly withholding exculpatory material.  Susan DeSantis, *Judges Ordered to Direct Prosecutors to Turn Over Information Favorable to Defense,* New York Law Journal (November 7, 2017), *available at* http://www.law.com/newyorklawjournal/sites/newyorklawjournal/2017/11/07/judges-ordered-to-direct-prosecutors-to-turn-over-information-favorable-to-defense/.  Such misconduct has caused people to suffer decades of imprisonment with accompanying physical and mental trauma and separation from family and loved ones.

36.     The lack of discipline for prosecutors who commit misconduct is a topic of tremendous public importance.  In recent years, two advisory bodies created by the Chief Judge of the New York Court of Appeals have issued recommendations about this issue.

37.     In September 2015,  the Commission on Statewide Attorney Discipline recommended putting in place a process "to ensure that judicial determinations of prosecutorial misconduct are promptly referred to the appropriate disciplinary committee" and that sanctions meted out for misconduct be "publicly released" because "the public has every right to scrutinize the conduct of those it entrusts with public office."  NYS Commission on Statewide Attorney Discipline, Final Report to Chief Judge Jonathan Lippman, the Court of Appeals, and the Administrative Board of the Courts (September 24, 2015) (the "Lippman Commission Report"), 78-79, *available at* http://ww2.nycourts.gov/sites/default/files/document/files/2020-10/AttyDiscFINAL9-24-1.pdf.

38.     Just 15 months later, the New York State Justice Task Force recommended that grievance committees "proactively review available court decisions" and undertake investigations "where a finding of attorney misconduct has been made in a court decision."  New York State Justice Task Force, Report on Attorney Responsibility in Criminal Cases (February 2017), 5, *available at* http://www.nyjusticetaskforce.com/pdfs/2017JTF-AttorneyDisciplineReport.pdf.

39.      Beginning in 2018, New York State has attempted to implement legislation creating a first-in-the-nation State Commission on Prosecutorial Conduct. That reform effort has been met with unrelenting opposition from the District Attorney Association of New York, which filed suit immediately after the law was enacted. In response to the lawsuit, the State amended the law, and the District Attorneys sued again. They won an order invalidating the new law in January 2020.  With no acknowledgement of the disingenuity of their position,

opponents of the Commission have argued that the solution is not a State Commission, but rather more of the same—for "grievance committees [to] focus more carefully on prosecutors in appropriate cases."  But, of course, that has not happened and is not likely to happen anytime soon.

40.     In June 2021, New York tried for a third time to obtain some control over misbehaving prosecutors.  It passed new legislation in June 2021—much watered-down from its earlier attempts—to address the challenges to the prior legislation.  Nick Reisman, *Cuomo signs bill creating prosecutor conduct panel*, Spectrum News 1 (June 18, 2021), *available at* https://spectrumlocalnews.com/nys/central-ny/ny-state-of-politics/2021/06/18/cuomo-signs-bill-creating-prosecutor-conduct-panel.  Even if this iteration of the legislation survives intact, it is just one insufficient step to address an enduring problem.

**B.     New York Law Keeps Disciplinary Proceedings Confidential**

41.     The grievance proceedings that are supposed to protect New Yorkers from unethical lawyers, including prosecutors who engage in misconduct, are almost invariably conducted in secret.  In that respect, New York Judiciary Law § 90(10) is a rarity among the attorney discipline procedures throughout the Nation.  It requires confidentiality of attorney disciplinary proceedings and all papers related to the proceedings unless and until discipline is recommended, or more often, disciplinary charges are sustained by the Appellate Division.  Technically, the Appellate Division could make proceedings and documents public sooner "upon good cause being shown," but this almost never happens in practice.

42.     For example, despite considerable public attention and an amicus brief from prominent news organization, the Second Department denied the Innocence Project's application to unseal any records or hearing concerning disciplinary proceedings against Glenn Kurtzrock.  In a one-paragraph ruling, the court held, without analysis, that the petition "had

failed to establish good cause to disclose the documents, if any, relating to the alleged investigation described in the application" or "to establish good cause to open to the public any hearings which may be held in connection with the alleged disciplinary proceeding." *In the Matter of the Application of The Innocence Project, Inc.*, No. 2019-05674, at 1 (N.Y. App. Div. July 12, 2019).

43.    For many years, the American Bar Association, the New York courts, and various committees of the New York State Bar Association have recommended amending § 90(10) so that disciplinary proceedings become public once the disciplinary authorities find probable cause to believe that an attorney has violated the Code of Professional Responsibility. For instance, in 2015, the so-called McKay Commission concluded, "secret records and secret proceedings create public suspicion regardless of how fair the system really is." NYS Commission September 2015 Final Report at 26. Secrecy "create[s] an atmosphere of public suspicion and skepticism." *Id.* at 12. The report concluded that "[i]f it is true that the public is suspicious of the attorney discipline process because it is secret, then proceedings should be opened at the earliest practical point." *Id.* at 25.

44.    The extreme secrecy attached to New York's attorney disciplinary proceedings makes them an outlier nationally. As of mid-2014, "the vast majority of jurisdictions open proceedings upon the filing of a formal charge following a finding of probable cause." The Lippmann Commission Report at 62. "New York is one of only 9 jurisdictions which do not permit public dissemination of information concerning disciplinary proceedings until, at the earliest, a recommendation that discipline be imposed, and usually upon a final adjudication." *Id.*

45.    Moreover, courts in other jurisdictions have consistently found that overbroad confidentiality rules for attorney disciplinary processes violate the First Amendment.

*See Doe v. Supreme Court of Fla.*, 734 F. Supp. 981, 988 (S.D. Fla. 1990) (Florida Bar Rule prohibiting speaking about a meritorious grievance filed against an attorney violates the First Amendment); *In re Petition of Brooks*, 678 A.2d 140, 143-46 (N.H. 1996) (New Hampshire Supreme Court Rule prohibiting complainant "from revealing the fact that a complaint had been filed, what information or testimony the complainant provided the committee, any action taken by the committee in response to the complaint, and any information acquired by the complainant through interaction with the committee" violates the First Amendment); *R.M. v. Supreme Court*, 883 A.2d 369, 377-82 (N.J. 2005) (New Jersey Supreme Court Rule prohibiting speech on a "given disciplinary matter and the associated written records" violates the First Amendment); *In re Warner*, 21 So. 3d 218, 262 (La. 2009) (Louisiana Supreme Court Rule prohibiting speech about attorney disciplinary proceedings until formal charges are filed violates the First Amendment).

46.     The secrecy of New York's disciplinary process, together with the New York's failure to supervise and discipline prosecutors, makes the process doubly deficient and deprives the public of any substantial insight into, and protection against, prosecutorial misconduct.

**C.     Plaintiffs File Complaints Against Prosecutors Who Engaged in Misconduct**

47.     Plaintiffs, like many other members of the public, are concerned about prosecutorial misconduct and the grievance committees' consistent failure to meet their responsibility to discipline prosecutors who violate New York's Rules of Professional Conduct. They are likewise concerned about the extent to which the work of the grievance committees is conducted under a veil of secrecy.

48.     On May 3, 2021, with support from CRC, the Law Professors filed 21 discrete complaints pursuant to New York Judiciary Law § 90(10) against individual attorneys

currently or formerly employed by the Queens District Attorney's Office for misconduct committed while working as an assistant district attorney.  Each of the complaints recited the sorry history of prosecutorial misconduct in New York State.  Each complaint carefully identified and marshalled public records and relied on judicial findings that the subject attorney had committed professional misconduct during the course of a criminal prosecution.  The complaints are well documented and do not rely on any private or off-the-record sources.  The Law Professors requested that the respective grievance committees investigate and discipline each attorney for his or her misconduct, and that they do so publicly.  According to publicly-available records maintained by the New York State Unified Court System, none of the accused prosecutors has ever been publicly disciplined.

49.    The Law Professors' complaint against Jesse Sligh is representative of the complaints.  In 1988, Sligh prosecuted and obtained a conviction against Clinton Turner for first degree robbery.  Turner maintained his innocence, but he was convicted and spent ten years in prison.  After his parole, Turner discovered that his conviction was the result of pervasive misconduct by Sligh and he sought habeas relief.  A federal court set aside the conviction, finding that Sligh's extensive *Brady* violations had deprived Turner of a fair trial.  The Queens District Attorney declined to retry Turner.  When Turner later sued New York State for compensation, the state court "conclude[ed] that by clear and convincing evidence Clinton Turner [was] innocent of the crimes charged to the jury."  To date, so far as the public record reflects, Sligh has not been sanctioned for his misconduct, and he continues to practice law in New York State.

50.    Also representative is the Professors' complaint against Charles Testagrossa.  Testagrossa's prosecutorial misconduct led to the wrongful conviction of three defendants. Each was imprisoned for 24 years.  In March 2021, Testagrossa's misconduct was

finally confirmed by a court and the convictions were reversed.  The presiding judge concluded that Testagrossa – who was still a prosecutor 24 years later – had lied to the court in defending his conduct. The judge stated, "This was, in short, not a good-faith misstatement; it was a deliberate falsehood."  *People v. Bell*, 71 Misc. 3d 646, 664 (N.Y. Sup. Ct. 2021).  Based on Testagrossa's misconduct, the Queens District Attorney dropped the charges against the three men on June 4, 2021.  To date, so far as the public record reflects, Testagrossa has not been sanctioned for his misconduct, and he continues to practice law in New York State.

    51.    Recognizing that one of the failures of New York's disciplinary proceedings was pervasive and unnecessary secrecy, the complaints urged that the proceedings be conducted in public.  "For the legitimacy of and public trust in the criminal system, and the bar, the investigation should be public at every stage possible."  Moreover, the complaints called for more expansive investigations of prosecutorial misconduct, also to be conducted in public. "[W]e also call for the implementation of an independent public commission empowered to investigate all cases handled by this prosecutor and vacate convictions where appropriate.  To be clear, we do not mean a closed-door, cloaked process at the Queens District Attorney's Office, but rather a commission that operates transparently and includes members of the public, including members of impacted communities of color, public defenders and other criminal defense attorneys, civil rights attorneys, and people who have been incarcerated and their loved ones."

    52.    To bring awareness to their complaints and to the pervasive failure to discipline prosecutors for misconduct, Plaintiffs created a website, AccountabilityNY.org, and posted the full text of their complaints.  The website's homepage provides an overview of the problem of prosecutorial misconduct and notes that the "majority of these violations are likely never discovered or disclosed to New Yorkers."  It continues: "The biggest reason prosecutorial

misconduct continues to be widespread is that courts, district attorneys, and bar associations rarely hold prosecutors accountable for their misconduct." Thus, the website explains, "Accountability NY – a group of law professors and activists with the support of Civil Rights Corps – filed grievances in instances where New York courts found prosecutors committing misconduct and those prosecutors had not yet faced public discipline. In the grievances, the professors urge the Grievance Committees to act." *See* https://accountabilityny.org/.

53.     In addition to disseminating information on prosecutorial misconduct and publishing the Professors' complaints, the website also encourages visitors to put public pressure on grievance committees to hold prosecutors accountable for misconduct. There is a red button in the website's navigation bar that says, "Take Action." *See* https://accountabilityny.org/complaints/. A suggested action is to send an email to "your Grievance Committee" saying "I am deeply concerned by prosecutorial misconduct in New York City. I ask that you please hold prosecutors publicly accountable when they violate the rights of New Yorkers. Thank you for making a more accountable New York."

54.     The website also contains a link to a "social media toolkit" with draft messages and images that concerned members of the public can post on social media to express support for holding prosecutors accountable when they engage in misconduct. *See* https://accountabilityny.org/wp-content/uploads/2021/06/AccountabilityNY-Toolkit-2.pdf.

**D.     Defendants Threaten and Retaliate Against the Professors For Engaging in Protected Speech**

**1.  The Corporation Counsel's Threats**

55.     On June 2, 2021, James E. Johnson, then the Corporation Counsel for the City of New York, sent an extraordinary letter to each grievance committee before which the Professors had filed their complaints. A copy of each letter was also sent to the Law Professors. Other than the names of the relevant grievance committee to which the letter was directed and

the subject attorney, the substance of the letters is identical.  An example letter is attached under seal to this complaint as Exhibit 1.

56.     In the letter, the Corporation Counsel makes clear that he is acting in his official capacity under color of state law.  He explains that he is writing in his capacity as the Chief Legal Officer of the City of New York and also as counsel to the Queens District Attorney. Defendant Melinda Katz.  The letter then "express[es] my deep concern" about the grievance complaints filed by the Law Professors regarding present and former Queens Assistant District Attorneys.  Ex. 1 at 1.

57.     In inflammatory language, the Corporation Counsel then accuses the Law Professors of violating "the law and the principles on which the grievance process is based"—in particular, Judiciary Law § 90(10)—because the Professors' complaints are part of a "public campaign."  *Id.*  The Corporation Counsel asks the grievance committee members to "consider the manner in which [each complaint] was filed" as they review that complaint—implying that the complaint should be disregarded, or the Professors sanctioned, or both—because the complaints were filed as part of "an orchestrated campaign to upend the attorney grievance process to advance [the Law Professors'] stated goal of holding prosecutors accountable."  Ex. 1 at 1-2.

58.     In the letter, the Corporation Counsel accuses the Law Professors of engaging in unethical conduct by simultaneously filing the complaints with the grievance committee and at the same time publishing the complaints and advocating for reform.  He accuses the Professors of "misus[ing] and indeed abus[ing]" the grievance process "to promote a political agenda," which is "harmful to the profession and the process and should not be countenanced."  *Id.* at 2-3.  Repeatedly citing Judiciary Law § 90(10), he claims that the "law professor complainants should well know" that "the grievance process is not the proper venue"

for achieving systemic reform, and that they should have instead addressed their advocacy "to the legislature, the courts, and the Bar at large." *Id.* at 3.  The approach taken by the Professors, according to the Corporation Counsel, "is both abusive and wrong." *Id.*

59.     Nowhere in his letter on behalf of the City of New York and the Queens District Attorney does the Corporation Counsel explain why there is any inconsistency between filing well-documented complaints that should be acted upon and publicly advocating for reform of the disciplinary process.  Nor does he explain why what the Law Professors are doing is not fully within their First Amendment rights, which should protect them from such governmental harassment.  Indeed, he does not even deny that the Law Professors' complaints document real, pervasive and unchecked misconduct in the Office of the Queens District Attorney or that it is the public interest to raise such issues.  In fact, he does not dispute anything of substance any of the professors complaints; he actually goes out of his way to say that he is "taking no position on the substance of the allegations involving the individual ADAs."

60.     The Corporation Counsel's letter to the Grievance Committee expresses particular ire about the Law Professors' decision to publish their complaints on the Accountability NY website to help educate the public about this State's plague of prosecutorial misconduct.  He claims that the Law Professors have violated the law—suggesting that they should be punished—because, he says, Judiciary Law § 90(10) makes attorney disciplinary records "including the complaint" private and confidential.

61.     The supposed secrecy of a complaint by a member of the public would be news to the many aggrieved parties who, exercising their First Amendment rights, have told relatives, colleagues, and the press about the complaints they have filed about particular lawyers. It would also be news to those who filed complaints with grievance committees with respect to Rudolph Giuliani over his role in the 2020 election and January 6, 2021 Capitol riots, and then

published their complaints widely in the press.  The list of these individuals—whom the Corporation Counsel would also presumably dub lawbreakers acting in a manner "harmful to the profession"—reads like a Who's Who of the American bar, including retired federal and state judges, former federal and state prosecutors, past presidents of the American Bar Association, and the like. Particularly relevant here, it included 20 retired New York State judges and seven former members of New York State Grievance Committees.

62.     Speaking for the City of New York and the Queens District Attorney, the Corporation Counsel found it particularly offensive that the Law Professors were not personally the victims of the alleged misconduct and that their complaints were all documented from the public record.  They "readily concede," he says, that they have "no first-hand knowledge" the misconduct that is copiously documented in their complaints.  The letter does not explain why the grievance process is, or should be, limited to complaints from victims.  In particular, the letter ignores the fact that the attorney's reporting obligations are far broader.  As the New York State Bar Association has made clear, "a lawyer is always free to report evidence of what may constitute improper conduct by another attorney."  New York State Bar Assoc., Committee on Professional Ethics, Opinion 854 (March 11, 2011).  All that is needed is "a good faith belief or suspicion that misconduct has been committed."  *Id.*  There was no impropriety in the Law Professors' relying on judicial findings of prosecutorial misconduct.

63.     The Corporation Counsel's letter calling the Law Professors unethical is not simply an idle threat to them.  Rather it involves some of the most powerful figures in the New York legal community.  The letter itself is on behalf of the City of New York and the Queen District Attorney.  Meanwhile, the grievance committees to which he wrote are empowered to investigate and punish the Law Professors—each of whom is admitted to and an active member of the New York bar—for any breaches of professional conduct.  By stating that

the Law Professors had violated the law and were knowingly "abusing" the judicial process in violation of Judiciary Law § 90(10) the Corporation Counsel was accusing the Law Professors of violating (at the least) New York Rule of Professional Conduct 8.4(d) ("A lawyer shall not engage in conduct that is prejudicial to the administration of justice").  And by insisting that the Professors' conduct "should not be countenanced," the Corporation Counsel was suggesting that the grievance committees investigate and punish the Professors for their supposed breach.

64.    The Corporation Counsel also made it clear that he was not yet finished with his campaign of threats and harassment.  He said that "at this juncture" all he was doing was alerting the grievance committees to the fact that the Law Professors were engaged in a "very public campaign" that supposedly "runs afoul of the confidentiality provisions of the law and the purpose of the grievance process."  But he asserted ominously that all five of  New York City's five district attorneys—and the Special Narcotics Prosecutor as well—are supposedly "concerned about this abuse of the grievance process."   And he threatened that if the Professors "continue on their quest to publicly disclose grievance complaints," he may be "compelled" to continue his abusive threats, wrongful accusations of misconduct and demands for punitive action against the Law Professors.  *Id.*

65.    The Law Professors have published their complaints, and aired their mission, relying on the dictum that "sunlight is the best disinfectant" and it is sorely needed here to help rehabilitate the New York grievance process.  The Corporation Counsel apparently believes the opposite and, in particular, that the people of New York should not know about his outrageous effort to interfere with the Law Professors exercise of their First Amendment rights. He ends his letter by insisting that it is, for some reason, "private and confidential under Judiciary Law 90(10)."  And he adds yet another threat:  "any disclosure of this letter" by the Professors "would be unlawful under the Judiciary Law."  Ex. 1 at 3, n. 4.  (As a result of this

threat and another from the current Corporation Counsel, Plaintiffs have filed these letters and other related correspondence under seal).

66.     In response to complaints from the Law Professors about this baseless effort to threaten them for their exercise of their First Amendment rights (Exs. 3 & 4), New York City's chief legal counsel wrote again to the Grievance Committee on July 8, 2021. Ex. 5.  In this later letter addressed to the Grievance Committee for the Second, Eleventh & Thirteenth Judicial Districts, the Defendant Corporation Counsel Georgia Pestana (Mr. Johnson having resigned) apparently recognized that the Law Professors were entitled to publish their complaints, but she maintained—albeit in softer language—that the Law Professors were improperly "using the confidential grievance process to wage a public campaign for prosecutorial reform."  This supposed abuse of the process—publicly filing complaints in an attempt to seek reform of the disciplinary process while at the same time bringing ethical violations to the attention of the Grievance Committee—required the Grievance Committee to "consider this context" in addressing the complaints.  As before, the Corporation Counsel did not attempt to defend the accused prosecutors, even while implicitly suggesting that the Grievance Committee not treat the complaints seriously.  And, as before, the Defendant Corporation Counsel insisted that under Judiciary Law § 90(10) her letter—the views of the chief legal officer of New York City writing on behalf of the City of New York and the Queens District Attorney, Defendant Katz, about a matter of great public importance—must be treated as secret and withheld from the public.

67.     The July 8, 2021 letter did add one more allegation of supposed misconduct by the Plaintiffs.  The Corporation Counsel noted that the Accountability NY website, maintained by Plaintiff Civil Rights Corps, allows members of the public to "create automated emails" that can be sent to grievance committees, asking that prosecutors be held "publicly accountable when they violate the rights of New Yorkers."  The Corporation Counsel

seems to suggest this is somehow improper.  According to the letter, that is because "these emails do not identify any attorney or any alleged misconduct, but merely express a policy position about accountability."  The letter does not identify why the First Amendment does not fully protect any such communications with the Grievance Committee or why they are in any way improper.  Nor does it explain why it is somehow wrong to ask members of the public to lobby the Grievance Committee to do its job.  Ironically, the Corporation Counsel seemingly believes that it is proper for her to communicate to the Grievance Committee about matters of public policy without focusing on "any attorney or any alleged misconduct"—as is true of both Corporation Counsel letters—but somehow improper for members of the public to do the same.

### 2.  The Grievance Committee Excludes the Law Professors From the Process

68.     The Law Professors had filed their complaints in strict compliance with the rules set forth in 22 N.Y.C.R.R. § 1240.  Under the rules, the Law Professors were the "complainants," a defined term that simply means "a person or entity that submits a complaint to a Committee."  22 N.Y.C.R.R. § 1240.2(e).  Complainants are entitled to certain rights and information under the law.  This includes notification of the disposition of the matter, the ability to appeal a disposition, and notification of the outcome of the challenge.  22 N.Y.C.R.R. § 1240.7(d), (e).  In practice, complainants are automatically given a copy of any response filed by the accused attorney for comment.  When they filed their complaints on May 3, 2021, the Law Professors had every right to expect that they would receive all of these rights with respect to the 21 complaints that they filed.

69.     Nothing happened for over a month after the complaints were filed.  Then, as outlined above, on June 2, 2021, the Corporation Counsel wrote to the Grievance Committee accusing the Law Professors of "misus[ing] and indeed abus[ing]" the grievance process in violation of Judiciary Law § 90(10).  On behalf of the City of New York and the Queens District

Attorney, the Corporation Counsel urged the Grievance Committee to take adverse action against the Law Professors or their complaints—to "consider the manner in which [each complaint] was filed" and "this broader context as you evaluate [each] complaint."

70.     With these outrageous allegations before it from the city's chief legal officer, the Grievance Committee did take adverse action against the Professors.  It baselessly denied the Law Professors their statutory right to participate in the review process by denying them their statutory status as "complainants."  On June 11, 2021, just 9 days after the Corporation Counsel's letter, Defendant Kearse, Chief Counsel of the Grievance Committee, wrote a letter to the Law Professors.  Ex. 2.  The letter is on the official letterhead of the Grievance Committee.  On information and belief, the letter was sent with the approval of Defendant Andrea Bonina, chair of the Grievance Committee.  The upshot of Defendant Kearse's letter is that the Grievance Committee is ***not*** going to treat the Law Professors as complainants and the Professors will ***not*** receive the information to which complainants are entitled under the law.

71.     Seizing on the fact—previously emphasized by the Corporation Counsel— that the complaints are all "based on information derived from public sources," Defendant Kearse asserted without elaboration that—supposedly for that reason—the Professors were not complainants and instead "any investigations into these allegations would be initiated by the Grievance Committee, *sua sponte*."  The Law Professors would have not access to the process, which would instead "remain confidential pursuant to New York State Judiciary Law § 90".  Defendant Kearse even refused to confirm "whether any investigations will or will not be pursued," leaving the Professors out in the cold.  *Id.*  This was all double-talk designed to penalize the Law Professors for asserting their First Amendment rights and to exclude them from the process that they initiated and to which they are entitled to participate.

72.     The Grievance Committee does have the right to institute an investigation "*sua sponte*."  22 N.Y.C.R.R. § 1240.7(a)(1).  But those words mean "on its own motion," an action undertaken without formal prompting from another party.  Of course, the Grievance Committee can undertake an investigation based on its own—based on something in a newspaper or a judicial opinion.  Sometimes the Grievance Committee may expand the scope of a previously filed complaint on its own initiative.  *See, e.g.*, *In re Mays*, 132 A.D.3d 241, 243 (2d Dep't 2015); *In re Reid*, 149 A.D.3d 114, 115 (1st Dep't 2017).  Sometimes a judge may forward an opinion, but has no interest in participating in the ongoing proceedings as a complainant.  But "*sua sponte*" simply does not describe the facts here.  The Grievance Committee has 21 complaints before it.  They reflect an extraordinary amount of work and include the formal request signed by members of the New York bar that the Grievance Committee investigate their complaints.  It is true that the complaints are based on public records, but there is no reason to think the Committee would otherwise look at those records, which sometimes are years old and had to be collected and assembled with great care, if the complaints had not been filed by the complainants—the Law Professors.  Defendant Kearse cited no authority—and we are aware of none—to refuse to treat a complainant as a complainant.

73.     The principal effect of Defendant Kearse's decision is to exclude the Law Professors from the grievance process, denying them the right of complainants.  In response, the Law Professors noted that Defendant Kearse's letter came on the heels of the Corporation Counsel's baseless attack on them and her decision "suggests that, at the urging of Mr. Johnson, the Committee is rejecting the complaints and taking action against the professors for the exercise of their First Amendment rights." Ex. 6.

74.     On behalf of the Grievance Committee, Defendant Kearse responded with a terse letter sent on July 26, 2021.  Ex. 7.  ***Notably, she did not deny that the Committee action***

*was taken in response to the Corporation Counsel's demands*.  Instead, she asserted that the *sua sponte* review of "complaints filed against attorneys based upon public records" is somehow based on the Rules for Attorney Disciplinary Matters and "the long-standing policy of the Appellate Division, Second Judicial Department."  She cited nothing for this proposition.  And of course, the recent discipline of Rudolph Giuliani was not *sua sponte*, but was based on "numerous complaints of [Mr. Giuliani's] alleged professional misconduct," all based on the public record.  *Matter of Giuliani*, No. 2021-00491, 2021 WL 2583536, at *1 (1st Dep't June 24, 2021).  Indeed, the Grievance Committee's position is a *non-sequitur*.  The logic of Defendant Kearse's position is that when "complaints [are] filed against attorneys based upon public records," there is no complainant.  But if a complaint is filed, the person who filed it is a complainant as defined by, and with rights under, under New York law.  Defendant Kearse's transparent fiction has only one purpose—to exclude the Professors from the ongoing process that their complaints have generated and thereby punish them for exercising their First Amendment rights.

75.     In the ordinary course, a complaint is initially reviewed by the Chief Attorney for the Committee—Defendant Kearse.  She may decline to investigate a complaint for a proper reason, but if she does, the law requires that "[t]he complainant shall be provided with a brief description of the basis of any disposition of a complaint by the Chief Attorney."  22 N.Y.C.R.R. § 1240.7(d).  Thereupon, the complainant has a right to seek reconsideration of the decision by the chair of the Committee, Defendant Bonina.  *Id.* § 1240.7(e)(3).  By treating the Professors' complaints as *sua sponte* inquiries, the professors are denied these rights.  Ms. Kearse can now refuse to investigate the 21 complaints—*and tell no one*.  The Law Professors and the public will be kept in the dark forever.  In effect, in retaliation against the Law Professors for what the Corporation Counsel, and presumably the Grievance Committee, view as an abuse of

28

the grievance process, Defendant Kearse has turned the investigatory process into a black box, in which complaints go in and no one can assess whether anything comes out.  Prosecutors who have violated the law, such as Jesse Sligh and Charles Testagrossa, have dodged any discipline for decades for their misconduct.  The Law Professors and the public have a right to know if the Grievance Committee is prepared finally to intervene.

**E.      On-going Injury**

76.      Unless remedied by the Court, it is impossible to quantify the ongoing injury that the actions of the Corporation Counsel and the Grievance Committee may cause.  The Law Professors have done nothing remotely improper.  They have respectfully exercised their First Amendment rights to speak out against flaws in the New York system for attorney grievance and to petition their government for the redress of their grievances.  Their grievances are both particular to named individuals—the failure of the system to discipline the subjects of the 21 complaints filed by the Law Professors, and to do so in public.  And they are general to the system at large—its failure systematically to impose justice on misbehaving prosecutors throughout the state and its wrongful insistence on secrecy.  There is no inconsistency in pursuing those grievances simultaneously.  And public officials—the Corporation Counsel, the Queens District Attorney and the Grievance Committee Chief Counsel and Chair—and the public bodies that they represent have no business threatening or punishing the Professors for their conduct.

77.      The threats and retaliation will continue unless enjoined.  The Corporation Counsel has all but promised more inflammatory accusations if the Law Professors continue filing complaints—as they fully intend to do.  The Corporation Counsel asserts that this endeavor is supported by New York City's five district attorneys and the Special Narcotics Prosecutor, all of whom are supposedly "concerned about this abuse of the grievance process."  Meanwhile, the

Grievance Committee Chief Counsel and Chair will seemingly continue baselessly treating well-documented complaints filed by the Law Professors as not complaints at all and have reserved the right to bury them without public notice.  There is now no reason to expect a good-faith investigation of the accused prosecutors by the Grievance Committee.  Indeed, as matters now stand, the Grievance Committee may actually decide instead to investigate the Law Professors—rather than the prosecutors—for imaginary misconduct.

78.     Even if the Grievance Committee does undertake an investigation based on the Law Professors' complaints, under Judiciary Law § 90(10) that investigation will take place in secret.  On the facts of this case, that is, by itself, a First Amendment violation.  The public has a right to see and hear the proceedings against these disgraced prosecutors in order to judge whether their public servants are performing their jobs and whether justice is being done.  There is no countervailing reason for secrecy here.  The allegations against the prosecutors are already known and part of the public record.  Secrecy serves only to permit justice to be denied.

79.     Meanwhile, for their part, the Law Professors have to assess whether, as members of the bar, they wish to continue to submit themselves to baseless accusations of abuse of the system by law enforcement and other officials, threatening potential disciplinary investigations, when all they are doing is so plainly in the public interest and protected by First Amendment.  The Plaintiff Civil Rights Corps will incur unnecessary difficulty in soliciting more professors to join in its campaign to reform the disciplinary process.  And professors who have not yet submitted a complaint, such as plaintiff Justin Murray, will think twice about whether they want to subject themselves to unnecessary abuse and threatened discipline.

80.     All of this directly harms the public and will continue to do so unless enjoined.  There is already a serious gap in reporting and addressing instances of prosecutorial misconduct.  The prosecutors who misbehave do not have clients who can report them to the

Grievance Committee.  Defense lawyers who may be aware of misconduct must nonetheless engage daily with the Queens District Attorney and her office, and so are discouraged from reporting misconduct for fear that whistleblowing will have a negative effect on their relations with the prosecutors.  And when independent legal experts like the Professors are attacked by powerful government officials for the offense of making public their request that the Grievance Committee do its job, that operates to perpetuate the disrepair of the current system.  All of this erodes the legitimacy of the grievance process and the claim that the bar is able to govern itself. All of these harms above and beyond the direct threat of professional discipline are intangible, but they are real, they are irreparable and they are ongoing.

## FIRST CLAIM FOR RELIEF

### Against Defendants Bonina, Katz, Kearse, And Pestana For Violating Plaintiffs' First Amendment Rights

81.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-80 above with the same force and effect as if fully set forth herein.

82.    The acts of the Corporation Counsel, the Queens District Attorney, the Grievance Committee Chief Counsel and Chair constitute conduct under color of state law that deprived the Law Professors of rights, privileges, and immunities under the First and Fourteenth Amendments to the United States Constitution.

83.    The First Amendment protects the right to "freedom of speech" and to "petition the Government for a redress of grievances."  U.S. Const., amend. I.  "The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment."  *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 750 n.1 (1976).

84.    The state and its officials acting under color of law are barred by the First Amendment from threatening, harassing and retaliating against individuals for engaging in protected speech.

85.    The Law Professors have a First Amendment right to make complaints to the Grievance Committee, to publish these complaints, and to engage in a political activity to encourage greater accountability for prosecutorial misconduct.  These activities involve freedom of speech, freedom to petition the government and freedom of association, all protected by the First Amendment.  They are all matters of compelling public concern.  They cannot be investigated or sanctioned by state officials for engaging in these activities.

86.    The Corporation Counsel, the Queens District Attorney and the Grievance Committee Chief Counsel and Chair have engaged in an ongoing effort to harass, threaten, and punish the Law Professors for their exercise of their First Amendment rights.

## SECOND CLAIM FOR RELIEF

**Against Defendants Bonina And Kearse For Violating the Equal Protection Clause**

87.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-80 above with the same force and effect as if fully set forth herein.

88.    The Equal Protection Clause of the Fourteenth Amendment "requires that the government treat all similarly situated people alike."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

89.    Under New York law, "a person or entity that submits a complaint to [an attorney grievance committee]" is called the "complainant."   22 N.Y.C.R.R. §§ 1240.2(d), 1240.2(e).  Grievance committees do not possess any discretion to deny a person or entity that submits a complaint of their "complainant" status.  A complainant is given certain rights—and the grievance committee certain obligations—in connection with any disciplinary process that

arises from their complaints.  Those rights include notice of grievance committee decisions, the reasons therefor and the right to appeal those decisions.

90.    By determining that any investigations of the misconduct recounted in the Law Professors' complaints would be undertaken "*sua sponte*," the Grievance Committee Chief Counsel and Chair have deprived or threatened to deprive the Law Professors of their status as "complainants" and the rights that flow therefrom, and they have treated the Law Professors differently than other similarly-situated individuals who file grievance complaints.  These actions were undertaken to retaliate against the Law Professors for activities protected by the First Amendment and they deny the Professors equal protection of the law.

### THIRD CLAIM FOR RELIEF

**Against All Defendants For Enforcing New York Judiciary Law § 90(10) In Violation of Plaintiffs' First Amendment Right To Speak Freely Under The United States Constitution And Article I § 8 of the New York State Constitution (As-Applied and Facial Challenge)**

91.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-80 above with the same force and effect as if fully set forth herein.

92.    New York Judiciary Law § 90(10) provides that "all papers, records and documents . . . upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys, shall be sealed and be deemed private and confidential." The same statute allows for public disclosure of such documents only "in the event that charges are sustained by the justices of the appellate division" or "upon good cause being shown."  *Id.*

93.    Insofar as New York State Judiciary Law § 90(10)'s confidentiality provision limits the Professors' right to speak freely, it violates the First Amendment of the United States Constitution and its New  York State counterpart, Article I § 8 of the New York State Constitution.  Section 90(10) cannot constitutionally be applied to preclude the Professors from publishing (1) the 21 complaints they filed and any future complaints they may file, (2) the

letters written by and between Defendants and the Professors regarding those complaints, and (3) any information Plaintiffs may receive from Defendants in the future in connection with those complaints.  When applied to muzzle the Plaintiffs, New York State Judiciary Law § 90(10) is a content-based prior restraint on speech that is not narrowly tailored to serve a compelling government interest.

94.     The Plaintiffs wish to draw public attention to the Grievance Committee's failure appropriately to investigate and discipline prosecutors who engage in misconduct.  New York State Judiciary Law § 90(10) injures them by preventing them from engaging in core political speech and advocacy.

95.     Moreover, if Defendants' interpretation of Judiciary Law § 90(10) is correct, then the law is constitutionally overbroad on its face.  It purports to keep confidential the most mundane and routine communications, from correspondence setting a date for a proceeding to a notice stating the Grievance Committee offices will be closed on a particular date.  On the facts set forth above, that overbreadth is patent.  The Corporation Counsel and the Queens District Attorney contend Judiciary Law § 90(10) bars disclosure of the letters written by the Corporation Counsel on behalf of the Queens District Attorney to the Law Professors.  These letters attack the Law Professors for engaging in First Amendment activities and say nothing at all about the underlying allegations of prosecutorial misconduct that are the subject of the Law Professors' complaints.  Indeed, the letters disclaim taking any position on those allegations at all.  While the letters are surely embarrassing to the Corporation Counsel and the Queens District Attorney, they disclose nothing that can remotely be thought to be confidential.  There is no legitimate governmental interest in keeping such letters confidential.

**FOURTH CLAIM FOR RELIEF**

**Against All Defendants For Enforcing New York Judiciary Law § 90(10) In Violation Of Plaintiffs' Right To Access Government Proceedings And Records Under The First Amendment Of The United States Constitution, Article I § 8 Of The New York State Constitution, and New York Judiciary Law § 4 (As-Applied)**

96.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-80 above as if fully set forth herein.

97.     In addition to explicitly prohibiting the disclosure of "all papers, records and documents . . . upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys," the New York Court of Appeals has also interpreted New York Judiciary Law § 90(10) as mandating confidentiality for attorney disciplinary hearings. *Johnson Newspaper Corp. v. Melino*, 564 N.E.2d 1046, 1050-51 (N.Y. 1990).

98.     The First Amendment of the United States Constitution, Article I § 8 of the New York Constitution, and New York Judiciary Law § 4 provide the public with a qualified right of access to government proceedings and records.  New York Judiciary Law § 90(10)'s confidentiality provision—as applied to any hearing and any materials "upon" any of the 21 complaints Plaintiffs filed—violates the public's right of access.

99.     Attorney disciplinary hearings are "judicial proceedings" and the grievance committees that investigate and hear misconduct complaints act as a "quasi-judicial body" and "an arm of the Appellate Division." *Wiener v. Weintraub*, 29 N.E.2d 540, 541 (N.Y. 1968).  There is a long history in the United States that judicial and quasi-judicial proceedings are open to the public.  New York law affirmatively requires that "[t]he sittings of every court within this state shall be public, and every citizen may freely attend the same."  New York Judiciary Law § 4.  Even if these proceedings were viewed as administrative, rather than judicial or quasi-judicial, they are "administrative hearings at which individual rights are adjudicated,"

which is a type of administrative hearing that has "traditionally been open [to the public]." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 302 n. 12 (2d Cir. 2011).

100.    In New York, attorney disciplinary complaints were historically heard in a public forum: "Petitions or complaints charging professional misconduct of an attorney" that are "now usually filed with the Grievance Committee" were, "in the past," "presented to the General Term of the Supreme Court." *Wiener*, 39 N.E.2d at 541.

101.    In addition to being out-of-step with the state's past tradition of openness, Judiciary Law § 90(10) is an outlier nationally.  As of mid-2014, "the vast majority of jurisdictions open proceedings upon the filing of a formal charge following a finding of probable cause."  The Lippman Commission Report at 62.  "New York is one of only 9 jurisdictions which do not permit public dissemination of information concerning disciplinary proceedings until, at the earliest, a recommendation that discipline be imposed, and usually upon a final adjudication." *Id.*

102.    Even if grievance proceedings involving private disputes can lawfully be conducted in secret, that is the not the case when Judiciary Law § 90(10) is applied here, to keep confidential hearings relating to discipline of the prosecutors charged by the Professors with misconduct.  Both the conduct of prosecutors and the discipline of prosecutors who commit misconduct are issues of great public importance.  Absent access to these proceedings, the public will be unable to determine whether the system currently in place to investigate and discipline prosecutors is effective or if further reforms are needed.

103.    The confidentiality provision of Judiciary Law § 90(10) purportedly "serves the purpose of safeguarding information that a potential complainant may regard as private or confidential and thereby removes a possible disincentive to the filing of complaints of

36

professional misconduct."  It  also purportedly "evinces a sensitivity to the possibility of irreparable harm to a professional's reputation resulting from unfounded accusations."  *Matter of Johnson Newspaper Corp. v. Melino*, 564 N.E.2d 1046, 1051 (N.Y. 1990).  Neither of these concerns applies here.

104.    The Professors have already chosen to publicize their complaints, so there is no need to "safeguard[] information [that the] complainant[s] may regard as private or confidential."  Meanwhile, the Professors' complaints are based on information already in the public record—namely, public findings of prosecutorial misconduct by courts—so the accused prosecutors have already suffered whatever reputational harm may result from their conduct. Moreover, the fact that the complaints are based on judicial findings significantly reduces the risk of "unfounded accusations."   In any event, "injury to official reputation is an insufficient reason 'for repressing speech that would otherwise be free.'"  *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841–42 (1978).  Thus, application of Judiciary Law § 90(10) in this case serves no legitimate government interest whatsoever.

105.    As applied to these facts, the First Amendment of the United States Constitution, Article I § 8 of the New York Constitution, and New York Judiciary Law § 4 require that all records and proceedings arising out of the complaints that the Law Professors have filed, and any similar complaints that they may file, be public.

### FIFTH CLAIM FOR RELIEF

**Against All Defendants Under Judiciary Law § 90(10) Allowing Plaintiffs Access To Disciplinary Records and Proceedings For Good Cause Shown**

106.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-80 above as if fully set forth herein.

107.    Upon a showing of "good cause," Judiciary Law § 90(10) permits the public a right of access to disciplinary proceedings and all records of such proceedings.  Good cause exists here.  The public interest in, and the importance of, disciplining prosecutors for misconduct is intense.  The 21 complaints detail proven instances of misconduct that go back decades without redress.  There are no confidentiality issues at stake.  Meanwhile, the Grievance Committee has shown a willingness to disregard the complaints and keep even the complainants themselves from being apprised of any investigation.  The only way to assure the public that these complaints will be considered promptly and fairly is to let the public in.  Good cause has been shown for opening the proceedings involving the 21 complaints filed by the Law Professors.

## PRAYER FOR RELIEF

The conduct alleged herein, unless and until enjoined by an order of this Court, will cause great and irreparable injury to Plaintiffs.  A judicial declaration is necessary and appropriate at this time so that all parties may know their respective rights and act accordingly.

WHEREFORE, Plaintiffs demand judgment against Defendants:

A.    Declaring that Defendants Bonina, Katz, Kearse, and Pestana's harassment, threats and retaliation against Plaintiffs violate the First Amendment of the United States Constitution;

B.    Preliminarily and permanently enjoining Defendants Bonina, Katz, Kearse, Pestana, and their employees, agents, and any and all persons acting in concert with them from harassing, threatening or retaliating against Plaintiffs because of their exercise of their First Amendment rights;

C.        Declaring that the Defendants Bonina and Kearse unlawfully denied the Law Professors the status of "complainant" as defined in N.Y.C.R.R. § 1240.2(e) in violation of the First and Fourteenth Amendments of the United States Constitution;

D.        Preliminarily and permanently enjoining the Defendants Bonina, Katz, and their employees, agents, and any and all persons acting in concert with them from depriving the Plaintiffs of the equal protection of the law by treating their complaints differently than those of other similarly situated complainants in retaliation for their exercise of their First Amendment rights;

E.        Declaring that Judiciary Law § 90(10) violates the First Amendment of the United States Constitution and Article I Section 8 of the New York State Constitution, insofar as it is applied to prevent Plaintiffs from publishing information that is in their possession or that comes into their possession relating to any complaints of prosecutorial misconduct that they have filed or may file;

F.        Preliminarily and permanently enjoining all Defendants and their employees, agents, and any and all persons acting in concert with them from enforcing or attempting to enforce Judiciary Law § 90(10) to preclude Plaintiffs from publishing information that is in their possession or that comes into their possession relating to any complaints of prosecutorial misconduct that they have filed or may file;

G.        Declaring that Judiciary Law § 90(10) violates the First Amendment of the United States Constitution, Article I, § 8, of the New York State Constitution and New York Judiciary Law § 4 insofar as it is applied to deny public access to any and all records and proceedings that may result from the complaints of prosecutorial misconduct that the Law Professors have filed or may file;

H.      Preliminarily and permanently enjoining all Defendants and their employees, agents, and any and all persons acting in concert with them from enforcing or attempting to enforce Judiciary Law § 90(10) insofar as it is applied to deny public access to any and all records and proceedings that may result from the complaints of prosecutorial misconduct that the Law Professors have filed or may file;

I.      Ordering the Defendants Bonina, Kearse and LaSalle and their employees, agents, and any and all persons acting in concert with them to make public any and all records that may result from the complaints of prosecutorial misconduct that the Law Professors have filed or may file and to hold any and all proceedings arising from those complaints in public;

J.      Declaring that there is "good cause" pursuant to Judiciary Law § 90(10) to unseal and divulge any and all disciplinary proceedings and records that may result from the complaints of prosecutorial misconduct that the Law Professors have filed or may file;

K.      Awarding monetary damages in an amount to be proven at trial of $1 or more;

L.      Awarding Plaintiffs their costs and reasonable attorneys' fees in this action; and

M.      Any other or further relief the Court deems appropriate.

Dated: New York, New York
        November 4, 2021

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

Gregory L. Diskant
Jeffrey F. Kinkle

40

Jeffrey C. Skinner
Jake Walter-Warner
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
gldiskant@pbwt.com
jkinkle@pbwt.com
jskinner@pbwt.com
jwalterwarner@pbwt.com

*Attorneys for the Plaintiffs*