# Figueira Decl.

# Ex. 9

# NYS Commission
## on
## Statewide Attorney Discipline

---

# Enhancing Fairness and Consistency

# Fostering Efficiency and Transparency

---

## Final Report to

## Chief Judge Jonathan Lippman
### the
## Court of Appeals
### and the
## Administrative Board of the Courts

## SEPTEMBER 2015

# Commission on Statewide Attorney Discipline

## CHAIR

### HON. BARRY A. COZIER[1]

Senior Counsel, LeClair Ryan, former Associate Justice of the Appellate Division, Second Judicial Department

## VICE CHAIR

### PROF. W. BRADLEY WENDEL[2]

Professor of Law, Cornell University Law School

## MEMBERS

### HARVEY B. BESUNDER, ESQ.

Partner, Bracken Margolin Besunder LLP

### HON. JAMES M. CATTERSON

Special Counsel, Kaye Scholer LLP, former Associate Justice, Appellate Division of the Supreme Court, First Judicial Department

### RONALD M. CERRACHIO, ESQ.

Chief Clerk, Richmond County Surrogate's Court and Member, Grievance Committee, Appellate Division of the Supreme Court, Second Judicial Department, Second, Eleventh and Thirteenth Judicial Districts

---

[1] The Commission was chaired by the Hon. A. Gail Prudenti, Chief Administrative Judge, until her resignation on July 30, 2015, when then-Vice Chair Cozier assumed the position of chairman.

[2] On Aug. 10, 2015, Chief Judge Lippman appointed Professor Wendel as vice chair.

**HON. CARMEN BEAUCHAMP CIPARICK**

Of Counsel and Co-Chair, National Appellate Practice Group, Greenberg Traurig LLP, Chair of Mayor's Advisory Committee on the Judiciary and former Senior Associate Judge, New York State Court of Appeals

**LANCE D. CLARKE, ESQ.**

Managing Attorney, Cooke & Clarke and former president, Nassau County Bar Association

**HON. JEFFREY A. COHEN**

Associate Justice, Appellate Division of the Supreme Court, Second Judicial Department

**JOHN P. CONNORS, JR., ESQ.**

Partner, Connors & Connors, P.C. and Chairman, Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts

**RITA DiMARTINO, M.P.A., B.A., A.A.**

Former Vice President of Congressional Relations for AT&T, Member, CUNY Board of Trustees and Member, Grievance Committee, Appellate Division of the Supreme Court, First Judicial Department

**VINCENT E. DOYLE III, ESQ.**

Partner, Connors & Vilardo LLP and former president, New York State Bar Association

**MONICA A. DUFFY, ESQ.**

Chief Attorney, Committee on Professional Standards, Appellate Division of the Supreme Court, Third Judicial Department

**DONNA M. ENGLAND, ESQ.**

Partner, England & England, President, Suffolk County Bar Association

**CHARLOTTE MOSES FISCHMAN, ESQ.**

General Counsel, Kramer Levin Naftalis & Frankel LLP and Special Counsel to the Policy Committee of the Departmental Disciplinary Committee, First Judicial Department

**EMILY F. FRANCHINA, ESQ.**

Founding Partner, Franchina & Giordano, P.C.

**PROF. STEPHEN GILLERS**

Elihu Root Professor of Law, New York University School of Law

**ROBERT J. GIUFFRA, JR., ESQ.**
Partner, Sullivan & Cromwell LLP

**NICHOLAS A. GRAVANTE, JR., ESQ.**
Administrative Partner and General Counsel, Boies, Schiller & Flexner LLP

**ROBERT P. GUIDO, ESQ.**
Executive Director for Attorney Matters, Appellate Division of the Supreme Court,
Second Judicial Department

**SARAH JO HAMILTON, ESQ.**
Partner, Scalise, Hamilton & Sheridan LLP, former Special Trial Counsel and First
Deputy Chief Counsel, Departmental Disciplinary Committee, Appellate Division of the
Supreme Court, First Judicial Department

**SAMANTHA M. HOLBROOK, ESQ.**
Partner, Joyce & Holbrook Law Firm, and Chair of the Appellate Division, Third
Department, Committee on Professional Standards

**PETER JAMES JOHNSON, JR., ESQ.**
President, Leahey & Johnson, P.C., and Chairman, Committee on Character and Fitness,
Appellate Division of the Supreme Court, First Judicial Department

**FREDERICK C. JOHS, ESQ.**
Founding Partner, Lewis Johs Avallone Aviles LLP and Vice Chairman, Grievance
Committee for the Tenth Judicial District

**HON. E. MICHAEL KAVANAGH**
Neutral, National Arbitration and Mediation (NAM) and former Associate Justice,
Appellate Division of the Supreme Court, First and Third Judicial Departments

**DEVIKA KEWALRAMANI, ESQ.**
Partner and General Counsel, Moses & Singer, and Chair of the New York City Bar
Association's Committee on Professional Discipline

**GLENN LAU-KEE, ESQ.**
Partner, Kee & Lau-Kee, and former president, New York State Bar Association

**HAL R. LIEBERMAN, ESQ.**

Partner, Emery Celli Brinckerhoff & Abady LLP, and co-author of "New York Attorney Discipline"

**HON. STEPHEN K. LINDLEY**

Associate Justice, Appellate Division of the Supreme Court, Fourth Judicial Department

**CHRISTOPHER D. LINDQUIST, ESQ.**

Principal Appellate Court Attorney, Appellate Division of the Supreme Court, Fourth Judicial Department

**HON. ANGELA M. MAZZARELLI**

Associate Justice, Appellate Division of the Supreme Court, First Judicial Department

**WILLIAM T. MCDONALD, CPA, M.B.A.**

Partner and Healthcare Department Head, EFP Rotenberg, and Member, Grievance Committee, Appellate Division of the Supreme Court, Fourth Judicial Department, Seventh Judicial District

**SEAN MICHAEL MORTON, ESQ.**

Deputy Clerk of the Court, Appellate Division of the Supreme Court, Third Judicial Department

**HON. EUGENE L. NARDELLI**

Counsel, Boies, Schiller & Flexner LLP, and former Associate Justice, Appellate Division of the Supreme Court, First Judicial Department

**JEROLD R. RUDERMAN, ESQ.**

Of Counsel, Wilson Elser Moskowitz Edelman & Dicker LLP, and Chairman, Grievance Committee for the Ninth Judicial District

**HON. FRED T. SANTUCCI**

Former Associate Justice, Appellate Division of the Supreme Court, Second Judicial Department, and Executive Director, Committee on Character and Fitness, Appellate Division of the Supreme Court, Second Judicial Department

**HON. PETER B. SKELOS**

Partner, Forchelli, Curto, Deegan, Schwartz, Mineo & Terrana, LLP
Former Associate Justice, Appellate Division of the Supreme Court, Second Judicial Department

**SHELDON K. SMITH, ESQ.**

Partner, Nixon Peabody, past president of the Minority Bar Association of Western New York and Member at Large of the Executive Committee to the New York State Bar Association

**EUN CHONG THORSEN, ESQ.**

Associate, Vishnick McGovern Milizio LLP, Vice President, Korean American Lawyers Association of Greater New York and Member, Committee on Character and Fitness, Appellate Division of the Supreme Court, Second Judicial Department

**MILTON L. WILLIAMS, JR., ESQ.**

Partner, Vladeck, Raskin & Clark

**AKOSUA GARCIA YEBOAH**

Senior Information Technology Project Manager, City of Albany, and Member, Committee on Professional Standards, Appellate Division of the Supreme Court, Third Judicial Department, Third Judicial District

**MARK C. ZAUDERER, ESQ.**

Partner, Flemming Zulack Williamson Zauderer LLP

## *COUNSEL*

**MATTHEW G. KIERNAN, ESQ.**

Special Counsel to the Chief Administrative Judge

## *STAFF*

**ANGELA J. BADAMO, ESQ.**

Assistant Deputy Counsel, Office of the Chief Administrative Judge

**JOHN M. CAHER**

Senior Advisor for Strategic Communications

# TABLE OF CONTENTS

Executive Summary ................................................................................. 1

I.  Introduction .................................................................................... 5

    A. Legal Authority .................................................................. 12

    B. The Purpose of Discipline .................................................. 13

    C. The Matter of Delay ........................................................... 16

    D. Uniformity in Interim Suspensions and the Relationship to Delay ...... 17

    E. ABA Model Rules for Lawyer Disciplinary Enforcement ................... 17

II. Recent History of Attorney Discipline in New York ....................................... 19

III. Recent Efforts at Reform ............................................................. 25

IV. The Commission's Work ................................................................. 29

    A. Initial Steps ...................................................................... 29

    B. Public Outreach .................................................................. 30

    C. Public Hearings .................................................................. 31

V. Report of the Subcommittee on Uniformity and Fairness ............................... 37

    A. Uniformity and Fairness in Procedure .................................... 38

    B. Uniformity and Fairness in Sanctions .................................... 38

    C. Discovery and Disclosure ..................................................... 40

    D. Conclusion ........................................................................ 42

VI. Report of the Subcommittee on Enhancing Efficiency ................................. 49

    A. Methodology ...................................................................... 49

    B. Summary of Evidence .......................................................... 50

C. Issue 1: Is There Undue Delay? ........................................................... 54

D. Issue 2: Potential Causes of Undue Delay ............................................ 54

E. Conclusion ............................................................................................ 56

VII. Report of the Subcommittee on Transparency and Access ........................... 61

A. Other Jurisdictions ............................................................................... 62

B. Mechanics .............................................................................................. 62

C. Dissemination of Information ............................................................... 64

D. Confidentiality ...................................................................................... 65

E. Filing of Formal Charges ...................................................................... 66

F. Conclusion ............................................................................................. 67

G. The Position of the Full Commission on a More Open System ............ 71

H. Subcommittee Recommendation on Transparency and Access .......... 72

VIII. Other issues .................................................................................................. 75

A. Prosecutorial Misconduct ..................................................................... 75

B. Dealing with Attorney Mental Illness and Addiction .......................... 79

IX. Conclusion ...................................................................................................... 81

Acknowledgments .................................................................................................. 83

Appendices (available online) ............................................................................... 85

Appendix 1: List of subcommittees and members .................................... 85

Appendix 2: Notice of Public Hearings ................................................... 85

Appendix 3: Gillers article, "Lowering the Bar: How Lawyer
Discipline in New York Fails to Protect the Public" ................................. 85

Appendix 4: Simon article Part 1, "Confidential Disciplinary Proceedings & First Amendment" ............................................................. 85

Appendix 5: Simon article Part 2: "Confidential Disciplinary Proceedings & First Amendment" ............................................................. 85

Appendix 6: Podcast Interview with Judge Barry Cozier and transcript ... 85

Appendix 7: Abel article 1, "Lawyers in the Dock: Learnings from Attorney Disciplinary Proceedings" ............................................................ 85

Appendix 8: Abel article 2, "Lawyers on Trial: Understanding Ethical Misconduct" ........................................................... 85

Appendix 9: Scalise article, "Ethically Dealing with Clients, Witnesses and Attorneys with Diminished Capacity" .............................. 85

Appendix 10: Letter from New York City Bar re uniform diversion rules 85

Appendix 11:  Letter from Ellyn Rosen and Nancy Cohen, members of ABA Standing Committee on Professional Discipline .......... 86

Appendix 12: Albany Public Hearing Transcript ...................................... 86

Appendix 13: Buffalo  Public Hearing Transcript .................................... 86

Appendix 14:  New York City Public Hearing Transcript ........................ 86

# EXECUTIVE SUMMARY

In March 2015, Chief Judge Jonathan Lippman created the Commission on Statewide Attorney Discipline to conduct a comprehensive review of New York's attorney disciplinary system to determine what is working well, what can work better and to offer recommendations to enhance the efficiency and effectiveness of New York's attorney discipline process.

Among the issues considered by the Commission were whether New York's current departmental-based system leads to regional disparities in the implementation of discipline; if conversion to a statewide system is desirable; the point at which disciplinary charges or findings should be publicly revealed; and, how to achieve dispositions more quickly to provide much needed closure to both clients and attorneys.

After rigorous deliberation, three public hearings in different regions of the state and input from a myriad of stakeholders—legal consumers, lawyers, bar associations, affinity and specialized bar groups, advocates and others—the Commission recommends, through consensus[3], a series of critical reforms, including but not necessarily restricted to the following:

1. Approval by the Administrative Board of the Courts, and by each Department of the Appellate Division, of statewide uniform rules and procedures governing the processing of disciplinary matters at both the investigatory and adjudicatory levels, from intake through final disposition, which strike the necessary balance between facilitating prompt resolution of complaints and affording the attorney an opportunity to fairly defend the allegations. These new rules and procedures

---

[3] The Commission's recommendations reflect a clear consensus view. Although the Commission was unanimous in its approval of the majority of proposals, there are members who disagree with certain recommendations or portions thereof.

should include uniform discovery rules and information-sharing for attorneys who are the subject of a disciplinary complaint. This recommendation is of the highest priority and a firm deadline for adoption should be established.

2. Adoption of guidelines modeled after the ABA Standards for Imposing Lawyer Sanctions to ensure more consistent, uniform results statewide.

3. Amendment of the current rules of the Appellate Division to expressly authorize each disciplinary committee to seek, either separately or in conjunction with an application for interim suspension and upon notice to the affected attorney, an order unsealing proceedings to permit the publication of charges pursuant to Judiciary Law §90(10), upon a finding by the Court that the attorney's conduct places clients at significant risk or presents an immediate threat to the public interest. The amendment would be approved by the Administrative Board of the Courts and approved by each Department of the Appellate Division.

4. Implementation of a statewide diversion/alternatives to discipline program to address matters involving alcohol, substance abuse and mental illness.

5. Revision of court rules to uniformly allow for "administrative" suspension and reinstatement of attorneys who are delinquent in timely registering or paying registration fees. Such "administrative" suspension should occur automatically after a period of delinquency and following written notice to the attorney. In revising these rules, particular attention should be paid to streamlining the process as well as to enhancing coordination and the exchange of information between each Department of the Appellate Division and the Office of Court Administration (OCA).

2

6.  Creation of a more easily accessible, searchable, consumer-friendly, statewide
    website geared toward the legal consumer. Critical information, such as where to
    file a grievance, should be available in languages in addition to English.
    Consideration should also be given to establishing a telephone "hot line" to
    accommodate individuals who do not have access to the internet.

7.  Revision of court rules and procedures to allow "plea bargaining," or discipline
    upon consent, to encourage prompt resolution of disciplinary charges, where
    appropriate.

8.  Action by the Administrative Board of the Courts to ensure that judicial
    determinations of prosecutorial misconduct are promptly referred to the
    appropriate disciplinary committee. Further, appropriate record management
    practices and procedures should be revised (or adopted) to allow each Department
    of the Appellate Division to better record and track disciplinary matters involving
    prosecutorial misconduct with a view toward generating annual statistical reports.

9.  Establishment of a new position of Statewide Coordinator of Attorney Discipline.
    The Coordinator would function as a liaison/ resource for each Department of the
    Appellate Division. The precise powers and functions of the new position are to
    be further defined by the Administrative Board of the Courts. The Commission
    envisions, however, that the Coordinator would be tasked with assisting the
    Administrative Board of the Courts in fostering uniformity in procedures and
    sanctions, encouraging communication and consistency among the Departments
    of the Appellate Division, producing an annual statistical report providing
    statewide data on the administration of attorney discipline, and recommending

3

ongoing reforms as deemed necessary. The need for this position is immediate and the Administrative Board of the Courts should select a suitable candidate as soon as is practicable.

10.  Appointment of members to a Statewide Advisory Board on Attorney Discipline, consisting of volunteers from around the state, to assist in implementing these recommendations and to study and propose additional recommendations to further the goals of uniformity, transparency and efficiency in the attorney disciplinary system.

11. Increase to funding and staffing across-the-board for the disciplinary committees.

# Report of the Commission on Statewide Attorney Discipline

## I. Introduction

As officers of the court, all attorneys are obligated to maintain the highest ethical standards, consistent with the New York Rules of Professional Conduct (Rules) as adopted by the Appellate Division of State Supreme Court and published as Part 1200 of the Joint Rules of the Appellate Divisions (22 NYCRR Part 1200). The preamble to the Appellate Division-adopted Rules clearly articulates the weighty responsibility attorneys carry by virtue of being granted an exclusive license to practice law:

> A lawyer, as a member of the legal profession, is a representative of clients and an officer of the legal system with special responsibility for the quality of justice. As a representative of clients, a lawyer assumes many roles, including advisor, advocate, negotiator, and evaluator. As an officer of the legal system, each lawyer has a duty to uphold the legal process; to demonstrate respect for the legal system; to seek improvement of the law; and to promote access to the legal system and the administration of justice. In addition, a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because, in a constitutional democracy, legal institutions depend on popular participation and support to maintain their authority.[4]

---

[4] See "New York Rules of Professional Conduct," effective as of April 1, 2009, (https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=50671)

Attorneys who violate that trust risk discipline ranging from a private admonishment to a public censure to suspension to disbarment. However, as the Court of Appeals has made plain, the attorney disciplinary process is designed principally as a consumer protection measure.[5] With both the Rules and the Court of Appeals' interpretation of those strictures in mind, the Commission sought to address the broad question of whether New York's system of attorney discipline adequately protects the consuming public and the administration of justice, promotes the integrity and reputation of the bar and the public's confidence in the legal system, encourages adherence to high ethical standards and discourages misconduct—or if we can do better. To put it simply, we can indeed do better and we can make a functional system more efficient, more transparent, more responsive, more consistent and more credible with the public at large.

At the outset, it is important to note that New York has a uniquely decentralized system for handling attorney grievances, with four different sets of procedures administered by eight regional grievance offices. Virtually every jurisdiction outside New York has a central body responsible for attorney oversight. However, in New York professional conduct is managed independently by the four departments of the Appellate Division of State Supreme Court, each with its own distinctive nomenclature and rules:

- The First Department in New York County addresses attorney misconduct in Manhattan and the Bronx through a "Departmental Disciplinary Committee" under the Rules and Procedures of the Departmental Disciplinary Committee of the First Department, 22 NYCRR §§ 603, 605 (http://www.courts.state.ny.us/courts/AD1/Committees&Programs/DDC/index.shtml).

---

[5] See *Levy v. Association of the Bar of New York*, 333 N.E. 2d 350, 1975.

- The Second Department, based in Brooklyn, has jurisdiction over discipline in 10 downstate counties, including three within the City of New York, and administers that responsibility through a Grievance Committee for the 2nd, 11th and 13th Judiciary Districts plus a Grievance Committee for the 9th Judicial District and a Grievance Committee for the 10th Judicial District as set forth in 22 NYCRR Part 691.1-691.25 (https://govt.westlaw.com/nycrr/Browse/Home/NewYork/NewYorkCodesRulesandRegulations?guid=Ice3dde60bbec11dd8529f5ff2182bffa&originationContext=documenttoc&transitionType=Default&contextData=(sc.Default)).

-  In the Second Department, each Grievance Committee investigates misconduct complaints. Each Committee has the authority to serve charges and conduct a hearing, or it can ask the Appellate Division to institute formal disciplinary proceedings.

- In the Albany-based Third Department, which handles attorney discipline in 28 upstate counties, the tasks associated with disciplinary matters are assigned to the "Committee on Professional Standards" and the investigative duties are executed by the professional staff of the Committee under its supervision (see 22 NYCRR Part 806) to conduct investigations (http://www.courts.state.ny.us/ad3/cops/COPSRules.html).

- The Fourth Department, based in Rochester, has jurisdiction over attorney discipline in Central and Western New York through the "Grievance Committees" for the 5th , 7th and 8th judicial districts [see 22 NYCRR Part 1022.17-2.8, https://govt.westlaw.com/nycrr/Browse/Home/NewYork/NewYorkCodesRulesan

7

dRegulations?guid=Id32f95d0bbec11dd8529f5ff2182bffa&originationContext=d
ocumenttoc&transitionType=Default&contextData=(sc.Default]).  Investigations
are conducted by the Committees and their legal staff.

The separate disciplinary bodies in the four Departments screen and investigate the
thousands of complaints that are filed each year alleging an array of attorney misconduct from
neglect of client matters and misappropriation of funds, to dishonesty and deceit in matters
before the courts, and criminal behavior. Consistently, more than 90 percent of the complaints
are dismissed.[6] Others are resolved at the committee level when the misconduct does not warrant
formal action by the court. But hundreds do annually result in formal disciplinary proceedings.
Following these proceedings, each Department may issue sanctions ranging from public censure
to suspension from the practice of law, to disbarment. Each Department, while bound by the
same rules, operates independently, applying its own procedures. To this day, the state lacks a
single definition on what constitutes professional misconduct.[7]

There are innumerable procedural inconsistencies, including the following examples: [8]

---

[6] See the annual reports of the New York State Bar Association Committee on Professional Discipline
(https://www.nysba.org/copdannualreports/).

[7] Although the language varies, the departments generally define professional misconduct the same way. However,
the First Department adds a paragraph to define misconduct by law firms, a provision that the other three
departments do not use. The provision in the First Department's court rules reads as follows: "Any law firm that
fails to conduct itself in conformity with the Rules of Professional Conduct (22 NYCRR. Part 1200) with respect to
conduct on or after April 1, 2009, or the former Disciplinary Rules of the Code of Professional Responsibility
pertaining to law firms with respect to conduct on or before March 31, 2009, shall be guilty of professional
misconduct within the meaning of subdivision 2 of section 90 of the Judiciary Law." See Rules of the Court,
sections 603.2, 691.2, 806.2 and 1022.7.

[8] For a more thorough discussion of the disparities, see Aug. 11, 2015 letter from Ellyn S. Rosen, Deputy Director,
American Bar Association Center for Professional Responsibility, and Nancy Cohen, partner, MiletichCohen PC,
Denver, http://www.nycourts.gov/attorneys/discipline/resources.shtml.

- The First and Second departments do not allow respondent attorneys to present oral arguments in disciplinary hearings, while the Third and Fourth departments do.

- Only the First Department conducts disciplinary proceedings with hearing panels.

- The Second, Third and Fourth departments have diversion programs for attorneys with a documented drug or alcohol addiction, but there is no such provision in the First Department.

- The First Department specifically provides for law firm discipline; the other three departments do not.

- In the First Department, the filing of formal charges requires approval of only two members of a policy committee; in the Second, Third and Fourth departments charges can be lodged only by the grievance or disciplinary committee itself.

- Complaints in the First Department can be dismissed after review of the chief attorney's recommendation by a single attorney member of the Disciplinary Committee. In the Second Department, a majority vote of the entire Grievance Committee is required. The Third Department's Committee on Professional Standards makes all dismissal decisions. And in the Fourth Department, the chief counsel or his/her designee can dismiss a charge after consulting with the Grievance Committee chair.

- Only the Third Department mentions the standard of proof necessary to sustain a misconduct charge (clear and convincing evidence). The other departments make no mention of standard of proof.

9

- An attorney in the First Department who is suspended for failing to cooperate with the Departmental Disciplinary Committee can be summarily disbarred if he or she does not apply for reinstatement within six months. There is no such rule or practice in the other three departments.

- The First and Second departments require attorneys to certify during their biennial registration that they are in compliance with rules governing escrow funds. The Third and Fourth departments do not have such a rule.

- The First and Second departments have adopted audit rules authorizing the random examination of financial records of attorneys in their jurisdiction. There is no such provision in the Third or Fourth department.

- The Second, Third and Fourth departments all authorize their respective grievance committee to issue a confidential letter of caution to attorneys in their jurisdiction, and the Third Department also authorizes a "letter of education"[9] to an offending attorney. The First Department does not permit cautionary or educational letters. However, it does issue "dismissals with guidance."

For many years, that fragmentation has prompted concerns that the attorney disciplinary process in New York is replete with regional disparities in the implementation of discipline and imposition of sanctions, raising obvious questions: Will the same or similar conduct in one region result in the same or similar discipline in another region, or are there unacceptable disparities in the way punishment is meted out by the Appellate Division departments?; Are

---

[9] See 22 NYCRR §806.4 (c)(iv).

10

consumers better protected in some areas and in some types of grievances in one region than another?

That confusion is exacerbated by the fact that disciplinary decisions are frequently terse and lacking even minimal detail that would enable the public to understand why a particular sanction was appropriate in a particular case. With so little information it is impossible to know whether the seemingly light sanction is defensible.

Additional concerns have been raised regarding lengthy delays between the time the alleged misconduct comes to the attention of the disciplinary committees and resolution. This breeds troublesome uncertainty for both clients and attorneys, the former whose interests may be prejudiced during the lengthy pendency of a disciplinary complaint, and the latter who may be significantly hindered when renewing malpractice insurance policies or seeking to change jobs. Prolonged delays can also result in lawyers who will and should be suspended or disbarred continuing to practice for years—and in some cases, continuing to engage in professional misconduct—before a sanction is implemented (despite existing rules permitting the interim suspension of attorneys who may pose a risk to clients), putting the consuming public at risk. Approximately 1 percent of the attorney-orchestrated thefts reimbursed by the Lawyers' Fund for Client Protection were committed by attorneys who were the target of pending disciplinary proceedings, [10] a fact likely unknown by the consumer because of existing confidentiality rules. Granted, that is a very small percentage and involves only 28 of 3,479 awards processed over a seven-year period.[11] Regardless, delay cost clients—and eventually the Lawyers' Fund— $131,000.[12]

---

[10] See the testimony of Timothy J. O'Sullivan, executive director and counsel to the Lawyers' Fund, at page 11 of the transcript of the July 28 public hearing.
http://www.nycourts.gov/attorneys/discipline/Documents/AlbanyTranscript.pdf

[11] Ibid.

[12] Ibid.

Finally, New York deviates from the prevailing practice of opening the disciplinary process to the public on a finding of probable cause or sooner. New York does not make the discipline public unless and until a court imposes public discipline, a practice contrary to the ABA Model Rules for Lawyer Disciplinary Enforcement and inconsistent with the policies in a majority of states.[13] This practice, along with the relative difficulty of finding records of public discipline, has led critics to raise concerns about transparency and access, and created an atmosphere of public suspicion and skepticism. To begin addressing these concerns, the court system recently launched a more comprehensive "Attorney Directory," accessible directly on the Unified Court System's website, which provides attorneys' disciplinary history dating back decades and links readers to disciplinary orders issued since 2003 (see https://iapps.courts.state.ny.us/attorneyservices/search).

### A.  Legal Authority

The jurisdiction for attorney discipline is articulated in §90 of the Judiciary Law and the dominion of the Court of Appeals. Paragraph 2 of §90 provides in part:

> The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice; and the appellate division of the supreme court is hereby authorized to revoke such admission for any misrepresentation or suppression of any information in connection with the application for admission to practice.

---

[13] (N.Y. JUD. LAW §90(10) (McKinney Supp. 2014)

12

Paragraph 8 of §90 provides:

> Any petitioner or respondent in a disciplinary proceeding against an attorney or counsellor-at-law under this section, including a bar association or any other corporation or association, shall have the right to appeal to the court of appeals from a final order of any appellate division in such proceeding upon questions of law involved therein, subject to the limitations prescribed by section three of article six of the constitution of this state.

The Court of Appeals long ago wrote in *In re Flannery:*[14]

> The Appellate Division has found the appellant guilty of gross unprofessional conduct and has decreed his disbarment. On this record our power of review is limited to the consideration of the single question whether the finding of guilt has any evidence to sustain it…. It is not for us to revise the measure of punishment which guilt, when adjudged, is to entail…. If the conduct condemned is not wholly blameless, the extent to which it shall be reprobated is not for our determination.

In addition to §90, the state constitution limits the jurisdiction of the Court of Appeals in discipline matters to review of questions of law. Art. VI, section 3(a).

## B.  The Purpose of Discipline

The attorney discipline process has three primary objectives: first, protection of the public; second, deterrence of professional misconduct and preservation of the reputation of the bar; and third, to sanction those attorneys who violate the conditions of their exclusive privilege

---

[14] *In re Flannery*, 212 N.Y. 610 (1914) (internal citation omitted).

to practice law in this state. Over the decades, the courts have addressed the *primary* purpose of the attorney disciplinary system, and an analysis of those rulings strongly suggests that the principal goal is consumer protection.

In 1975, the New York Court of Appeals wrote:

> The proper frame of reference, of course, is the protection of the public interest, for while a disciplinary proceeding has aspects of the imposition of punishment on the attorney charged, its primary focus must be on protection of the public. Our duty in these circumstances is to impose discipline, not as punishment, but to protect the public in its reliance upon the presumed integrity and responsibility of lawyers.[15]

Years later, the Court further distanced itself from a view of discipline as punishment:

> A disciplinary proceeding is concerned with fitness to practice law, not punishment. Criminal culpability is not, therefore, controlling . . . . The primary concern of a disciplinary proceeding is the protection of the public in its reliance on the integrity and responsibility of the legal profession . . . . [16]

Some statements by lower New York courts expand on, or even appear inconsistent with, the goal the Court of Appeals identified. One court, introducing a deterrence function, long ago wrote that "the purpose of a sanction in a disciplinary proceeding is to protect the public, to deter similar conduct, and to preserve the reputation of the bar." [17]

---

[15] *Levy v. Ass'n of the Bar of N.Y.*, 333 N.E.2d 350, 352 (N.Y. 1975) (internal quotation marks omitted).

[16] *In re Rowe*, 604 N.E.2d 728, 730 (N.Y. 1992) (citation omitted). This view is consistent with primary and secondary authorities nationwide.

[17] *In re Casey*, 490 N.Y.S. 2d 287, 290 (Third Dep't 1985).

Nearly three decades later, the same Department cited the need "to deter similar misconduct" as among the purposes of discipline. *In re Van Siclen*, 997 N.Y.S.2d 842 (Third Department, 2014). *Van Siclen*, like other decisions, also cites the need to "preserve the reputation of the bar" as a separate goal of discipline. It is not clear how protecting the bar's reputation should influence the severity of sanction.

It is also unclear whether courts that speak of deterrence mean to deter the particular lawyer from relapsing (special deterrence), other lawyers from the same misconduct (general deterrence), or both. The First Department, long ago, opted for both general and special deterrence in *Rotwein*: [18]

> It has been repeatedly enunciated that the purpose of disciplinary proceedings is not punishment per se but protection of the public from the ministrations of the unfit.
>
> . . . Protection is afforded not only by the revocation of the license to practice but by a lesser sanction which would have the effect of a *deterrent* to the person at fault . . . and to others who might be similarly tempted . . . . An equally important factor is the preservation of the reputation of the bar. (Emphasis added.)[19]

As *Rotwein* recognized, deterrence of future misconduct advances the goal of protecting the public, too.

The courts sometimes suggest that a disciplinary sanction foster the purposes of punishment. In 2004, the First Department wrote that discipline serves the "punitive purpose of demonstrating that such unbridled misconduct will not go *unpunished*."[20]  And yet in 2013,

---

[18] *In re Rotwein*, 247 N.Y.S.2d 775, 777 (First Dep't, 1964) (citation omitted).

[19] Ibid.

[20] *In re Law Firm of Wilens & Baker*, 777 N.Y.S.2d 116, 119 (First Dep't, 2004) (citation omitted) (emphasis added).

citing precedent, the same court held: "As in all disciplinary proceedings '[our purpose] is not to punish the respondent attorney, but rather to determine the fitness of an officer of the court and to protect the courts and public from attorneys that are unfit for practice.'"[21]

The ABA's *Standards for Imposing Lawyer Sanctions* ("ABA Standards"), discussed further below, describes the purpose of discipline as follows:

> The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system, and the legal profession.

### C.  The Matter of Delay

The "justice delayed is justice denied" adage is certainly applicable to attorney disciplinary matters, for both the lawyer and client.

Discipline often occurs years after the underlying event, sometimes as many as three or four (or even more) years. The courts then purport to calibrate the length of suspension to the need to protect the public prospectively for misconduct that occurred long ago. It might seem that in reality, the suspension is not meant to protect the public at all, since so much time has elapsed, but serves a different purpose: punishment or general deterrence – i.e., as a warning to all lawyers. The issue of delay and its relationship to the purpose of discipline is less acute if suspension is ordered closer in time to the violation, but the question persists even if the time lapse can be reduced to a year or two.

Prolonged delay also hurts lawyers who live with uncertainty during the delay and who may be harmed when renewing malpractice insurance policies or seeking to change firms.

---

[21] *In re Samuel*, 959 N.Y.S.2d 471, 473 (First Dep't, 2013) (citation omitted).

### D.  Uniformity in Interim Suspensions and the Relationship to Delay

Each department's rules provide for the possibility of interim suspension in very limited circumstances, as authorized by *Matter of Padilla*, 67 N.Y.2d 440 (1986), and *Matter of Russakoff,* 79 N.Y.2d 520 (1992).  In addition, §90 of the Judiciary Law automatically imposes an interim suspension on lawyers convicted of a "serious crime," a term that includes certain misdemeanor convictions and a felony conviction in a court other than a New York court if the crime would be a misdemeanor in New York. But the Appellate Division departments may set aside an interim suspension under §90.

Interim suspensions are public, but they are not regularly reported in commercial databases, so there is no easy way to identify the frequency with which an interim suspension is imposed or set aside in each department of the Appellate Division. Consequently, it is unclear whether the practice of interim suspensions or relief from them is uniform among the departments.

An interim suspension, when it occurs, will of course protect the public pending final hearing. But delay during an interim suspension will hurt the lawyer who is not ultimately sanctioned or whose sanction will be less harsh than the period of suspension.

### E.  ABA Model Rules for Lawyer Disciplinary Enforcement

The American Bar Association House of Delegates adopted the Model Rules of Lawyer Disciplinary Enforcement on Aug. 8, 1989, with amendments in 1993, 1996, 1999 and 2002. [22] These model rules cover a broad spectrum and include best practices covering the recommended structure of attorney discipline systems, the imposition of sanctions and procedural matters. New

---

[22] See
http://www.americanbar.org/groups/professional_responsibility/resources/lawyer_ethics_regulation/model_rules_for_lawyer_disciplinary_enforcement.html

York has never adopted the rules and its practices are in many regards inconsistent with the ABA model (see Aug. 11, 2015 letter to the Commission from Rosen and Cohen, http://www.nycourts.gov/attorneys/discipline/resources.shtml)

# II. RECENT HISTORY OF ATTORNEY DISCIPLINE IN NEW YORK

Over the years, New York's attorney disciplinary system has been roundly criticized as fragmented, inconsistent, lacking in transparency and ineffective in fulfilling its primary role of shielding consumers from unscrupulous or incompetent attorneys—in part because the process works so slowly. The issue has been the focus of myriad reports, studies, articles and legislative hearings.[23]

A 1985 report of the New York State Bar Association's Committee on Professional Discipline provides a helpful background on the New York State attorney disciplinary process.[24] It was inspired by a study of professional discipline published in 1970 by the American Bar Association. The so-called "Clark Report"[25] noted significant public dissatisfaction nationwide with attorney disciplinary procedures. Among the recommended reforms was statewide, centralized disciplinary systems—in sharp contrast to New York's system which, then and now, is divided among the four Appellate Division departments:

> A disciplinary system centralized on a statewide basis, with jurisdiction vested solely in the state's highest court and a single disciplinary agency with members distributed throughout the state provides the greatest degree

---

[23] In 2009, the Senate Ethics Committee and Senate Judiciary Committee held hearings on the manner in which grievances against lawyers and judges are handled by their respective disciplinary watchdogs. At one of the hearings, in Albany, more than two dozen witnesses complained about the processes. See Stashenko, Joel, "Grievances Against Lawyer, Judge Discipline Panels Aired at Capital," *New York Law Journal*, June 9, 2009.

[24] See "A Comprehensive Study of the State of Discipline in New York State*," New York State Bar Association Committee on Professional Discipline*, June 1985.

[25] The "Clark Report," formally titled "Problems and Recommendations in Disciplinary Enforcement," is posted to the "resources" section of the Commission's webpage at http://www.nycourts.gov/attorneys/discipline/resources.shtml

> of structural impartiality. Close personal relationships
> between accused attorneys and those who are to judge the
> charges against them are more likely to be avoided. A
> centralized disciplinary structure, moreover, provides
> uniformity in disciplinary enforcement throughout the state
> since only a single court and a single disciplinary agency
> are involved in the process. [26]

The "Clark Report" led to the creation of the New York State Committee on Disciplinary Enforcement, which was called the "Christ Committee." In 1972, the Christ Committee submitted a comprehensive report to the Judicial Conference calling for standardized and uniform procedural rules and regulations, adoption of the Code of Professional Responsibility, professional staffs, the maintenance of permanent records and other reforms. It did not, however, find any advantage in stripping the Appellate Division departments of their professional discipline jurisdiction and transferring that authority to the Court of Appeals.[27]

Eight years later, the Presiding Justice of the Appellate Division, First Department, Hon. Francis T. Murphy, invited the ABA's Standing Committee on Professional Discipline to evaluate the disciplinary system in that department. In 1981, Chief Judge Lawrence Cooke of the Court of Appeals extended that invitation to include the other three disciplinary systems in the state.[28] Pursuant to those invitations, in December 1982 the ABA Committee issued two reports, recommending a total dismantling of the current structure, to be replaced by a statewide court of discipline, a statewide administrative body, hearing committees and staff. [29] Those

---

[26] See, "Problems and Recommendations in Disciplinary Enforcement*," American Bar Association Special Committee on Evaluation of Disciplinary Enforcement, June 1970, p 26-27* (http://www.americanbar.org/content/dam/aba/migrated/cpr/reports/Clark_Report.authcheckdam.pdf*)*.

[27] "A Comprehensive Study of the State of Discipline in New York State*," New York State Bar Association Committee on Professional Discipline*, June 1985. P.3, quoting from p. XI of the Christ Report.

[28] Ibid, p. 3-4.

[29] Ibid, p. 4.

recommendations were rejected in 1983 by the New York State Bar Association's Committee on Professional Discipline, which expressed concern that the ABA model "would establish a new bureaucracy with what our Committee believes would be a politicization of the disciplinary system." [30] In addition, the Brooklyn Bar Association, what was then the Association of the Bar of the City of New York and the New York County Lawyers Association issued separate reports, all opposing the ABA recommendation. [31]

In the subsequent decades, various studies and reports critiqued various aspects of the attorney disciplinary process in New York. One of the more recent critiques, authored by Professor Stephen Gillers (a member of this Commission[32]), the Elihu Root Professor of Law at New York University School of Law, was published in 2014 in the New York University Journal of Legislation and Public Policy. [33]

Gillers' research, which included analyzing 577 public disciplinary opinions issued between 2008 and 2013 and data dating back to the early 1980s, concluded that the current system is inconsistent in its application of disciplinary rules and the imposition of sanctions. For instance, he found that in the First Department conversion of client funds nearly always results in the attorney's disbarment, but a similar infraction in the Second Department is most often punished with a two-year suspension. Similarly, according to Gillers' research, the Second Department generally censures lawyers who commit tax fraud, while the First Department typically suspends attorneys for virtually identical misconduct. Yet, while generally finding that the First Department is the strictest in the state in its imposition of disciplinary sanctions, Gillers

---

[30] Ibid, p. 5.

[31] Ibid, p. 6, footnote 3.

[32] Professor Gillers is a member of the Commission on Statewide Attorney Discipline and co-chair of the Subcommittee on Uniformity and Fairness.

[33] See Gillers, Stephen. "Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public," *New York University Journal of Legislation and Public Policy*, 17 N.Y.U. J. Legis. & Pub. Pol'y 485.

observed that the tribunal in Manhattan tends to be more tolerant of lawyers who are dishonest with their clients as opposed to those who mislead a court. Overall, he found that the Third and Fourth departments are generally considerably more lenient than their counterparts in Manhattan and Brooklyn.[34]

All New York lawyers are governed by the same Rules of Professional Conduct. And the First and Second Departments define "professional misconduct" in substantially identical language. But disciplinary cases—and sanctions—are adjudicated separately by the four Appellate Division departments. Gillers' examination of hundreds of disciplinary opinions from the four departments imply there are stark differences in the seriousness with which these courts regard the same misconduct, at least when measured by the sanctions they impose. He found that the courts opinions rarely if ever cite, let alone conform to, the sanctions imposed in the other departments, and that opinions outside the First Department often do not even attempt to harmonize a sanction with those of the same court's own precedent.[35]

Further, the New York State Bar Association's Committee on Professional Discipline regularly publishes a statistical analysis of disciplinary actions.[36] In its report for 2012 (the most recent posted to the Committee's web page, see https://www.nysba.org/copdannualreports/), the panel commented on the difficulty in evaluating and comparing disciplinary actions from department to department because the procedures are so varied:

> The multiplicity of disciplinary committees operating throughout the State results in each committee receiving a substantial number of inquiries and complaints that fall within the jurisdiction of other committees and which must then be referred out. Sometimes this is a

---

[34] Ibid.

[35] Ibid.

[36] See https://www.nysba.org/copdannualreports/

consequence of the complainant having chosen the wrong forum; other times it is a consequence of judicial policy requiring official staff review of all complaints relating to attorney conduct. For example, in the Second and Fourth Departments, all complaints received by the county bar association grievance committees (with the sole exception of those received by one association in the Fourth Department) are routinely referred to the professional staff of one of the district grievance committees. Even if the complaint appears to be nothing more than a fee dispute, by court rule in these Departments, a policy has been established to refer all inquiries to the district grievance committee's professional staff. Upon review, the district grievance committee, in turn, will refer a large portion of these matters to county bar association committees for further processing and investigation. Often a matter that was initially referred to the district committee will be referred back to the same county bar association.[37]

The Committee goes on to note that in the Second and Fourth Departments, "minor" complaints are generally processed by local bar association committees, while in the Third Department fewer than 10 percent of such matters are handled in that manner.[38] Further, it observes that since a portion—and in some departments, a substantial portion—of complaints are adjudicated by private, local  bar groups rather than a court, statistical information on those matters is unavailable. All of this makes for a system where it is, as Gillers specifically states and the bar committee infers, virtually impossible to accurately compare processes and results in the four departments.

In short, this is a system that has been ripe for reform for many years.

---

[37] See pages 3-4 of the 2012 Annual Report of the Committee on Professional Discipline at
https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51302

[38] Ibid, page 5.

# III. RECENT EFFORTS AT REFORM

There have been various recent efforts put forth to reform, revise or update the attorney disciplinary process in New York State. Those efforts, many of which necessitated legislative action, did not result in meaningful change.

Dating back at least to the early 1980s, a committee of what was then the Association of the Bar of the City of New York has endorsed greater transparency. A 1992 report of the Professional Discipline Committee of the City Bar (echoing another report by the committee a decade earlier), chaired by John M. Delehanty, proposed amending §90(10) to permit the public disclosure of disciplinary proceedings against lawyers after formal charges have been lodged.[39]

> We conclude that Section 90(10) advances the best interests of neither the public nor the bar and that it should be amended to provide for the opening of the proceedings when formal charges are filed…Section 90(10) is too restrictive. If it is true that the public is suspicious of the attorney discipline process because it is secret, then proceedings should be opened at the earliest practical point. Unless extenuating circumstances exist, there seems no compelling reason to keep secret charges against an attorney after a determination by an appropriate agency that the charge is one requiring adjudication. [40]

In 1995, the New York State Bar Association's Task Force on the Profession proposed a similar reform, and the Chief Judge's Committee on the Profession and the Courts followed suit the following year. Also in 1995, the New York State Bar Association's Committee on

---

[39] See "The Confidentiality of Discipline Proceedings" in the January/February 1992 edition of *The Record of the Association of the Bar of the City of New York*.

[40] Ibid, p. 59.

Professional Discipline (issued after the committee was granted extraordinary behind-the-scenes access to sealed cases and the operations of the grievance committees) found that despite the lack of uniformity, underfunding and delays, the system was essentially working well.[41] In 1999, the Chief Judge's Committee to Promote Public Trust and Confidence in the Legal System supported openness, and a special committee of the State Bar did the same in 2000. At its annual January meeting in 2002, the State Bar debated a proposal that would have opened disciplinary records to the public once a prima facie case was established—on the condition that the four departments of the Appellate Division adopt uniform standards. But the bar declined to vote on the proposal and instead urged the Appellate Division to formulate statewide rules. That never happened.[42]

It bears noting that in 1986 the ABA adopted the Standards for Imposing Lawyers Sanctions to promote consistency.[43] It is also noteworthy that the American Bar Association has supported the concept of open disciplinary hearings since 1992 through its Commission on Evaluation of Disciplinary Enforcement. [44] The so-called "McKay Commission" report concluded: "[S]ecret records and secret proceedings create public suspicion regardless of how fair the system really is."[45] New York has, thus far, turned a deaf ear to the ABA's recommendations. As Professor Gillers notes in his article:

---

[41] See "Lawyer Discipline in New York," a Feb. 10, 1995 report of the New York State Bar Association's Committee on Professional Discipline.

[42] Caher, John. "Study Urges Reform of 'Broken' Disciplinary System." *New York Law Journal* 27 May 2014.

[43] Gillers, 493.

[44] Caher, John. "Discipline Hearings a Hot Topic at Bar Meeting." *New York Law Journal* 23 Jan. 2002.

[45] Commission on Evaluation of Disciplinary Enforcement, Am. Bar Ass'n, Lawyer Regulation for a New Century 2 (1993), available at http://www.americanbar.org/groups/professional_responsibility/resources/report_archive/mckay_report.html.

The Standards can be seen as the lawyer discipline counterpart to sentencing guidelines in the criminal context. The Standards state: "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, or will not discharge, or are unlikely properly to discharge their professional duties to clients, the public, the legal system and the legal profession.[46]

Some states use the Standards as a guide to determine sanctions. Other states never do, New York and California among them. But California has its own standards. New York has none. This is unfortunate. If there were statewide standards, or if the New York courts all used the ABA standards, the New York Appellate Division courts might come closer to imposing substantially the same sanction in similar circumstances throughout the state. Today, they are not.[47]

---

[46] Standards for Attorney Sanctions for Professional Misconduct Section 1.3 (State Bar of Cal. 1986).

[47] Gillers, 493-494.

# IV. THE COMMISSION'S WORK

Because of the breadth of its mandate and the size of Chief Judge Lippman's Commission, the group organized itself into three topical subcommittees, each led by three co-chairs, tasked with exploring the major issues before the panel: a Subcommittee on Uniformity and Fairness; a Subcommittee on Enhancing Efficiency; and a Subcommittee on Transparency and Access. The co-chairs and members of each subcommittee are noted on the Commission's website at http://www.nycourts.gov/attorneys/discipline/subcommittees.shtml. Initially, each subcommittee (and in several cases, working groups within the subcommittee) worked independently, each studying the issues within its particular orbit of concern. After the subcommittees had tentatively finalized their findings and proposals, the three reports were brought to the full Commission for discussion and debate, resulting in this report.

## A. Initial Steps

Following its formation, the Commission or its subgroups met periodically (some meetings were conducted via teleconference) to formulate its plan to fulfill the Chief Judge's mandate. One of these meetings included a presentation by Ellyn S. Rosen, Deputy Director of the American Bar Association Center for Professional Responsibility, and Nancy L. Cohen, a member of the ABA Standing Committee on Professional Discipline and partner at MiletichCohen PC in Denver, and former chief deputy regulation counsel with the Colorado Supreme Court Office of Attorney Regulation Counsel. Ms. Rosen and Ms. Cohen provided the Commission with a broad national perspective on attorney discipline, offering insight into how New York's system differs from those of other states and how it compares to what the ABA would consider a model system.

In essence, Ms. Rosen and Ms. Cohen advised the Commission that New York's disjointed system has resulted in serious discrepancies in the manner in which professional

discipline is carried out in the four departments. A review of those four systems persuaded Ms. Rosen and Ms. Cohen that New York's procedures lack uniformity, that the rules of evidence are inconsistent and what may be admissible in one locale may be inadmissible in another, that the standard of proof necessary to sustain various charges of professional misconduct vary from region to region and that the potential range of penalties is erratic; for example, three of the departments have diversion programs in which attorneys whose misconduct is attributable to alcoholism or substance abuse, can be diverted outside the disciplinary system. But there is no such formal program in the First Department. They recommended a revised, centralized system with a consistent burden of proof, separate investigative and adjudicative functions and consistent standards.

On the issue of transparency, Ms. Rosen and Ms. Cohen stated that records on public discipline of attorneys remain difficult to access and recommended a more user-friendly and accessible website where consumers could readily determine if an attorney has been the subject of professional discipline. Further, Ms. Rosen and Ms. Cohen indicated that New York's system is almost singularly secretive, allowing the public to access disciplinary information only after a penalty is imposed by a court. In contrast, most other states make the information public at the point at which there is an official finding of probable cause and official disciplinary charges are lodged (a follow up letter from Ms. Rosen and Ms. Cohen is posted to the Commission's webpage at http://www.nycourts.gov/attorneys/discipline/resources.shtml).

### B.  Public Outreach

The Commission pursued input and insight from a broad spectrum of stakeholders—including consumers as well as attorneys—and made a concerted effort to publicize its public

hearings and encourage commentary (either at a hearing or through a written submission).
Dozens of comments were received and reviewed.[48]

### C.  Public Hearings

The Commission held a series of public hearings around the state. A notice of the public hearings, which listed the date and location of the hearings, was released on June 25, 2015, and was: (1) published in the *New York Law Journal*; (2) posted on the Commission's website; (3) repeatedly "tweeted" through the Office of Court Administration Twitter social media account (NYSCourtsNews); (4) e-mailed to all ABA-approved law school deans; (5) emailed to approximately 100 representatives of state, local and affinity bar associations in New York State; (6) published in the Albany *Times Union*; (7) published in the *Daily Record*; and (8) published in the *Legislative Gazette*. The Commission invited oral and written testimony on the proposal from individuals, organizations and entities. Witness lists were posted on the Commission's website prior to each hearing. A podcast interview with then-Commission Vice Chair Cozier was prominently posted on the court system's website in June (audio and transcript available at http://www.nycourts.gov/admin/amici/index.shtml).

Testimony at the public hearings was somewhat restricted by time constraints and the Commission was unable to accommodate every individual who sought an invitation (even after extending the time for the New York City hearing from two to approximately four hours duration). However, the Committee made clear from the outset that anyone wishing to comment

---

[48] A considerable number of the comments received by the Commission dealt with complaints which, if true, could form the basis for a claim of legal malpractice. The Commission finds it advisable to briefly address misconduct vis-à-vis malpractice, beginning with the acknowledgment that those two concepts are not necessarily mutually exclusive nor mutually inclusive: legal malpractice may well include professional misconduct; professional misconduct may well give rise to a parallel complaint of malpractice. On the other hand, malpractice and misconduct, while perhaps parallel, are different issues. Quite simply, attorney malpractice is a failure to exercise ordinary skill and knowledge, where that negligence results in damages to a client. By contrast, attorney misconduct is the failure to comply with the rules of conduct adopted by the courts. This Commission's focus was exclusively on attorney misconduct and, more specifically, the process from the initiation of a complaint through a finding of misconduct through the imposition of a sanction.

but unable to attend any of the hearings was free to submit a written statement. A total of 31 individual witnesses appeared at the hearings and approximately 50 interested parties submitted written comment.

Recurring topics at the hearings and in written submissions included: how to strike an appropriate balance between shielding an innocent attorney from reputation-damaging publicity while simultaneously providing the consuming public with the information it needs to make an informed decision on whether to retain a particular lawyer; whether the current disciplinary system should be replaced by a centralized system, thus removing attorney discipline from the control of the four separate Appellate Division departments; whether the current system could be retained while adopting more uniform procedures; whether a new entity, modeled after the Commission on Judicial Conduct, should be created to investigate allegations of prosecutorial misconduct; and an apparent crisis in confidence with at least some members of the public, who view the discipline system as it now exists as insular and designed more for the protection of attorneys than the protection of consumers. In general, attorneys and bar associations strongly favored retaining the existing confidentiality protections of §90 of the Judiciary Law while legal consumers urged more transparency. Several bar groups and attorneys suggested that the current disciplinary system should be replaced by a centralized system, and several others opposed that proposal (there was little comment from legal consumers on whether the process should be centralized or remain regional). But virtually all the witnesses who commented on the issue agreed that unified statewide rules and procedures should be adopted, that consistency among the four departments is paramount and that, to the extent feasible, the process should be streamlined to result in more prompt resolutions.

The Commission wishes to express its gratitude for the insight provided by the individuals and groups that took the time and made the effort to share their views and expertise on this topic. Complete transcripts of all three hearings are available on the Commission's website http://www.nycourts.gov/attorneys/discipline/.

## 1. Albany

The first public hearing was held at Court of Appeals Hall in Albany on July 28, 2015. At that hearing, the Commission heard from: (1) the executive director of the Lawyers' Fund for Client Protection (2) the deputy executive director of the Fund for Modern Courts; (3) the former chief attorney for the Commission on Judicial Conduct; (4) the president of the Albany County Bar Association; (5) a private citizen; (6) a member of the board "It Could Happen to You"; (6) and the president of the New York State Bar Association. Attendees included local attorneys, representatives of the New York State Senate and Assembly, a representative of the Third Department Committee on Professional Standards, private citizens and several members of the media. The hearing resulted in articles in the *New York Law Journal* (http://www.newyorklawjournal.com/id=1202733332962/Committee-Explores-Uniform-Attorney-Discipline-System?mcode=1202615704879), Albany *Times Union* (http://www.timesunion.com/local/article/Lawyers-Fund-Disbar-all-lawyers-who-steal-6410952.php), *Legislative Gazette* and *New York Daily Record*. In addition, the Associated Press transmitted an article about the hearing to its clients (see http://www.newsobserver.com/news/business/article29116984.html),Law360 posted an article on its website (http://www.law360.com/articles/684497) and the Albany *Times Union* published a subsequent editorial (http://www.timesunion.com/tuplus-opinion/article/Editorial-A-closer-eye-on-lawyers-6420735.php).

Also at the Albany hearing, the New York State Bar Association released a new report and recommendations by its Committee on Professional Discipline. The report, "Concerning Discovery in Disciplinary Proceedings" (available online at http://www.nysba.org/DownloadAsset.aspx?id=57725), recommended a series of changes to discovery procedures within the disciplinary framework.

A full transcript of the Albany public hearing was posted to the Commission's website within several days, and its availability was "tweeted" via the Unified Court System's Twitter feed (NYSCourtsNews) to more than 800 followers.

33

### 2. Buffalo

On Aug. 4, 2015, the Commission held a public hearing at the Erie County Ceremonial Courtroom in Buffalo. Testifying were: (1) the president of the Erie County Bar Association; (2) the president of the Minority Bar Association of Western New York; (3) the founder and chair of the organization "It Could Happen to You"; (4) the former chair of the Eighth Judicial District Attorney Disciplinary Committee; (5) a local attorney who represents lawyers accused of misconduct; (6) a law professor; (7) a legal consumer from Buffalo; and (8) a representative of the Western Mohegan Tribe and Nation of New York.

Twenty two people noted their attendance by signing a sign-in sheet, including representatives of the Erie County Bar Association, the Attorney Grievance Committee for the Fourth Judicial Department and the New York State Assembly. Media included a reporter and photographer with the *New York Daily Record* (http://nydailyrecord.com/blog/2015/08/05/ny-attorney-discipline-system-under-review/) and a reporter with the National Public Radio affiliate in Buffalo (http://news.wbfo.org/post/state-panel-visits-buffalo-hears-opinions-lawyer-discipline).

Again, the transcript was produced and posted promptly and prominently and noted in social media.

### 3. New York City

The third and final public hearing was held on Aug. 11, 2015, at the New York County Lawyers' Association in Manhattan. The witnesses were: (1) two representatives of the New York State Academy of Trial Lawyers; (2) an attorney in private practice; (3) an attorney who represents lawyers facing misconduct allegations; (4) a law professor; (5) two representatives of the Richmond County Bar Association; (6) the administrator/ counsel to the state Commission on Judicial Conduct; (7) the president of the Women's Bar Association of the State of New York; (8) a representative of the New York County Lawyers Association; (9) a representative of the New York City Bar Association; (10) a sociology professor/ legal consumer; (11) a retired

attorney/ legal consumer; (12) a legal consumer; (13) an attorney who had been the subject of disciplinary action; and (14) the director of a judicial reform organization, the Center for Judicial Accountability. The *New York Law Journal* published an advance article about the upcoming hearing on Aug. 10, 2015 (http://www.newyorklawjournal.com/id=1202734271410?keywords=stashenko&publication=New+York+Law+Journal).

    Although the hearing was initially scheduled for two hours, the Commission members continued to hear testimony for approximately four hours. Roughly 80 people attended the hearing, including representatives of various reform organizations, private citizens, a representative of the New York State Assembly, a representative of the Suffolk County Board of Ethics, a reporter and photographer for the *New York Law Journal,* a representative of *Our Time Press* and an investigative reporter and photographer with *Long Island Backstory* (https://www.youtube.com/channel/UCtWOavnShvC6eY6n28FXfrA). A videographer producing a documentary on attorney discipline filmed the entire proceeding. The *Law Journal* published an article the following day.

(http://www.newyorklawjournal.com/id=1202734518665/Commission-Hears-Pros-Cons-of-Uniform-Attorney-Discipline?mcode=1202615704879). *Law360* followed up with an online report on Aug. 24, 2015 (http://www.law360.com/articles/692868/ny-bar-seeks-elemental-rules-on-atty-discipline-discovery).

    As with the other two hearings, a full transcript was promptly made available to the public on the Commission's webpage, and its availability was "tweeted" to more than 800 followers.

    The following three sections of this report summarize the work, findings and recommendations of each of the subcommittees. It should be noted that while the subcommittee recommendations, as well as those of the full Commission, represent a consensus view, not all members agreed with each element of each proposal.

36

# V. REPORT OF THE SUBCOMMITTEE ON UNIFORMITY AND FAIRNESS[49]

Today, each Appellate Division department administers discipline separately. Ordinarily, lawyers are subject to discipline in the Department in which they practice. The four Departments have their own rules and procedures, and rarely cite cases from the other Departments. There is variation between Departments in the extent to which they cite to the facts of their own precedent. There is also variation in the extent to which they detail the lawyer's misconduct and the aggravating and mitigating factors in the matter before them.

In other states, a statewide body—typically, the state's highest court or a statewide body under that court—has ultimate jurisdiction for lawyer discipline. California, for example, imposes most discipline through its State Bar Court, which has a hearing (trial) and a review (appeal) department and statewide jurisdiction. The California Supreme Court retains authority to review the State Bar Court's decisions.

Against that backdrop, the subcommittee divided its mission into two parts: uniformity and fairness as it relates to procedures and rules; and uniformity and fairness as it relates to sanctions. It is axiomatic that violations of the New York Rules of Professional Conduct should be dealt with similarly, regardless of region, and that consumers and lawyers should have the same procedural rights and responsibilities no matter where they happen to reside in this state of

---

[49] The Subcommittee is co-chaired by Professor Stephen Gillers, Robert P. Guido, Esq., and Peter J. Johnson, Jr., Esq. The members are: Lance Clarke, Esq., Hon. Jeffrey Cohen, John P. Connors, Esq., Rita DiMartino, Vincent Doyle, Esq., Donna England, Esq., Nicholas Gravante, Esq., Sarah Jo Hamilton, Esq., Samantha Holbrook, Esq., Glenn Lau-Kee, Esq., Hal Lieberman, Esq., William T. McDonald, Sean Michael Morton, Esq., Hon. Fred Santucci, Eun Chong Thorsen, Esq., Mark Zauderer, Esq.

49,112-square-miles. Further, fundamental fairness requires that a transgression in one corner of the state should be dealt with in the same manner as a similar transgression that occurs in another corner, and that an attorney accused of misconduct in one region has the same procedural rights and remedies as an attorney in another locale.

### A. Uniformity and Fairness in Procedure

The procedural disparities of the current system are described in a prior section of this report and documented in the follow-up letter from Ms. Rosen and Ms. Cohen (http://www.nycourts.gov/attorneys/discipline/resources.shtml). There can be no doubt that New York State's attorney disciplinary systems lack consistency and uniformity, leaving only the question of how best to remedy that problem. At the outset, the Subcommittee is persuaded that the inconsistency is indeed a problem, despite the contentions of some who argue that the regional differences are rooted in historic and cultural distinctions. Undeniably, the practice of law is different in Kings County, the largest county in the state by population, than it is in Hamilton, the smallest county in the state by population. That said, the Subcommittee observes that attorneys in Brooklyn and Lake Pleasant are governed by the exact same Rules of Professional Conduct, and concludes that those rules should, and must, be applied equally and consistently.

### B. Uniformity and Fairness in Sanctions

On this prong of its analysis, the Subcommittee began its inquiry questioning whether there is in fact a lack of uniformity in sanctions. Because of a dearth of data and because public disciplinary opinions often lack even basic detail, the subcommittee was left largely with anecdotal evidence of disparity. However, there is no question that the *risk* of disparity is substantial, given that the four Departments decide lawyer discipline cases without reference to standards or precedents in similar cases from the other Departments and without statewide advisory guidelines on sanction. The following remedies were discussed:

38

- Give the Court of Appeals, the state's highest court, discretionary review of sanctions in disciplinary matters. That in itself would tend to foster consistency. However, it would require an amendment to §90 and possibly to the State Constitution provision defining the court's jurisdiction.

- Follow the California example and create a State Bar Court, with both hearing and review departments to handle all discipline statewide from complaint to conclusion, entirely displacing the Appellate Division departments. That would require an act of the Legislature.

- Create a statewide tribunal with limited and discretionary jurisdiction to review Appellate Division decisions (or certain categories of decision) on appeal by the respondent or the disciplinary agency. The composition of such a tribunal and its jurisdiction would have to be defined and established in statute.

- Create a statewide tribunal, responsible for all public discipline, with members chosen from among the four departments of the Appellate Division. For example, each department could designate one justice, and the four justices, perhaps aided by a dedicated law clerk or clerks, would administer all discipline in the state for a defined period. Overlapping terms for the justices would help ensure continuity. The court would be expected to make findings of fact and cite precedent. It may be possible to accomplish this change through court rules.

- Assign to a single Department the authority to administer all discipline in the state, rotating the responsibility periodically.

- Adopt an appropriately modified version of the ABA Standards for imposing lawyer sanctions. The ABA Standards address the nature of the misconduct and mitigating circumstances like substance abuse and depression. They are not binding, but there would be an expectation that they would be consulted and cited and that deviation from those guidelines would be explained.

- Urge each Appellate Division department, in its disciplinary rulings, to detail the facts of the violation and to describe the mitigating and aggravating circumstances, in the hope that simply providing a statewide repository of decisions would encourage consistency.

### C.  Discovery and Disclosure

While the Commission was conducting its inquiry, the New York State Bar Association Committee on Professional Discipline issued a report "Concerning Discovery in Disciplinary Proceedings."[50] The report, and the testimony of NYSBA President David Miranda at the July 28th public hearing in Albany,[51] revealed that New York State currently has perhaps the nation's most restrictive rules on the information that is available to attorneys who are the subject of a disciplinary complaint.  NYSBA offered five recommendations:

- The respondent attorney should always receive the initial complaint and supplemental materials.

---

[50]See  http://www.nysba.org/DownloadAsset.aspx?id=57725

[51] See Albany Public Hearing Transcript at
http://www.nycourts.gov/attorneys/discipline/Documents/AlbanyTranscript.pdf, pages 55-63

- The respondent attorney should have access to exculpatory materials and portions of the investigatory file that would not jeopardize the investigation or constitute work product.

- The respondent attorney should have the right to subpoena third-party documents that are relevant to the complaint and not in the possession of a disciplinary committee.

- The respondent attorney should be allowed to obtain certain, carefully delineated materials submitted to the disciplinary committee.[52]

- The referee should have the authority to compel depositions of the complainant. The Subcommittee can support this proposal, with the caveat that depositions should only be compelled upon a showing of good cause. Concerns were raised by Commission members that an unrestricted or insufficiently monitored deposition rule could tend to have a chilling impact on complainants. If those concerns—ensuring fairness for the respondent as well as the complainant without stifling the ability of consumers to pursue a complaint—can be balanced, this Subcommittee can support mandatory depositions in appropriate, carefully screened instances.

The Subcommittee recommends, in the event the Administrative Board adopts uniform, statewide rules regulating and standardizing disciplinary procedure, that those rules include discovery reform providing, at a minimum, the following: (1) reciprocal disclosure of all prior

---

[52] The Subcommittee urges great caution in this regard, and would oppose any rule requiring or even allowing disclosure of the confidential work product of the disciplinary committee staff.

statements of witnesses, including experts, and (2) disclosure to the respondent of all statements submitted by the complainant or other source which forms the basis for an investigation, all statements obtained from the respondent during the course of the investigation, and any exculpatory evidence.

A minority of the Subcommittee urged that the rules for discovery should allow the respondent to examine witnesses under oath in advance of any hearing; however, the majority of the Subcommittee disagreed, with the understanding that disciplinary proceedings should be uniformly treated as "special proceedings" governed by CPLR Article 4, and thereby allowing either party to seek such additional discovery as it deems necessary, upon motion to the court.

### D.  Conclusion

The Chief Judge, in a press release announcing the formation of the Commission, asked that it address "whether conversion to a statewide system is desirable." Certainly, if this Commission were starting from scratch and creating an attorney disciplinary system in the first instance, there is no question it would establish a single, statewide structure rather than the existing four-part configuration. However, it is not starting from scratch and the question distills to whether the current system is so dysfunctional and so unworkable that the only remedy is to tear it down and start over. On the contrary, the Subcommittee is of the view that while the system is most definitely in need of re-examination and reform, a complete dismantling is unwarranted and unnecessary. The Subcommittee is confident that many of the ills and perceived ills of the current system, which are clearly described in this report, can be addressed and remedied with fairly simple reforms that can be implemented administratively and expeditiously, without the need for constitutional amendment or statutory revision.

While the Subcommittee does not find a need to create a new statewide disciplinary system, it finds a pressing need for rejuvenation, coordination and uniformity in both procedure and sanction. Unfortunately, this Commission does not have the luxury of time to unilaterally determine, *in toto*, which procedures and practices of the various Appellate Division

42

Departments should be adopted statewide, whether there should be a uniform penalty for, say, escrow thefts or violations of the advertising regulations, or what those sanctions should be. However, it recommends the following uniformities as a starting point, and with the suggestion that the ABA guidelines would provide a good model for New York:

- Adopt a statewide, uniform definition for what constitutes "professional misconduct."

- Adopt statewide, uniform range of sanctions that may be issued upon the disposition of a disciplinary complaint, with standardized terminology and definitions, from dismissal through disbarment.

- Ensure that all complainants are entitled to the same type of information in every department.

- Harmonize the rules to regarding the process for acceptance of a resignation.

- The Departments should uniformly provide a procedure for the circumstance where an attorney has been judicially declared incompetent or has been involuntarily committed. To the extent they are inconsistent, the Departments' rules concerning an incapacity adjudication should be fully harmonized. Appointment of an attorney to safeguard client interests should be uniformly authorized, as in the Appellate Division, Third Department, "whenever there are reasonable grounds to believe that an attorney has abandoned or is seriously neglecting his practice to the prejudice of his clients."  Likewise, the Departments should uniformly adopt a procedure for suspension of an attorney under investigation who contends that he or she is suffering from a disability or

43

incapacity that makes it impossible for him or her to adequately mount a defense (see e.g. 22 NYCRR 806.10 [b]).

- The Departments should uniformly adopt procedures for the adjudication of felony/serious crime cases. Such procedures should establish the role of the Committee at the beginning stages of the adjudication, set forth the notice to be provided to the attorney at the inception of the proceeding and define the Committee's role where the crime does not constitute a felony/serious crime. Uniform rules should also provide that, upon a showing of good cause by the respondent attorney, the Court has the discretion, but not the obligation, to suspend a respondent who has committed a serious crime pending determination of final discipline (see Judiciary Law § 90 [4] [f]).

- Synchronize the rules of the Departments with a regard to the rights a respondent attorney has to be heard before a court in defending against a misconduct charge or in offering evidence in mitigation.

- The disparate rules of the Departments should be harmonized to require that all reinstatement applications are to be made on motion in the context of the proceeding giving rise to the suspension or disbarment. The Committee should be afforded an opportunity to be heard as a matter of course, and reference to a referee or the Committee on Character & Fitness should be in the Court's discretion. The Departments should uniformly adopt the "six-month rule" currently in use in the Appellate Division, First Department, to provide for expedited reinstatement from short-term suspensions.

- Adopt a uniform rule which codifies a collateral estoppel procedure (see generally *Matter of Dunn*, 24 NY3d 699 [2015]), likely similar to the procedures employed in the felony/serious crime conviction process.

- Promulgate statewide policy reasons for rejecting complaints at the threshold stage of the screening process, and standardize the process to ensure that complainants are provided with the reason(s) for that determination.

- Afford complainants the right to seek further review when the complaint is rejected upon initial screening, especially if rejection is permitted on authority of the Chief Attorney alone.

- Because the decision to commence a formal proceeding exposes the attorney to the severest of consequences, the process should be uniform statewide to avoid disparate treatment among the Departments.

- Bring the process in the First Department into conformity with the remainder of the state by requiring complaints to be disposed of upon a majority vote of the full committee, and eliminating the use of "hearing panels" in formal disciplinary proceedings.

- Harmonize the rules of all Departments to make clear that the authority to commence a *sua sponte* investigation does not vest in the Chief Attorney alone, but requires the additional approval of either the full Committee or the Chair.

45

- Amend the rule in the First Department to allow for the threshold determination to be made on the authority of the Chief Attorney alone, so long as a mechanism remains in place for the complainant to seek further review.

- Retain the statewide practice of fixing venue based upon the registered office address, and secondarily on the residence address.

- Ensure that the bases for both jurisdiction and venue account for the increasing use of the "virtual office" for conducting a practice (no physical presence).

- Inasmuch as the Admonition is the most serious action the Committee can take short of recommending the commencement of a formal proceeding, and because it constitutes "discipline," the process for issuing same, and the available remedies, should be the same for attorneys statewide, and thus should be harmonized. The harmonized process should allow discretion for the Admonition also to be issued orally to the respondent in appropriate cases.

Details should be worked out among the departments, with the assistance of a newly created statewide Coordinator of Attorney Discipline[53], who would function as a liaison/resource for the four judicial departments and whose precise powers and functions would be defined by the Administrative Board of the Courts. The Commission envisions that the Coordinator would be tasked with assisting the Board in fostering uniformity in procedure and sanction, encouraging communication and consistency among the separate departments,

_____

[53] Approximately five members of the Commission opposed the creation of this position.

46

producing an annual statistical report providing statewide data on the administration of attorney discipline, and recommending ongoing reforms as deemed necessary.

The Subcommittee and full Commission wrestled with the issue of whether there should be, in effect, "sentencing guidelines" to provide the disciplinary bodies with at least a frame of reference in which to administer sanctions. Cognizant that a "one-size-fits-all" approach rarely succeeds, the Subcommittee recommends the adoption of non-binding standards and general guidelines for imposing sanctions; non-binding, essentially advisory guidelines are of course inadequate without some expectation that they will be followed. Again, the details—such as what the usual sanction should be for an escrow theft, for a violation of the advertising rules, for client neglect, etc.—should be established jointly by the four Departments of the Appellate Division, with the assistance of the Statewide Coordinator. The Statewide Coordinator of Attorney Discipline should promptly issue a report to the Administrative Board and the public documenting disparities in sanction and recommending guidelines. Going forward, deviations from those guidelines should be explained in the Court's decisions and orders. That could be accomplished simply by stating mitigating or aggravating factors that warranted a lesser or greater sanction than would be the norm for a particular offense.

In sum, the Commission recommends approval by the Administrative Board of the Courts, and by each Department of the Appellate Division, of statewide uniform rules and procedures governing the processing of disciplinary matters at both the investigatory and adjudicatory levels, from intake through final disposition, which strike the necessary balance between facilitating prompt resolution of complaints and affording the attorney an opportunity to fairly defend the allegations. These new rules and procedures should include uniform discovery rules and information-sharing for attorneys who are the subject of a disciplinary complaint. This recommendation is of the highest priority and a firm deadline for adoption should be established.

# VI. REPORT OF THE SUBCOMMITTEE ON ENHANCING EFFICIENCY[54]

The Subcommittee on Enhancing Efficiency evaluated how to achieve dispositions in attorney disciplinary matters fairly and efficiently so as to provide closure to both attorneys and complainants.

## A. Methodology

To determine whether undue delay exists in the disciplinary process, the Subcommittee considered testimony received during hearings held by the Commission in Albany, Buffalo and New York City from July 28 through August 11, 2015, and written submissions from numerous bar leaders, attorneys and legal services consumers. The Subcommittee additionally considered data collected from the four Departments of the Appellate Division with respect to disciplinary matters that resulted in a final court order of sanction during a three-year period ( 2012 to 2014). We appreciate the efforts of the Chief Counsel and the Clerks of the four Departments in providing all of this information to us. It was no easy task to gather all of the requested information.

---

[54] The Subcommittee is co-chaired by: Hon. Peter B. Skelos, Hon. Stephen K. Lindley and Milton L. Williams, Jr., Esq. The members are: Hon. James Catterson, Ronald Cerrachio, Esq., Monica A. Duffy, Esq., Charlotte Moses Fischman, Esq., Emily Franchina, Esq., Fredrick Johs, Esq., Christopher Lindquist, Esq., Hon. Eugene Nardelli.

### B.  Summary of Evidence

From the hearings and submissions, the Subcommittee heard numerous complaints, much of them anecdotal, suggesting, inter alia that: delays in the resolution of disciplinary matters are exacerbated by inadequate funding; too much time is expended on certain types of complaints (such as those involving failure to communicate) that could be resolved expeditiously and satisfactorily though mediation; the use of hearing panels in the First Department contributes to delay because of the difficulty accommodating various schedules; time is unnecessarily expended during the reinstatement process, the result being that a one-year suspension may end up being a two-year suspension simply because disciplinary authority is backlogged; and the lack of any sort of "speedy trial" rule means there is no incentive to expedite resolution. Again, this commentary (while compelling) was largely anecdotal and the Subcommittee sought more concrete data.

Consequently, in addition to the witness testimony and written submissions summarized herein, the Subcommittee considered data received from the Clerks of the Appellate Division departments and Chief Counsels to the disciplinary committees with respect to a total of 458 disciplinary matters that resulted in a final court order of public discipline (i.e., censure, suspension or disbarment) entered between 2012 through 2014.  The data received allowed the Subcommittee to calculate a best estimate of the average time the disciplinary committees took to conduct investigations and the courts took to enter a final order of discipline after proceedings were filed. Those best estimates are as follows:

| **Table A – Average Time Frames for Disciplinary Proceedings** | **AD1** | **AD2** | **AD3** | **AD4** | **AVG** |
|---|---|---|---|---|---|
| Total Matters Determined (2012-2014) | 156 | 163 | 88 | 51 | 115 |
| Average Total Days for All Matters – Date of Opening of Investigation through  Final Order | 963 | 1072 | 767 | 620 | 856 |
| Average Total Days for Investigation of All Matters - Date of Opening of Investigation through Proceeding Filed in Court | 655 | 646 | 430 | 365 | 524 |
| Average Total Days for Court Proceedings in All Matters – Date of Proceeding Filed through Final Order | 308 | 426 | 337 | 255 | 332 |
| Average Total Days for Court Proceedings for Convictions – Date of Proceeding Filed in Court through Final Order | 260 | 215 | 119 | 357 | 237 |
| Average Total Days for Court Proceedings for Charges of Misconduct- Date of Petition Filed in Court through Final Order | 515 | 761 | 277 | 295 | 462 |

As set forth in Table A, disciplinary proceedings took an average total time of 856 days (Row 2) from beginning to completion, which represents the average time across the four Departments between the opening of a disciplinary investigation by the disciplinary committees and the entry of a final court order by the Appellate Division department. The investigation phase took an average of 524 days (Row 3), which represents the average time between the opening of an investigation and the commencement of a proceeding with the Appellate Division. Of the 458 matters that were considered by the Subcommittee, almost all of the proceedings were initiated in the Appellate Division by the filing of a petition alleging professional misconduct or a notice that an attorney had been convicted of a crime. Once proceedings were filed with the Appellate Division, the proceedings took an average of 332 days (Row 4), with proceedings arising from a conviction resulting in a final order after 237 days (Row 5) and petitions alleging misconduct resulting in a final court order after 462 days (Row 6).

The Subcommittee notes that the average time frames in Table A concern only those matters that resulted in a final court order of public discipline and, thus, those averages do not take into account any of the other work of the disciplinary committees or the Appellate Divisions, which is substantial. Such other matters include the disciplinary committees processing and investigating complaints that ultimately are dismissed or disposed of with a private letter of discipline, and the committees and the courts processing applications for reinstatement, incapacity, diversion, or interim suspension.

Because several witnesses testified that the disciplinary authorities lacked adequate staffing and funding and that increased staffing or funding may enhance the efficiency of the disciplinary process the Subcommittee evaluated the staffing levels of the disciplinary committees compared to the average number of matters processed by the committees during the time period from 2012 through 2014 and the total number of attorneys under the jurisdiction of those committees.  Other than the number of attorneys under the jurisdiction of the committees, the Subcommittee obtained the relevant data from the annual reports filed by the disciplinary committees with OCA.

52

| Table B – Data from Annual Reports of the Committees | AD1 | AD2 | AD3 | AD4 |
|---|---|---|---|---|
| Total Attorneys | 134,956 | 82,669 | 64,958 | 18,277 |
| Total New Matters | 3,530 | 5,187 | 1,895 | 1,927 |
| Matters Dismissed - Failure to State a Claim | 318 | 2,347 | 596 | 1,017 |
| Matters Disposed | 2,920 | 5,236 | 1,875 | 1,903 |
| Matters Pending - End of Period | 991 | 2,601 | 1,541 | 530 |
| Counsel on Staff | 20 | 31 | 6 | 7 |
| Investigators on Staff | 4 | 5 | 2 | 5 |

### C.  Issue 1: Is There Undue Delay?

Overall, the proof before the Subcommittee indicates that disciplinary investigations and proceedings, on average, take longer in the First and Second Departments, as compared to the Third and Fourth Departments. The Subcommittee recognizes, however, that simply calculating a best estimate of the average days it took for the disciplinary committees to investigate and determine disciplinary complaints, or the average number of days a matter was pending in the Appellate Division, does not establish that "undue" delay exists. Indeed, some delay may be productive (e.g., diversion for low-level offenders who suffer from substance abuse or mental health issues).  In addition, the Subcommittee agrees that the speedy resolution of disciplinary complaints should not be sought at the expense of the due process rights of the accused attorney. Thus, the Subcommittee evaluated the proof and potential remedies for any undue delay that may exist in the process with those principles in mind.

### D.  Issue 2: Potential Causes of Undue Delay

Remedies suggested by witnesses and other proof indicate that there are several potential causes of undue delay in the disciplinary process in New York:

- Inadequate resources for the disciplinary authorities.
  Testimony and comments reviewed by the Subcommittee suggests that all of the disciplinary committees are understaffed, both in terms of the number of investigators and attorneys. It is apparent that caseloads far exceed the ability of the attorneys and investigators to process claims quickly.

- Lack of actual or perceived discretion to dispose of complaints that lack merit.
  Although the Second, Third and Fourth Departments reject approximately 30 to 50 percent of disciplinary complaints as failing to state a claim, in the First

54

Department the rejection rate is only 9 percent.  This indicates that the disciplinary authorities in the First Department may want to reevaluate the process by which complaints are evaluated and either rejected or referred for further action.

- Inefficiencies in the disciplinary process.

    Aside from inadequate resources afforded to the disciplinary committees, the most common concern raised in the hearing testimony was procedural impediments to the efficient resolution of disciplinary complaints.

    Certain witnesses recommended that the Courts adopt procedures whereby, after a grievance committee determines that formal charges are warranted, the parties may agree on a statement of facts, enter into a "plea bargain" to resolve charges of misconduct, or agree on a proposed sanction.  It was suggested that such procedures would remove lower level offenses from the time-consuming and expensive process of resolving contested matters.

    Similarly, certain witnesses recommended that more formal discovery rules be adopted by the courts. It was suggested that information sharing early in the investigation could reduce disputed issues of fact. It was additionally suggested that the rules of the court be revised to allow for expedited procedures for "routine" proceedings such as felony disbarments, applications for subpoenas by the grievance committees, applications for resignation, and applications for reinstatement, particularly where the matters are uncontested or likely will not involve extensive fact finding.

    In addition, the lack of an "administrative" suspension procedure for attorneys who are delinquent in registering or paying registration fees likely causes unnecessary work for the disciplinary authorities.

    On that point, the Subcommittee members note that, within the past 10 years, the disciplinary committees in New York have been tasked with pursuing attorneys who are

delinquent in registering and paying the related registration fee. The disciplinary committees report that these matters are extremely time consuming and, in many cases, the delinquent attorneys are no longer in New York or are no longer residing or practicing law at the address that is on file with the Office of Court Administration, causing the committees to spend an inordinate amount of time and resources locating and serving them with disciplinary charges.

Specific to disciplinary proceedings that arise after an attorney is convicted of a crime, certain members of the Subcommittee note that, although Judiciary Law § 90 (4)(c) requires that the attorney report the conviction to the Appellate Division within 30 days, convicted attorneys routinely fail to comply with that requirement and, in many cases, the courts or the disciplinary committees do not otherwise become aware of a conviction, leading to undue delay in the processing of those matters. Regarding disciplinary proceedings that concern alleged trust account violations, certain members of the Subcommittee note that the processing of such matters would be much more efficient if the disciplinary committees and their counsel were provided with resources to facilitate trust account audits and trust account reconciliations in contested matters.

Finally, with regard to the First Department, it was suggested that the use of the two-tiered hearing process (i.e., hearing officers followed by hearing panels) may result in undue delay because of the difficulties in scheduling the proceeding before the numerous members of the hearing panels.

### E.  Conclusion

Based on the evidence submitted to the Commission, research and analysis conducted by the members of the Subcommittee, and their personal experience with the disciplinary process, the Subcommittee on Enhancing Efficiency makes the following recommendations:

- Additional funding and staffing must be made available to the disciplinary committees. Inasmuch as the Subcommittee believes that the public's confidence in the disciplinary process and the attorney's due process interests are best served by the prompt investigation and resolution of disciplinary complaints. The disciplinary committees are not able to improve their efficiency in the handling of disciplinary cases without additional staff and resources.

- The disciplinary authorities should be provided resources to enhance their ability to enforce the trust account requirements imposed on all attorneys. Accounting training or additional staff with accounting expertise should be provided to the committees, allowing for an increase in the number of trust account audits conducted and enhancing the efficiency of disciplinary investigations and contested proceedings that concern an alleged violation of the trust account rules.

- Court rules and procedures should be revised to allow the grievance committees and respondent attorneys to adopt stipulated facts or a statement of agreed upon facts, and to allow "plea bargaining" or discipline on consent whereby the parties could agree to a predetermined sanction, subject to approval by the appropriate grievance committee or Appellate Division department. In addition, the Subcommittee recommends that the court rules be revised to facilitate information sharing between staff counsel and an attorney accused of misconduct.  Such revisions could include mandatory document disclosure at an early stage in the process, whereby each party is obligated to disclose the proof upon which they intend to rely in the event formal charges are sought by the committee.

- The Appellate Division should adopt uniform procedures to be followed by the grievance committees in evaluating new matters, including uniform circumstances

under which the Chief Counsels to the grievance committees may dismiss a disciplinary complaint before an investigation is conducted by the committee. Such circumstances may include when a committee lacks jurisdiction over the complaint or when the complaint, even if accepted as true, fails to allege professional misconduct by the attorney.

- Each grievance committee should adopt procedures to be followed at the outset of any investigation that strike a balance between facilitating the prompt resolution of complaints and affording the attorney an opportunity to defend the allegations. Particular attention should be paid where the attorney fails to respond to a complaint or provides an incomplete response. Thus, upon such a failure to respond, the committee should have the authority to issue a subpoena within 60 days and, upon the attorney's failure to comply with the subpoena, promptly move for an order suspending the attorney on an interim basis.

- Staff counsel should be required to provide to the grievance committees status reports that detail the work that has been performed and the anticipated work remaining and estimated time to complete investigations or disciplinary proceedings that have been pending for more than one year. Whether any matter is experiencing undue delay should be evaluated against a uniform standard, developed by an appropriate authority and applicable to all four Departments, and after considering any particular circumstances relevant to the matter.

- Court rules should be evaluated and revised where appropriate to streamline procedures and to eliminate duplication for certain disciplinary proceedings that, by their very nature, do not require extensive fact-finding. Examples include

58

reciprocal discipline, felony disbarments, applications for resignation from the practice of law, and uncontested reinstatement applications.

- Court rules should be revised to allow for an "administrative" suspension for attorneys who fail to register or pay registration fees. The administrative suspension should be imposed automatically after a set time period and a set number of written notices have been sent to the attorney, without a requirement that the attorney be personally served with such notices or the threat of suspension. The administrative suspension could be lifted without court involvement when the attorney is no longer delinquent. Although failure to register and pay registration fees may technically constitute professional misconduct in New York, the Subcommittee believes that the disciplinary expertise and resources of the committees are unnecessarily expended on this purely administrative function. Thus, the Subcommittee recommends that these matters be removed from the disciplinary process altogether and the court rules be revised to uniformly allow for "administrative" suspension and reinstatement of attorneys who are delinquent in timely registering or paying registration fees. Such "administrative" suspension should occur automatically after a period of delinquency and following written notice to the attorney. In revising these rules, particular attention should be paid to streamlining the process as well as to enhancing coordination and the exchange of information between each Department of the Appellate Division and the Office of Court Administration.

- Court rules should be revised to provide for a statewide reporting requirement whereby judges and district attorneys are required to file a report to the Appellate Divisions or disciplinary committees whenever they become aware that an attorney has been convicted of a crime.

- The Appellate Division departments may consider utilizing volunteer special counsel or pro bono counsel in complex disciplinary matters.

- The First Department may consider re-evaluating its two-tier hearing process which utilizes both hearing officers and hearing panels.

# VII. REPORT OF THE SUBCOMMITTEE ON TRANSPARENCY AND ACCESS[55]

In considering whether the attorney disciplinary process in New York should be opened to the public, the Subcommittee recognized that the primary purpose of the disciplinary system is to protect the public. The Subcommittee also recognized that the system has important regulatory, educational and rehabilitative goals, as well as fostering public confidence in the system. Its mission was to consider whether each of these goals would be served by permitting the public to be privy to disciplinary proceedings, and also to explore some of the specific ways in which an open system would work, and what changes or improvements might need to be implemented to effectuate it.

At the initial meeting of the Subcommittee, specific topics were identified as requiring study, and members were divided into groups to research those topics and report back at a later meeting.  The topics were as follows:

- Rules governing confidentiality of disciplinary proceedings in jurisdictions outside of New York and American Bar Association recommendations.

---

[55] The Subcommittee is co-chaired by Co-chairs: Hon. Angela M. Mazzarelli, Devika Kewalramani, Esq., and Professor W. Bradley Wendel. The members are: Harvey Besunder, Esq., Hon. Carmen Beauchamp Ciparick, Robert Giuffra, Esq., Hon. E. Michael Kavanagh, Jerold Ruderman, Esq., Sheldon K. Smith, Esq., Akosua Garcia Yeboah.

- Mechanics of how an open disciplinary process would work in New York (the "when, what and how").

- Dissemination to the public of information concerning attorney discipline.

- Functioning of the four Departments/Uniformity of process.

### A.  Other Jurisdictions

The Subcommittee reviewed a survey conducted by the ABA Center for Professional Responsibility of all 50 states and the District of Columbia concerning the stage of a disciplinary proceeding at which the process becomes open to the public. Although the nuances may differ, the vast majority of jurisdictions open proceedings upon the filing of a formal charge following a finding of probable cause. New York is one of only 9 jurisdictions[56] which do not permit public dissemination of information concerning disciplinary proceedings until, at the earliest, a recommendation that discipline be imposed, and usually upon a final adjudication.

### B.  Mechanics

The Subcommittee studied the final reports of the American Bar Association's Commission on Evaluation of Disciplinary Enforcement (the McKay Commission), which released its report in 1992, and the New York State Committee on the Profession and the Courts (the Craco Committee), which released its report in 1995. The McKay Commission recommended that "[a]ll records of the lawyer disciplinary agency except the work product of disciplinary counsel should be available to the public" and that "[a]ll

---

[56]  The information in the survey was current as of May 27, 2014.  The eight other states are Alabama, Delaware, Iowa, Kentucky, Mississippi, South Dakota, Tennessee and Wyoming.

proceedings except adjudicative deliberations should be public." The Craco Committee recommended opening up the disciplinary process in this State. The Craco Committee was not as clear as the McKay Commission in delineating between disciplinary records and public hearings, but recommended that "the Legislature . . . amend Judiciary Law Section 90(10) to open disciplinary proceedings to public scrutiny," with a provision enabling the Appellate Division, in its discretion, "to close the proceedings for good cause shown."

The McKay Commission and the Craco Committee proposed benchmarks that differ in terminology but are similar in substance as to when a case against an attorney may be deemed strong enough to justify publicizing it. The former group recommended that records become available, and proceedings be opened, to the public, "after a determination has been made that probable cause exists to believe misconduct occurred." It did not define the term "probable cause."[57] The latter panel proposed a uniform standard across the Departments, to wit:

> "that formal charges be filed against a lawyer upon a finding that a prima facie case exists against the lawyer. We define prima facie purpose (sic) as sufficient evidence, if not contradicted, to support the conclusion that a lawyer has committed an ethical violation recognized by the Lawyer's Code of Professional Responsibility. Stated in other terms, for a prima facie case to exist, all the elements comprising a violation of a disciplinary rule must be established by sufficient evidence, if it is not contradicted by other credible evidence, to the satisfaction of the entity making the determination."

---

[57]  In 1995, the New York State Bar Association's Task Force on the Profession also recommended opening disciplinary proceedings on a showing of probable cause, defining the standard as "requiring disciplinary counsel to show that it is more likely than not that serious misconduct has occurred."

The Subcommittee, again looking to the work of the other bodies that studied the issue,[58] considered ideas for how to make attorney discipline public. Although the McKay Commission did not make any concrete suggestions on this subject, the Craco Committee did.  First, it recommended that the grievance committee, upon a finding of probable cause and the filing of charges, add the attorney's name to a list to be maintained by the committee with a caution to the public that charges have not yet been proven. The committee would be required to remove the attorney from the list in the event the charges are dismissed.  Presumably, if this proposal were adopted today, the list would be maintained online and updated, as necessary. The Craco Committee further suggested that the prima facie determination be made by a group of disciplinary committee members (as opposed to members of the staff) or the Appellate Division.  Finally, it recommended that, before charges were filed, the target attorney be afforded some due process to challenge any conclusion that a prima facie case exists.

### C.  Dissemination of Information

The Subcommittee studied the current system for notifying the public about disciplinary action against attorneys.  Presently, the only method for members of the public to determine the disciplinary status of an attorney is online. There are no printed materials or telephonic system for accessing such information.  Further, all available information is currently exclusively available in English.

The website for the Office of Court Administration has a link on its home page for "Legal Profession." A sub-link is entitled, "Attorney Directory." Clicking on that sub-link takes one to an "Attorney Search" page that contains a "captcha box," where one

---

[58]  The Subcommittee recognizes that the McKay Commission and the Craco Committee issued their reports long before the advent of social media, which has the potential to cast a much broader spotlight on attorneys who are subjected to disciplinary proceedings.

must enter a series of arbitrary characters (there is an option to listen to the characters) to prove that he or she is not an automated program (or "bot") designed to extract or mine data for commercial or other purposes. Once the actual search page is accessed and an attorney is selected, the results page (which reports name, registration number, professional affiliation, address and telephone number, year and department of admission, law school attended and registration status) will show whether there is any public disciplinary history, and if there is, state what the history is and include a link to any available reported decisions.

### D.  Confidentiality

Judiciary Law §90(10) governs confidentiality of disciplinary proceedings and applies to all four judicial departments. However, the respective rules of the departments further refine the practices and procedures for investigation and, if necessary, prosecution, of grievances against attorneys.  First Department Rule 605.24 ("Confidentiality") provides as follows:

> (a) **Confidentiality**.  Disciplinary committee members, committee lawyers, committee employees, and all other individuals officially associated or affiliated with the committee, including pro bono lawyers, bar mediators, law students, stenographers, operators of recording devices and typists who transcribe recorded testimony shall keep committee matters confidential in accordance with applicable law.

> (b) **Waiver**.  Upon the written waiver of confidentiality by any Respondent, all participants shall thereafter hold the matter confidential to the extent required by the terms of the waiver.

The Second Department has its own confidentiality rule (Section 691.4(j) – "Unless otherwise provided for by this court, all proceedings conducted by a grievance committee shall be sealed and be deemed private and confidential.").

The Third Department's rules do not contain a broad confidentiality provision. They do state, however, that where an attorney has been admonished or cautioned, "[t]he committee's records relating to its investigation and sanction shall be confidential" (Section 806.4 [c][5]). They further provide that, where an attorney has been suspended on an interim basis, "[t]he papers submitted in connection with the application therefor shall be deemed confidential until such time as the disciplinary matter has been concluded and the charges are sustained by the court" (Section 806.4 [f][3]). The Fourth Department does not have any specific rules related to confidentiality.

### E.  Filing of Formal Charges

The four departments also differ in the manner in which a determination is made to institute formal charges against an attorney after the filing of a preliminary complaint. For example, there are differences in how the committees approve the filing of formal charges. In the First Department, two members of the Policy Committee approve the filing; in the Second, Third and Fourth Departments, it must be a committee determination.  Further, only the Second and Fourth Departments apply a probable cause standard to determine whether to file formal charges, and only the Second Department appears to permit a probable cause hearing before a subcommittee of the committee. There are also dissimilar "majority" voting requirements for approval of filing of formal charges.  The Second Department requires a majority vote of the full committee; the Fourth Department requires a vote of the majority of committee members present; and the First and Third Departments do not specify any such requirement. Finally, only the Fourth Department allows the attorney to appear before the committee and be heard before the issuance of formal charges.

66

### F.  Conclusion

The Subcommittee recognizes that the paramount concern of the attorney disciplinary process is the protection of the public, and that the public would be better served if the disciplinary process is structured so that it is more accessible to the public. Engaging the public in the process can only serve to advance that fundamental and important goal that underlies the system of attorney discipline. Accordingly, the Subcommittee recommends that New York join the vast majority of United States jurisdictions which permit public access to disciplinary proceedings.

It is important to recognize that the primary purposes underlying the attorney disciplinary system are regulatory, educational and rehabilitative. In addition to sanctioning attorneys with disbarment, suspension, and public censure for crimes or serious misconduct, the system offers diversion programs for less serious misconduct, such as substance abuse and alcohol-related counseling. There is a need to delineate between young or wayward lawyers who would be best served by positive action that steers them to the right path, and those who are "rotten apples" who should be removed from the bar either temporarily or permanently. Those attorneys who mostly need a helping hand may not be best served if their involvement with the disciplinary system is made public.  There are also concerns that important factors (such as mental or physical health issues, family issues, dependency and other significant mitigating or diversion factors) only come to light after a probable cause or similar charge finding has been made, or perhaps even during a trial, and that any publicity of such information could unnecessarily cause irreparable harm to the respondent attorney. Additionally, there is a concern that complainants might be deterred from lodging complaints against attorneys if they knew the matter would expose them to the media or otherwise make their private concerns public. Some mechanism may need to be devised to deal with these practical considerations.

It was the consensus of the Subcommittee, with two strong dissents, that no disciplinary proceeding should become open, and no disciplinary records (except for the work product of disciplinary counsel), should become available to the public until after an initial complaint is filed against the attorney, based on a clearly demarcated standard of evidence. This could be "probable cause," the term used by the McKay Commission, or "prima facie case," which the Craco Committee used. In either case, the terminology would need to be clearly defined to ensure that no proceeding is opened to the public until a sufficiently solid case has been assembled against the attorney-respondent. Giving attorneys an opportunity to appear before the disciplinary committee before formal charges are filed, as currently allowed in the Fourth Department, might also be considered, as the personal stakes for an attorney are heightened when such charges would expose the attorney's predicament to the public.

It is noted, however, that, although the Subcommittee unanimously agrees that confidentiality of the process should remain, at a minimum, through at least some sort of probable cause or evidentiary finding, certain Subcommittee members also believe, based on their experiences on grievance committees or otherwise, that confidentiality should remain until a finding on conduct and discipline is ultimately made by a court (i.e., confirmation or dismissal of formal charges), even if efforts are made at statewide uniformity and efficiency regarding the underlying processes. These Subcommittee members think that most matters should take their full course, so as not to in any way usurp the Court's powers or chill any party's rights, and because the presumptions of innocence and other discovery tools and evidentiary/procedural/due process rules that exist in other contexts are not present in the grievance process, particularly not in a sufficient enough manner to outweigh potential irreparable reputational damage (also a paramount concern of the grievance process) or to guard against unfairly slanting the process either way.

Two members also believe that letters of caution and admonition, and the like, determined by grievance committees or chief counsel, should remain confidential, regardless of changed uniformity and other procedural rules or guidelines. These Subcommittee members also note that there are rules that permit exceptions to Judiciary Law §90 and allow disclosure (e.g., obtaining a "sharing order" under certain circumstances to disclose to other authorities certain facts that the grievance committee has uncovered). It has been suggested that efforts be made toward courts considering the use of sharing orders and interim suspensions more frequently, as reasonable steps toward more protection for the public, rather than the current overhaul suggestions. Other reasons stated by these Subcommittee members as to why the process should not be opened to the public at any time earlier than currently allowed include:

- That the consequences of opening the system have not been properly studied and there is no empirical data to support the proposition that opening up the process will enhance the public image of lawyers or the legal profession.

- That, assuming the primary purpose of the disciplinary system is to protect the public, it is unclear how an open system protects the public any more than the current system does. Currently, if there are "serious" violations of the Rules, and a continuing danger to the public, an application for an interim suspension can be made and if granted will result in notice to the public.

- That, to the extent one of the purposes of the disciplinary system is to educate lawyers and guide them toward compliance with the Rules of Professional Conduct, there is no basis to believe that opening the system to the public would be more effective in meeting that goal than the current system of requiring new

69

attorneys to pass the MPRE and requiring all attorneys to achieve a minimum number of continuing legal education credits in legal ethics.

- That any recommendation that attorneys have the opportunity to show good cause as to why proceedings should be closed to the public merely creates an additional burden upon the accused attorney.

- That the Appellate Division Departments presumably have the power at this point to "open the proceedings" if there is need for public awareness of an individual proceeding.

- That a change in the current system may subject the grievance committees to the Executive Law regarding compliance with the open meetings and Freedom of Information laws, which would place an additional burden on the committees.

- That the terms "probable cause" and "prima facie" proof of a violation have not been clearly defined.

In sum: This Subcommittee recommends legislation that would allow public dissemination of disciplinary charges after a finding of probable cause or prima facie evidence and the service of formal charges. The information would become public 30 days after the service of charges, providing the attorney time to show cause why the record should not be opened to the public. The aforementioned Statewide Coordinator of Attorney Discipline would track all instances in which an attorney requested continued sealing of the record and publicly report annually the number of requests made and granted. The precise legislation should be promulgated by the Chief Administrative

70

Judge, in conjunction with the Administrative Board, and presented to the Chief Judge and Chief Administrative Judge for inclusion in the 2016-17 legislative agenda.

### G.  The Position of the Full Commission on a More Open System

Whether to open the disciplinary process to the public and, if so, when and how, was the first issue debated by the Commission and proved to be the most difficult and divisive.

The main argument in favor centered on the legal consumer's interest in knowing if the attorney he or she  may hire has a pending disciplinary charge—possibly in the same type of case the client presents—and the societal importance of governmental transparency. The supporters noted that 40 states currently disclose disciplinary charges at the probable cause stage or earlier and that it is exceedingly rare for misconduct charges, once lodged, to be dismissed. They argued that public confidence and trust in the disciplinary system requires a greater element of openness.

The main argument in opposition centered on the danger that an attorney exonerated after a charge was lodged (and made available to the public) would be exposed to career-damaging publicity which, in the era of social media, could never be fully retracted. Opponents noted that of the roughly 13,000 new disciplinary complaints filed annually against lawyers, only about 2 percent result in public discipline, and a high percentage of those involve attorneys who either resigned without a disciplinary hearing or were automatically disbarred because of a felony conviction. Additionally, the opponents observed that courts already have the authority to order the interim suspension (which are public) of an attorney when there is evidence the attorney is a threat to the public interest.

A compromise was reached that the members believe will ensure the consuming public is protected from potentially unscrupulous lawyers, while also ensuring that the

reputations of innocent attorneys are not unjustly tarnished.[59] The compromise proposal is as follows: "Amend the current rules of the Appellate Division to expressly authorize each disciplinary committee to seek, either separately or in conjunction with an application for interim suspension and upon notice to the affected attorney, an order unsealing proceedings to permit the publication of charges pursuant to Judiciary Law §90(10), upon a finding by the Court that the attorney's conduct places clients at significant risk or presents an immediate threat to the public interest.  The amendment would be proposed by the Chief Administrative Judge, approved by the Administrative Board of the Courts, and approved by each Department of the Appellate Division."

The disclosure issue has lingered for decades and has been addressed repeatedly by various bar groups and others, without legislative resolution. The Commission believes that this compromise, which can be implemented immediately and without legislative action, properly balances the competing interests at hand. However, several members stressed that the four Departments of the Appellate Division should, consistent with this report, establish consistent standards and guidelines for the application of this provision.

### H.  Subcommittee Recommendation on Transparency and Access

Although an initiative earlier this year by Chief Judge Lippman, who required the addition of already public attorney disciplinary records to the attorney registration website, made this information much more accessible, it remains, in the opinion of this Subcommittee, too cumbersome. It observed that the current mechanism for accessing disciplinary data is complicated because it requires multiple steps to obtain the desired information. The Subcommittee strongly recommends a new, consumer-oriented web

---

[59] One member opposed the compromise, arguing that it does not adequately protect the public and that the recommendation is "superfluous since a broader authority already exists in Judiciary Law 90(10)."

presence that makes it much easier to review existing public records on attorney discipline. It should include:

- A more easily locatable, searchable, consumer friendly and robust website for the disciplinary system.

- Information (especially complaint forms) available in languages other than English.

- The website should centralize links to the Rules of Professional Conduct, disciplinary rules and procedures, forms for the Lawyers' Fund for Client Protection, and other relevant New York legal resources and publications.

- The website should provide a searchable library of the Court of Appeals' disciplinary opinions and those of the four departments of the Appellate Division, grievance committees and referees.

- Consideration should be given to including e-news alerts, summaries of recent cases of interest and import, and information about available continuing legal education programs relating to the system and ethics and professional responsibility generally.

The Subcommittee recommends that, in addition to the public website maintained by the Unified Court System, the private intranet available to judges and court personnel should also include information concerning attorney discipline. For those without access to the internet, a telephone hotline should be created whereby those members of the public could verify an attorney's disciplinary status and history. Also, literature

73

concerning the disciplinary process and structure, such as how and where to file a complaint against an attorney suspected of violating the Rules of Professional Conduct, should be available online and in printed form, also in several languages, at courthouses, bar associations, and other locations.

# VIII. OTHER ISSUES

### A.  Prosecutorial Misconduct

An issue that arose repeatedly was whether there should be a separate disciplinary mechanism to address claims of prosecutorial misconduct. That issue was raised at all three public hearings and centers on the fact that some wrongful convictions have resulted from unethical or illegal conduct by prosecutors. Witnesses and critics have suggested that prosecutors are rarely disciplined for professional misconduct, and noted that judicial determinations that a prosecutor behaved unethically or inappropriately are not automatically referred to a disciplinary committee. Some witnesses proposed a separate disciplinary panel, modeled after the Commission on Judicial Conduct, to review and prosecute claims of prosecutorial misconduct. Legislation to that effect is pending in both houses of the State Legislature.[60]

At the outset, the Commission recognizes that prosecutorial misconduct can stem from a good-faith but errant application of the law that is later rectified by a trial or appellate court. To that extent, the Commission restricts its analysis to those instances where a violation is intentional and evincing not a judgmental or legal error by a prosecutor, but an act of dishonesty.

---

[60] See S24 (DeFrancisco) and A1131 (Perry).

75

In 2009, the New York State Bar Association's Task Force on Wrongful Convictions published a final report in which it addressed, among many other issues, prosecutorial misconduct. [61] Among its recommendations:

> Where there is no effective procedure already in place for preventing, identifying and sanctioning misconduct, prosecutor's offices should establish such a procedure appropriate to its staffing. In cases in which a state or federal court has concluded that an Assistant District Attorney has violated the rules, the prosecutor's process should determine the appropriate sanction, including dismissal from employment. If the court has not made such a finding, where questions about an assistant's behavior are raised, the office should undertake an investigation of the conduct and determine if there has been unconstitutional conduct and, if so, the appropriate sanctions to be imposed…

> Although court decisions provide a source of information about *Brady*[62] and truthful evidence issues, there is no standardized procedure for sending cases from the Appellate Divisions involving lawyer conduct to the committees. The Appellate Division clerks do not forward to the disciplinary committees opinions of the courts dealing with prosecutorial misconduct.

> The Task Force recommends that cases in which a state court finds there has been intentional or reckless prosecutorial misconduct based on a *Brady*

---

[61] See Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, April 4, 2009, at https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26663.

[62] See *Brady v. Maryland*, 373 U.S. 83, 1963, where the Supreme Court held that a prosecutor's suppression of exculpatory evidence constitutes a denial of due process.

> or truthful evidence rule violation be referred by the
> clerk of the court to the appropriate disciplinary
> committee for examination, investigation and
> further processing where appropriate. Where there
> are vacatures of convictions by federal courts, upon
> the remand to the state court, the state court clerk
> should likewise forward the case to the committee
> for consideration of sanctions.[63]

The Task Force observed in a footnote that it had received a letter from the First Department Disciplinary Committee confirming that "[i]f the Committee learns of a judicial decision criticizing a prosecutor for intentionally failing to provide the defense with exculpatory materials or a defendant's attorney for gross ineffective assistance of counsel, the Committee might open an inquiry to determine whether discipline were appropriate. These decisions are made on a case-by-case basis."[64]

In sum: the State Bar Association calls on district attorneys to address the issue internally; the pending legislation would require a new bureaucracy to monitor the conduct of prosecutors.[65] While the aims of the bill are laudatory, this Commission favors another simpler, more efficient and less costly potential remedy: Ensure that every matter in which a court has found that a prosecutor engaged in misconduct is referred to a disciplinary committee. The Commission stresses, again, the difference between prosecutorial misconduct that results from a good-faith error and prosecutorial

_____

[63] Ibid, pages 31, 34-35.

[64] Ibid, footnote 9 on page 35.

[65] It bears noting that while several witnesses at the public hearings and several individuals who submitted written statements to the Commission supported the concept of a new disciplinary apparatus designed solely to address prosecutorial misconduct, the Commission received no comment or testimony from any prosecutor.

misconduct that evinces unethical or malicious behavior, and recognizes that the vast majority of such judicial findings involve the former.

Still, the Commission is convinced, as a matter of public trust and confidence, that it would be valuable to at least have these matters reviewed by the appropriate disciplinary committee. Hearing testimony and written materials indicate that professional misconduct claims grounded in prosecutorial misconduct receive the same attention and scrutiny from the disciplinary and grievance committees as any other complaint—*if the committee receives a complaint or becomes aware of an instance of prosecutorial misconduct*. If there is a problem, it lies therein. The Commission has no reason to doubt that the grievance and disciplinary committees diligently examine claims of prosecutorial misconduct that come to their attention, often by defendants. This proposed compromise between the State Bar position and the pending legislation would simply ensure that each and every matter in which a prosecutor in New York is found liable for prosecutorial misconduct is brought to the attention of disciplinary authorities.

It is the position of this Commission that the Administrative Board should take immediate action to ensure that judicial determinations of prosecutorial misconduct are promptly referred to the appropriate disciplinary committee. Of equal importance, given the perception or misperception, that claims of prosecutorial misconduct are routinely "swept under the rug," the coordinator of attorney discipline, proposed earlier in this report, should compile, and release as part of an annual report, a statistical summary including, inter alia, the number of complaints of prosecutorial misconduct received and reviewed, the number resulting in public discipline and the number resulting in private discipline.

One final point re prosecutorial misconduct: It is abundantly clear from the public hearings and comments received by the Commission that there is a perception of rampant prosecutorial misconduct which is ignored by the disciplinary committees. As stated earlier, the Commission finds no support for that contention. However, given that

prosecutors are public officials, and given that the public has every right to scrutinize the conduct of those it entrusts with public office, this Commission believes that in all cases in which a prosecutor is sanctioned for misconduct, even if the sanction is a private one, appropriately redacted details should be publicly released. The public must be able to make an informed judgment about whether the result of a complaint of prosecutorial misconduct is fair, whether the disciplinary committee did its job and whether the system is working.

### B.  Dealing with Attorney Mental Illness and Addiction

Several witnesses raised concerns over the way the attorney disciplinary process deals with lawyers suffering with mental illness or an addiction.[66] All four departments have rules for how to deal with an attorney lacking capacity. However, the rules are inconsistent. The First and Second Departments have identical rules.[67] A different rule applies in the Third Department. [68] The Fourth Department has two separate rules addressing the issue.[69] Only the Second Department has a specific rule covering medical and psychological evidence at a mitigation hearing.[70] As previously indicated, the Second, Third and Fourth Departments all have diversion rules, but the First Department does not.

---

[66] In particular, see the testimony of Deborah A. Scalise, Scalise Hamilton & Sheridan at the Aug. 11 public hearing in Manhattan, http://www.nycourts.gov/attorneys/discipline/Documents/NYCTranscript.pdf. Also, see Ms. Scalise's article, "Ethically Dealing with Clients, Witnesses and Attorneys with Diminished Capacity" at http://www.nycourts.gov/attorneys/discipline/resources.shtml.

[67] See 22 NYCRR §603.16 and 22 NYCRR §691.13.

[68] See 22 NYCRR §806.10.

[69] See 22 NYCRR §1022.23 AND 22 NYCRR §1022.24.

[70] See 22 NYCRR §691.4 (n).

As a first step, the First Department must join the rest of the state and adopt a diversion rule. The second question, of course, is what should that rule be? That is a decision the Administrative Board should make. However, it should be noted that the New York State Bar Association's Lawyer Assistance Program and the New York City Bar Association Lawyer Assistance Program collaborated on a proposed unified diversion rule that could be adopted by all four departments. Again, that is a task rightly entrusted to the Administrative Board, but it need go no further for a potential model than the bars' proposed unified diversion rule.[71] If nothing else, it is a good starting point.

---

[71] The proposed rule is contained in an Aug. 28, 2015 letter the Commission was sent by the New York City Bar. That letter is available on the "resources" page of the Commission's website: http://www.nycourts.gov/attorneys/discipline/resources.shtml

# IX. CONCLUSION

This Commission's thorough examination of the attorney disciplinary process in New York suggests that the existing system is not "broken." In many ways, it works quite well. By and large, the work done on a daily basis by the staff and volunteer lawyers and lay members is laudable, especially given the inadequate resources and lack of guidelines. But the system is antiquated, inefficient and far too opaque—a flaw which undermines public confidence. Most of the recommendations in this report can be achieved administratively and, since the court system can implement reforms on its own, the Commission urges both prompt action and an ongoing commitment to review and, where necessary, revise the rules and procedures.

Going forward, the Commission recognizes that modernizing and improving the attorney disciplinary system is an enduring process and recommends the formation of a permanent, volunteer long-range planning panel that would continue to evaluate the system, with the benefit of being able to review what the Commission perceives as very detailed annual reports of the proposed coordinator. The current state of the disciplinary system is a result, largely, of a lack of ongoing "maintenance." It is the Commission's belief that regular and diligent monitoring of the system, largely through the Statewide Coordinator of Attorney Discipline and the Administrative Board but also through what we view as a long-range planning advisory board, would bring and keep the system up-to-date.

82

# ACKNOWLEDGMENTS

The Commission is deeply appreciative of the individuals and groups that provided their thoughts and insight on attorney discipline in New York State. The diverse and informed commentary was invaluable to the Commission as it considered the relevant issues. Whether by way of written comment sent via e-mail, ideas shared at a focus group or stakeholder meeting, or through formal testimony at a public hearing, the Commission considered each and every viewpoint in making its recommendation to the Court.  Without the well-reasoned input of the members of the legal community, including judges, practitioners, bar leaders, law school faculty, and students, the Committee would have been unable to fulfill its mandate.

The Commission also would like to express its appreciation to the staff at the New York State Court of Appeals, the New York County Lawyers' Association and Erie County who provided space for and helped facilitate the three public hearings. Finally, the Commission expresses its sincere gratitude to former Chief Administrative Judge A. Gail Prudenti, who initially served as chair of the Commission and guided it through its formative stages. Judge Prudenti's outstanding leadership and guidance through July 30, 2015, when she resigned from the Judiciary after 23 exemplary years of service, is evident on every page of this report.

# APPENDICES (AVAILABLE ONLINE)

**Appendix 1:   List of subcommittees and members**
(http://www.nycourts.gov/attorneys/discipline/subcommittees.shtml)

**Appendix 2:   Notice of Public Hearings**
(http://www.nycourts.gov/attorneys/discipline/PublicHearings.shtml)

**Appendix 3:   Gillers article, "Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public"**
(http://www.nycourts.gov/attorneys/discipline/Resources/Gillers-Lowering-the-Bar-17NYUJLPP2.pdf)

**Appendix 4:    Simon article Part 1, "Confidential Disciplinary Proceedings & First Amendment"**
(http://www.newyorklegalethics.com/confidential-disciplinary-proceedings-first-amendment-part-1/)

**Appendix 5: Simon article Part 2: "Confidential Disciplinary Proceedings & First Amendment"** (http://www.newyorklegalethics.com/confidential-disciplinary-proceedings-first-amendment-part-ii/)

**Appendix 6: Podcast Interview with Judge Barry Cozier and transcript**
(http://www.nycourts.gov/attorneys/discipline/resources.shtml)

**Appendix 7: Abel article 1, "Lawyers in the Dock: Learnings from Attorney Disciplinary Proceedings"**
(http://www.nycourts.gov/attorneys/discipline/Documents/Lawyers%20in%20the%20Dock.pdf)

**Appendix 8: Abel article 2, "Lawyers on Trial: Understanding Ethical Misconduct"**
(http://www.nycourts.gov/attorneys/discipline/Documents/Lawyers%20on%20Trial.pdf)

**Appendix 9: Scalise article, "Ethically Dealing with Clients, Witnesses and Attorneys with Diminished Capacity"**
(http://www.nycourts.gov/attorneys/discipline/Documents/Ethics%20update%202015%20--%20Incapacity.pdf)

**Appendix 10: Letter from New York City Bar re uniform diversion rules**
(http://www.nycourts.gov/attorneys/discipline/resources.shtml)

**Appendix 11:  Letter from Ellyn Rosen and Nancy Cohen, members of ABA Standing Committee on Professional Discipline**
(http://www.nycourts.gov/attorneys/discipline/Documents/RosenCohenLetter.pdf)

**Appendix 12:  Albany Public Hearing Transcript**
(http://www.nycourts.gov/attorneys/discipline/Documents/AlbanyTranscript.pdf)

**Appendix 13:  Buffalo Public Hearing Transcript**
(http://www.nycourts.gov/attorneys/discipline/Documents/BuffaloTranscript.pdf)

**Appendix 14:  New York City Public Hearing Transcript**
(http://www.nycourts.gov/attorneys/discipline/Documents/NYCtranscript.pdf)