**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CIVIL RIGHTS CORPS, CYNTHIA GODSOE,
NICOLE SMITH FUTRELL, DANIEL S.
MEDWED, JUSTIN MURRAY, ABBE SMITH,
AND STEVEN ZEIDMAN,

                        Plaintiffs,

v.

STEVEN STEIN CUSHMAN, Corporation Counsel
of the City of New York, in his official capacity;
GEORGIA PESTANA, Former Corporation Counsel
of the City of New York, in her personal
capacity; MELINDA KATZ, the District Attorney
for Queens County, in her official and personal
capacity; HECTOR D. LASALLE, Presiding Justice
of the Second Judicial Department of the Appellate
Division of the Supreme Court of the State of New
York, in his official capacity,

                        Defendants.

Case No. 1:21-cv-09128 (VM)

Hon. Victor Marrero

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**ON THE FOURTH CLAIM FOR RELIEF**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

    **A.**    The Plaintiffs File Grievance Complaints And Initiate This Litigation .................1

    **B.**    The Grievance Committee Declines To Provide Any Information About The Complaints, Leading to This Motion ....................................................................3

    **C.**    Prosecutorial Misconduct "Infrequently" Leads To Attorney Discipline..............4

    **D.**    Grievance Proceedings Are Secret....................................................................5

        1.    Investigations By The Grievance Committee Staff ...................................6

        2.    Dispositions By The Grievance Committee ..............................................6

        3.    Formal Disciplinary Proceeding Before The Appellate Division...............8

LEGAL STANDARD................................................................................................................9

ARGUMENT ........................................................................................................................10

I.    Attorney Disciplinary Proceedings In The Grievance Committee And The Appellate Division Are Judicial Proceedings To Which The Right Of Access Attaches.................................................................................................................11

II.    Under The "Experience" And "Logic" Test, There Is A Presumptive Right Of Public Access To Attorney Disciplinary Proceedings And Records ................................12

    **A.**    Disciplinary Proceedings Are Historically Open....................................................14

    **B.**    Public Access Would Play A Significant Positive Role In Attorney Discipline ........................................................................................................16

III.    The Dispositions Of Grievance Committee Proceedings Should Be Public ....................19

IV.    The Records and Proceedings of Appellate Division Hearings Should Be Public...........21

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABC, Inc. v. Stewart*,
    360 F.3d 90 (2d Cir. 2004)....................................................................................22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................10

*Matter of Aretakis*,
    16 A.D.3d 899 (3d Dep't 2005)............................................................................5

*Petition of Brooks*,
    678 A.2d 140 (1996).........................................................................................23

*D.C. Ct. of Appeals v. Feldman*,
    460 U.S. 462 (1983)..........................................................................................11

*In re Demetriades*,
    58 F.4th 37 (2d Cir. 2023) ...........................................................................21, 23

*Detroit Free Press v. Ashcroft*,
    303 F.3d 681 (6th Cir. 2002) .............................................................................13

*Doe v. Doe*,
    127 S.W.3d 728 (Tenn. 2004)............................................................................23

*Doe v. Rosenberry*,
    255 F.2d 118 (2d Cir. 1958)..............................................................................11

*Doe v. Supreme Ct.*,
    734 F. Supp. 981 (S.D. Fla. 1990) .....................................................................23

*In re Dunn*,
    50 N.Y.S. 163 (3d Dep't 1898).....................................................................14, 24

*El Vocero de Puerto Rico v. Puerto Rico*,
    508 U.S. 147 (1993)..........................................................................................14

*F.T.C. v. Standard Fin. Mgmt. Corp.*,
    830 F.2d 404 (1st Cir. 1987)..............................................................................18

*In re Gitto Global Corp.*,
    No. 05-CV-10334, 2005 WL 1027348 (D. Mass. May 2, 2005)............................24

*Globe Newspaper Co. v. Superior Ct.*,
    457 U.S. 596 (1982)................................................................................12, 13, 23

*In re Harding*,
    125 N.Y.S. 264 (3d Dep't 1910)........................................................................24

*Hartford Courant Co. v. Pellegrino*,
    380 F.3d 83 (2d Cir. 2004)..................................................................11, 13, 20

*Hatzimihalis v. SMBC Nikko Sec. Am., Inc.*,
    No. 20-CV-8037, 2023 WL 3736440 (S.D.N.Y. May 31, 2023) ...........................20

*Joy v. North*,
    692 F.2d 880 (2d Cir. 1982)...............................................................................10

*Karlin v. Culkin*,
    162 N.E. 487 (N.Y. 1928)...................................................................................20

*In re Kelly*,
    59 N.Y. 595 (1875) ...........................................................................................14

*Matter of Kurtzrock*,
    192 A.D.3d 197 (2nd Dep't 2020) .......................................................................5

*Landmark Commc'ns, Inc. v. Virginia Risk*,
    435 U.S. 829 (1978)...........................................................................................24

*Levy v. Ass'n of the Bar of the City of N.Y.*,
    37 N.Y.2d 279 (1975) ........................................................................................17

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006)..........................................................................13, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).............................................................................................9

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. (1982).............................................................................................6, 12

*Moroughan v. Cty. of Suffolk*,
    No. 12-CV-0512, 2021 WL 280053 (E.D.N.Y. Jan. 24, 2021) ..........................21

*Mosby v. Ligon*,
    418 F.3d 927 (8th Cir. 2005) .............................................................................20

*In re N.Y. News, Inc.*,
    113 A.D.2d 92 (1st Dep't 1985) ..........................................................................5

*In re N.Y. Times Co.*,
    828 F.2d 110 (2d Cir.1987)..................................................................13, 23

*N.Y.C.L.U v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)................................................................12, 13

*Newsday LLC v. Cty. of Nassau*,
    730 F.3d 156 (2d Cir. 2013)................................................................20, 21

*Press-Enterprise Co. v. Superior Ct.*,
    464 U.S. 501 (1984) ("*Press-Enterprise I*") ...............................12, 17,
    23

*Press–Enterprise Co. v. Superior Ct.*,
    478 U.S. 1 (1986) ("*Press-Enterprise II*")....................................13, 16, 18, 19,
    23

*R.M. v. Supreme Ct.*,
    883 A.2d 369 (N.J. 2005)....................................................................23, 24

*In re Raisch*,
    90 A. 12 (N.J. Ch. 1914).........................................................................14

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980)..............................................................11, 13, 16, 17

*In re Rowe*,
    80 N.Y.2d 336 (1992) ...........................................................................17

*Scheiner v. Wallace*,
    No. 93-CV-62, 1996 WL 633226 (S.D.N.Y. Oct. 31, 1996)....................21

*Soc'y of Prof'l Journalists v. Sec'y of Labor*,
    616 F. Supp. 569 (D. Utah 1985)...........................................................13

*In re Special Proceedings*,
    842 F. Supp. 2d 232 (D.D.C. 2012).......................................................18

*In re Spencer*,
    122 N.Y.S. 190 (1st Dep't 1910) ...........................................................14

*United States v. Amodeo*,
    71 F.3d 1044 (2d Cir. 1995)...................................................................21

*United States v. Antar*,
    38 F.3d 1348 (3d Cir.1994)....................................................................22

*United States v. Doe*,
    629 F. App'x 69 (2d Cir. 2015) .............................................................23

*United States v. Stevens*,
    No. 08-CV-231, 2008 WL 8743218 (D.D.C. Dec. 19, 2008) .................................................18

*United States v. Travers*,
    25 M.J. 61 (C.M.A. 1987) ..............................................................................................13

*In re Warner*,
    21 So.3d 218 (La. 2009) ..............................................................................................23

*Westmoreland v. Columbia Broad. Sys., Inc.*,
    752 F.2d 16 (2d Cir. 1984)...............................................................................10, 11, 17

*Wiener v. Weintraub*,
    22 N.Y.2d 330 (1968) .............................................................................................11, 14

*Youmans v. Smith*,
    153 N.Y. 214 (1897) ......................................................................................................14

**Statutes**

N.Y. Jud. Law § 88(8) ..........................................................................................................14

N.Y. Jud. Law § 90(10) .................................................................................................. passim

**Other Authorities**

22 N.Y.C.R.R. 1240..........................................................................................................passim

*A Charge Against An Attorney*, N.Y. Times, Oct. 2, 1877 ...............................................22

ABA Commission on Evaluation of Disciplinary Enforcement, *Lawyer
    Regulation for a New Century* (Feb. 1992), https://www.americanbar./groups/
    professional_responsibility/resources/report_archive/mckay_report/ ..................................24

ABA, Model Rules of Lawyer Disciplinary Enforcement R. 16A (2002) ...................................15

*An Attorneys' Fight: Horace Bell and Dunnigan & Dunnigan in Court*, L.A.
    Times, Dec. 13, 1898 .....................................................................................................22

*Attorney Attacked, Attempt to Disbar Earl Rogers*, L.A. Times, May 27, 1900 ..........................22

*Attempt to Disbar a Cincinnati Attorney—The Textile Fabrics Exposition*, Chi.
    Trib., July 29, 1869 .........................................................................................................22

*Campbell's Case*, CHI. DAILY TRIB., July 17, 1884............................................................21

*Charge Against Lawyer: J. J. Halligan Accused of Exacting an Exorbitant Fee*,
    N.Y. Times, Mar. 10, 1999 ............................................................................................22

*Charges Against Two Lawyers: Proceedings to Disbar the Firm of Hall & Webster*, N.Y. Times, Oct. 5, 1875 ......................................................................21

Chief Judge's Comm. on the Profession and the Courts, *Final Report to the Chief Judge* (1995) .................................................................................................15

Chief Judge's Comm. on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 12 (2015)............................15

*Club Feud, Now Suit to Disbar*, Chi. Trib., May 20, 1904.........................................22

*Court Clears an Attorney: Appellate Division Finds No Ground to Disbar O'Neill*, N.Y. Times, July 12, 1918 .......................................................................24

*The Defense Injects a Demurrer that Puts it Off*, L.A. Times, Oct. 14, 1888 ...............22

*The Disbarment Case: The Defense Injects a Demurrer that Puts it Off*, L.A. Times, Oct. 14, 1888 ..............................................................................................21

*Domestic Intelligence*, Cohen's Lottery Gazette & Reg., May 23, 1822 .....................21

*Fellow-Attorney Asks that John Patterson be Disbarred*, Wash. Post, Mar. 31, 1906 .........................................................................................................................22

Joaquin Sapien & Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority?  Usually Nobody,* PROPUBLICA (Apr. 3, 2013), https://www.propublica.org/article/who-polices-prosecutors-who-abuse-their-authority-usually-nobody ....................................................................................16

Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 10 n.47 (2014) ..................................................................................14

Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 13, 14 n.249 (2007) ...........................................................................16

*Motion to Disbar Attorneys*, N.Y. Times, Oct. 21, 1874 ...........................................22

*Negro Lawyer in Trouble: To Disbar G.R. Brewster: Newberg Lawyer Accused of Using Funds Left in His Care*, N.Y. Times, Jan. 25, 1914 .....................................22

New York Times Editorial Board, *How Can You Destroy a Person's Life and Only Get a Slap on the Wrist?*, N.Y. Times (Dec. 4, 2021)......................................16

Nina Morrison, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018)...........................................................................................................16

*Proceedings to Disbar Attorneys Dismissed*, N.Y. Times, May 30, 1874 ...................24

N.Y. State Bar Ass'n Comm. on Prof'l Discipline, *A Comprehensive Study of the State of Discipline in New York* 50 (June 1985) ....................................................................15

Committee on Prof'l Discipline, *The Confidentiality of Discipline Proceedings*, 47 REC. ASS'N B. CITY N.Y. 48 (1992)....................................................................15

Stephen Gillers, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 NYU J. L. Pub. Pol. 485 (2014)....................................................16, 18

*Threatens to Kill Accuser if Attorneys Disbar Him*, Chi. Trib., Feb. 11, 1908 ...........................22

## PRELIMINARY STATEMENT

The First Amendment protects the public's right of access to judicial proceedings and records. This right of access applies to New York State's trial-type attorney disciplinary proceedings held before the Appellate Division and to the written dispositions of all grievance complaints by the Grievance Committee (which acts on behalf of the Appellate Division). That is particularly true here, where the attorneys accused of misconduct are present or former prosecutors and where there is an intense public interest in monitoring their proper conduct.

Plaintiffs seek two forms of relief on their Fourth Claim for Relief. *First,* where the grievance committee or its Chief Counsel disposes of one of Plaintiffs' grievance complaints pursuant to 22 NYCRR. § 1240.7(d)(1) or (2), Plaintiffs seek access to any such dispositions, whether in the form of letters of dismissal, advisement or admonishment, opinions authorizing formal disciplinary hearings and/or decisions on reconsideration or review. *Second,* where the grievance committee refers a complaint for disposition to the Appellate Division pursuant to 22 NYCRR. § 1240.8, Plaintiffs seek live access to any hearings and related submissions and decisions before the Appellate Division (including those before a special referee).

## STATEMENT OF FACTS

### A.  The Plaintiffs File Grievance Complaints And Initiate This Litigation

The Court is well familiar with the underlying facts, *see* January 25, 2022 Order to Unseal, ECF No. 58; May 5, 2022 Decision and Order ("May 2022 Order"), ECF No. 90; June 13, 2022 Decision and Order ("June 13 Order"), ECF No. 94, and Plaintiffs summarize them only briefly. In May 2021, the Plaintiff Law Professors, with support of the Plaintiff Civil Rights Corps ("CRC"), filed twenty-one (21) complaints pursuant to New York Judiciary Law § 90(10) against present or former prosecutors with the Queens District Attorney's Office, alleging prosecutorial misconduct (the "Grievance Complaints"). Pls.' Stmt. of Material Facts Pursuant to Local R. 56.

1 ("Pls.' 56. 1") ¶ 2.  The complaints were all based on judicial findings of misconduct and were all published on the CRC-supported website, AccountabiltyNY.com.  *Id.*

The grievance committee for the 2nd, 11th, and 13th judicial districts, through its Chief Counsel, Diana Maxfield Kearse, responded to the Grievance Complaints by advising the Law Professors that, because the complaints were "based on information derived from public sources, specifically, court decisions and court records," the grievance committee would initiate any investigation *sua sponte*.  *Id.* ¶ 5.  Plaintiffs understood this to mean that the Law Professors would not be treated as "complainants" in accordance with § 1240.2(e) of the New York Codes, Rules and Regulations ("NYCRR"), and would not receive the notice to which complainants are entitled about the disposition of their complaints under §1240.7(d)(1)(iii); (d)(3); and (e)(4).  Rather, any action by the grievance committee would "remain confidential" under Section 90(10).  *Id.*  ¶ 6.

Stymied by the lack of information from the grievance committee and threatening letters received from both the New York City Corporation counsel and Ms. Kearse, on November 4, 2021, Plaintiffs brought this action against the City and State Defendants for violations of federal and state laws, including the First Amendment and Equal Protection Clause of the United States Constitution.[1]  *See* ECF No. 1.  Motion practice followed.

First, Plaintiffs moved to unseal their correspondence with the grievance committee and the Corporation Counsel, which the Defendants alleged must remain confidential under Judiciary Law § 90(10).  *See* ECF No. 9.  The Court granted Plaintiffs' motion, noting that Defendants had attempted to "weaponize[] a secrecy law in order to silence the plaintiffs on a matter of serious public concern."  ECF No. 58, at 10-11.  On May 5, 2022, the Court denied in part Defendants' motions to dismiss.  *See* May 2022 Order, ECF No. 90.  In particular, the Court held that federal

---

[1]  The City Defendants are not respondents to this motion and settlement with them is anticipated.  The respondent on this motion is the only remaining State defendant, Justice LaSalle, Presiding Justice of the Second Department.

jurisdiction was appropriate and declined to abstain based on any of the abstention doctrines raised by State Defendants.  *See id.* at 7–19.

Finally, on June 13, 2022, the Court partially granted Plaintiffs' motion for partial summary judgment and denied the remaining issues from the Defendants' motions to dismiss.  *See* June 13 Order, ECF No. 94.  In so finding, the Court held that Plaintiffs had standing to bring their claims and that no other jurisdictional grounds to dismiss the Complaint existed.  *Id.* at 14–19.  Most importantly, the Court ruled that Section 90(10), as applied to the Law Professors' publication of the Grievance Complaints and related correspondence, violated the First Amendment and its New York State counterpart.  *Id.* at 20-30.

### B.    The Grievance Committee Declines To Provide Any Information About The Complaints, Leading to This Motion

Following this victory, Plaintiffs assumed that in addition to enjoying their right to freely publish their Grievance Complaints, they would also eventually come to learn what action, if any, the grievance committee took in response to their allegations.  That was, after all, the point of the complaints—to bring to account prosecutorial wrongdoing and publicly scrutinize the grievance committees' effectiveness in policing the bar.  But to date Plaintiffs have yet to receive any information about the status of their complaints—now more than two years old.

As discovery proceeded, Plaintiffs learned that this was no accident.  When Ms. Kearse informed them that their complaints would be considered, if at all, as a *sua sponte* investigation, she meant precisely what they had inferred: that by design, the grievance committee would provide them with no information at all about the results of their complaints.  Under New York law, a complainant is entitled to notice if the complaint is dismissed and, if the complaint leads to any form of disciplinary action, the complainant is supposed to receive "a brief description of the basis of any disposition. . . ."  22 NYCRR. § 1240.7(d)(1)(i)(d), (d)(3), (e)(4).  Plaintiffs believed they

were complainants, defined as "a person or entity that submits a complaint to a Committee." 22 NYCRR § 1240.2(e). Yet, during discovery Plaintiffs learned that the Appellate Division had promulgated an unpublished set of rules that effectively denied them that status.

These rules provided that in cases such as this one, where a complaint is based upon public information and the complainant lacks personal knowledge of the facts, the complainant is treated as lacking "standing" to make a complaint, and is denied the information otherwise provided to complainants with standing. Pls.' 56.1 ¶ 7. As a consequence, Plaintiffs do not know whether any of their complaints were dismissed, or resulted in action by the grievance committee, or a referral to the Appellate Division for a formal disciplinary hearing. Indeed, for all Plaintiffs know, there is a secret trial ongoing right now on one of their complaints before a referee appointed by the court. All of this secrecy is required, according to the State Defendant (hereafter, the "State"), by Judiciary Law § 90(10), which keeps confidential and sealed "all papers, records and documents . . . upon any complaint . . . relating to the conduct or discipline of any attorney. . . .".

In the Fourth Claim for Relief, Plaintiffs alleged that Judiciary Law § 90(10) violated the First Amendment of the United States Constitution (and the related provision of the New York Constitution) insofar as it purported to keep secret the records and proceedings, including any hearings, arising from the Grievance Complaints filed by the Plaintiffs and any similar complaints they may file. Because there are no facts in dispute, this summary judgment motion followed.

### C.    Prosecutorial Misconduct "Infrequently" Leads To Attorney Discipline

Prosecutorial misconduct causes devastating consequences around the country, playing a role in 30% of convictions that are later set aside. Pls.' 56.1 ¶ 8. One study found that in New York State prosecutorial misconduct led to thirty (30) wrongful convictions between 2001 and 2011 alone, but that only one of the prosecutors involved in those cases was ever publicly disciplined. *Id.* ¶ 9. Prosecutors receive "absolute immunity" from civil suit, leaving New York

attorney grievance committees as the sole avenue for discipline and punishment related to prosecutorial misconduct. *Id.* ¶ 10. But the grievance committee has failed to do its job and prosecutors are only rarely held accountable for misconduct.

Hiding behind a complex structure of confidential procedures and policies, the grievance committees have consistently failed to discipline bad prosecutors. *Id.* ¶¶ 11–12. The committee's Chief Counsel, Ms. Kearse, admitted as much: ***"[C]omplaints that come in against prosecutors infrequently result in any kind of discipline***". *See* Ex. 8 to Pls.' 56.1 at 91:7–20. Indeed, in 2022, in the 10th District, not one single case was referred by the Appellate Division for review on the grounds of prosecutorial misconduct.[2] Pls. 56.1 ¶ 11. None of the 21 complaints the Plaintiffs submitted two years ago has resulted in any form of public discipline to date. *Id.* ¶ 4.

### D. Grievance Proceedings Are Secret

As required by Judiciary Law § 90(10), attorney disciplinary proceedings take place in secret. The preliminary investigations are secret. Findings of misconduct by a preponderance of the evidence and by probable cause are secret. And all hearings after a finding of probable cause are secret (unless and until public discipline is later imposed). The public is therefore generally unaware of the existence and outcome of disciplinary proceedings.[3]

---

[2] The 2nd, 11th, and 13th judicial districts in the Second Department do not categorize their reported data in such a way as to reveal this information. Pls.' 56.1 ¶ 13.

[3] There is a theoretical exception to this secrecy: "upon good cause being shown," the Appellate Division may permit the disclosure of "all or any part of [the] papers, records and documents" of a grievance procedure. N.Y. Jud. Law § 90(10). In practice this almost never happens. We are aware of only two such orders in the almost 70 years since Section 90(10) was enacted. *See In re N.Y. News, Inc.,* 113 A.D.2d 92 (1st Dep't 1985); *Matter of Aretakis,* 16 A.D.3d 899 (3d Dep't 2005). More typically, the court denies these requests with little explanation. *See* Wells Decl., Ex. 20. In the cited disciplinary proceeding, former prosecutor Glenn Kurtzrock was suspended by the Appellate Division nearly three years after the details of his misconduct were first brought to light by a complaint filed by the Suffolk County District Attorney. *See Matter of Kurtzrock,* 192 A.D.3d 197 (2nd Dep't 2020).

1.    **Investigations By The Grievance Committee Staff**

Initial investigations by the grievance committee staff, which are somewhat akin to grand jury proceedings, are secret.  To be clear, we do not contend that they should be otherwise.  This motion is not directed at interfering with grievance committee investigations into allegations of misconduct.  The investigation is straightforward.  After the grievance committee receives a complaint, the Chief Attorney performs an "initial screening," which may lead to a decision to "decline to investigate" if, for instance, the matter involves someone who is not an attorney or conduct that, if true, would not violate the rules.  22 NYCRR § 1240.7(d)(1)(i).  The Complainant (if he or she has standing) and Respondent are both advised that the matter has been dismissed, *id.* § 1240.7(d)(1)(iii), and they both have the right under the First Amendment to publish that information.  *See* June 13 Order, ECF No. 94, at 20–30.  Nonetheless, the committee treats a dismissal as confidential under § 90(10).  If an investigation is opened, Staff Counsel investigate the matter and, if warranted, prosecute the State's case against the responding attorney, with the grievance committee sitting in judgment as the neutral decision maker.  Pls.' 56.1 ¶ 23.  Staff Counsel provide the responding attorney with notice of the allegations and an opportunity to respond in writing, and may interview witnesses and the respondent.  *Id.* ¶ 24.

2.    **Dispositions By The Grievance Committee**

The Chief Counsel can dismiss a complaint, but cannot take disciplinary action.  That requires action by the grievance committee itself, either summary action or a trial-type proceeding.  The committee typically acts based solely on a report prepared by Chief Counsel, which summarizes the parties' positions and the results of the staff investigation and provides analysis and recommendations.  Pls.' 56.1 ¶ 27.  The Supreme Court has called actions by the grievance committee somewhat akin to actions by a special master, which are usually public.  *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. at 434 n.13 (1982).  They can also be analogized

to decisions by a grand jury to issue an indictment, which is also a public judicial record.  But whatever the committee does, it does in secret under § 90(10).  The committee may find that: (1) the complaint should be dismissed; (2) the respondent should receive a Letter of Advisement for "conduct requiring comment that, under the facts of the case, does not warrant imposition of discipline"; (3) the respondent should receive an Admonishment because, by "a fair preponderance of the evidence," "the respondent has engaged in professional misconduct, but public discipline is not required to protect the public"[4]; or (4) the respondent should be subject to a formal proceeding before the Appellate Division because "there is probable cause to believe that the respondent engaged in professional misconduct warranting the imposition of public discipline".  *See* 22 N.Y.C.R.R. §§ 1240.7(d)(2)(i), (iv), (v), and (vi).  In connection with an Admonishment, trial-type proceedings can occur, with the respondent given a chance to appear.  *Id.* at § 1240.7(d)(v).  The respondent may also seek review of any Letter of Advisement or Admonition by the Chair of the committee or, as appropriate, in the Appellate Division.  *Id.* at § 1240.7(e)(1), (2).

Notice of the results of the committee action is given to both the complainant (with standing) and the respondent, both of whom are free under this Court's ruling to release the results publicly.  Nonetheless, as far as the committee is concerned, all of this judicial-type activity by the committee occurs behind closed doors, and is not disclosed to the public at large.  Indeed, the references in the rules to whether the conduct warrants "public discipline to protect the public" is itself misleading.  There are no standards guiding the committee's exercise of judgment.  Pls.' 56.1 ¶ 30.  And if the committee thinks public discipline is warranted, it does nothing publicly.  Rather, it confidentially refers the matter to the Appellate Division, *see* 22 NYCRR § 1240.7(d)(2)(vi);

---

[4] Sample letters of Advisement and Admonition to a respondent are attached to the Wells Declaration at Ex. 16 at 2DDEPT000925, 2DDEPT000927-0928.

which continues to proceed in secret, imposing public discipline only if the charges are sustained. N.Y. Jud. Law § 90(10).

As was undisputed in connection with Plaintiffs' previous summary judgment motion, *see* Pls. 56.1 Statement, ECF No. 66, at ¶ 47 and State Defendants' Response to 56.1 Statement, ECF. No. 79, at 11, almost all proceedings and almost all sanctions against attorneys occur in secret. ***Ninety-eight percent of all complaints received by the Second Department are resolved in secret.*** Most are just dismissed. Where any form of discipline occurs, it is five times more likely to occur in secret than to be made public. In the five years between 2016 and 2020, in the Second Department, 2513 cases ended with private discipline, while only 475 cases resulted in public sanctions. Pls.' 56.1 ¶ 14. And, as noted above, public discipline for a prosecutor is a particular oddity, essentially a unicorn.

Although the committee level dispositions remain confidential, a finding of misconduct remains on the respondent's record forever and both Letters Advisement and Admonitions have the potential to impact the respondent professionally. *Id.* ¶ 35. For example, if the responding attorney is applying for a judgeship, the relevant committee can consider this disciplinary history in assessing the application. *Id.* ¶ 36. Likewise, if the responding attorney faces subsequent allegations of misconduct, the grievance committee will consider past Advisements and/or Admonishments. *Id.* ¶ 37. The public is unaware that any of this is happening—that a decision is made *despite* such a record, or *because* of it.

### 3.    Formal Disciplinary Proceeding Before The Appellate Division

If the grievance committee finds probable cause to believe the respondent engaged in professional misconduct "warranting the imposition of public discipline", the Committee may refer the matter to the Appellate Division. *See* § 1240.7(d)(2)(vi). The State does not seriously dispute that the formal disciplinary proceeding before the Appellate Division is a judicial

proceeding.  Pls.' 56.1 ¶ 40; *see also* ECF. No. 78, at 28.  Like a grand jury indictment upon a finding of probable cause, the grievance committee serves the respondent with a petition outlining the charges.    The respondent, often represented by counsel, answers.    *See* 22 NYCRR § 1240.8(a)(1)(i).  The grievance committee then files a statement of disputed and undisputed facts. *See id.* § 1240.8(a)(2).  There is generally a period of discovery during which witnesses may be subpoenaed.  *See id.* § 1240.8(a)(4).  The Appellate Division then typically assigns a special referee to hear the case.  *See id.* § 1240.8(b)(1).  The hearing then proceeds like any other trial—there are opening statements, witnesses testify and are examined and cross-examined, followed by summations.  *See* Wells Decl., Exs. 21, 22.  The referee's findings thereafter may be affirmed or sustained by the Appellate Division.  *See* 22 NYCRR § 1240.8(b)(1).

Despite the judicial nature of these proceedings, they are conducted in secret and throughout the process the public remains unaware that an investigation occurred, much less that a trial is being conducted.  Pls.' 56.1 ¶ 41.  If the charges are sustained, the Appellate Division issues a public order.  *Id.* ¶ 51.  The records of the trial (but not the investigation) are then retroactively deemed public records,  but are available for review only in the Appellate Division's clerk's office.  *Id.* ¶ 52. If the charges are not sustained, they remain confidential pursuant to Section 90(10), notwithstanding the grievance committee's earlier finding that there was probable cause to believe the respondent engaged in misconduct.  *Id.* ¶ 53.

## LEGAL STANDARD

A court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine dispute "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 599 (1986).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  There are no genuine issues of material fact to prevent this Court from declaring that there is a First Amendment right of public access to decisions by the grievance committee and any trials held in the Appellate Division.

## ARGUMENT

### The First Amendment Right of Access Applies to New York State's Attorney Disciplinary Proceedings

As this Court had recognized, Judiciary Law 90(10) is "not facially neutral" but rather "imposes content-based restrictions."  June 13 Order, ECF. No. 94, at 27.  A content-based restriction on the exercise of First Amendment rights can only survive strict scrutiny, if it is narrowly tailored to meet a compelling state interest, *id.* at 26, a burden the State cannot meet here.

The First Amendment right of access to civil judicial proceedings is well-established.  *See Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) ("[T]he First Amendment does secure to the public and to the press a right of access to civil proceedings . . . .") (internal citations and quotation marks omitted); *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982) ("An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny.").  The right of the public to access civil proceedings goes to the core of the First Amendment "because public access . . . enhances the quality and safeguards the integrity of the factfinding process, fosters an appearance of fairness, and heightens public respect for the judicial process, while permitting the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government."  *Westmoreland*, 752 F.2d at 23 (internal citation and quotations omitted).

In the Supreme Court's seminal ruling in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980), the Court held that the First Amendment required public access to criminal trials, concluding that openness "has long been recognized as an indispensable attribute of an Anglo-American trial," not least because openness discouraged "the misconduct of participants." Extending the Supreme Court's decision in *Richmond Newspapers*, this Circuit has concluded that there is a constitutionally-grounded public right of access to civil trials and their related proceedings and records. *See Westmoreland*, 752 F.2d at 23; *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (recognizing a right to civil and criminal docket sheets which "provide a kind of index to judicial proceedings and documents" and thus "endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment").

I.    **Attorney Disciplinary Proceedings In The Grievance Committee And The Appellate Division Are Judicial Proceedings To Which The Right Of Access Attaches**

Attorney disciplinary proceedings in the Grievance Committee and the Appellate Division are judicial proceedings to which the qualified right of access under the First Amendment attaches. At their core, they seek "the compliance of [a] person, subject to judicial control, with standards imposed upon his conduct in the public interest," making those proceedings "judicial proceedings." *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958). They are not legislative, ministerial, or administrative, but involve a "judicial inquiry" in which the committee and the Appellate Division are called upon to "investigate, declare, and enforce liabilities as they [stood] on present or past facts and under laws supposed already to exist." *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 479 (1983). In New York, it is established that "the filing of a complaint [with a Grievance Committee] initiates a judicial proceeding." *See Wiener v. Weintraub*, 22 N.Y.2d 330, 331-32 (1968) (holding that proceedings before a "Grievance Committee[] of a bar association" "constitute a judicial proceeding", as the Committee is functioning as "an arm of the Appellate

11

Division.").  Indeed, the Supreme Court has noted that the delegation of the disciplinary function to bar ethics committees makes those committees an "arm of the court in performing the function of receiving and investigating complaints and holding hearings" and has analogized ethics committees to the "function of a special master," noting their actions have an "essentially judicial nature."  *Middlesex Cty. Ethics Comm.*, 457 U.S. at 434 n.13.

In New York, once a grievance complaint is filed, Staff Counsel and the Committee begin carrying out their delegated roles as an arm of the Court, with the authority to investigate complaints, subpoena witnesses, hear evidence, and ultimately issue binding sanctions on an accused attorney.  *See* Pls.' 56.1 ¶¶ 22–38.  It is not seriously disputed that this is the beginning of a judicial proceeding, one that can continue through action by the Grievance Committee and, if necessary, the Appellate Division.  The State essentially admitted as much in moving to dismiss the complaint.  It argued that "state-initiated attorney disciplinary proceedings for violations of state ethics rules are an example of civil enforcement proceedings."  ECF. No. 78, at 28.

## II.    Under The "Experience" And "Logic" Test, There Is A Presumptive Right Of Public Access To Attorney Disciplinary Proceedings And Records

Even if proceedings before the Grievance Committee and the Appellate Division were not clearly judicial proceedings, there would still be a First Amendment right of access to their records and hearings.  Under the standards set out in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982), and *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), the tradition of openness in grievance proceedings and the powerful functional values served by public access together give rise to a presumption of access under the First Amendment.  *See N.Y.C.L.U v. N.Y.C. Transit Auth.,* 684 F.3d 286, 298 (2d Cir. 2012) ("[T]here is no principle that limits the First Amendment right of access to any one particular type of government process.").

To determine whether the right of access attaches to a particular proceeding, the court applies what has been labeled the "experience" and "logic" test. *See id.* at 296–297 (citing *Press–Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986) ("*Press-Enterprise II*")).   Under the "experience" prong, the court considers "whether there exists a 'tradition' of public access to a type of proceeding," *id.*, because "a tradition of accessibility implies the favorable judgment of experience." *Globe Newspaper Co.,* 457 U.S. at 605 (quoting *Richmond Newspapers, Inc.*, 448 U.S. at 589).   Under the "logic" prong, the court examines "whether public access plays a significant positive role in the functioning of the particular process in question." *N.Y.C.L.U.*, 684 F.3d at 297 (quoting *Press–Enterprise II*, 478 U.S. at 8).

Applying these standards, courts have routinely extended the First Amendment right of access to categories of adjudicatory government proceedings "modeled on those of the courts." *See N.Y.C.L.U.,* 684 F.3d at 300 (hearings conducted by the Transit Adjudication Bureau); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) (military courts-martial); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700 (6th Cir. 2002) (deportation hearings); *Soc'y of Prof'l Journalists v. Sec'y of Labor*, 616 F. Supp. 569, 574-75 (D. Utah 1985) (administrative hearings), *vacated as moot*, 832 F.2d 1180 (10th Cir. 1987).   Courts in this Circuit have also held that the First Amendment right applies, among other things, to summary judgment motions and documents relied upon in adjudicating them, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006), pretrial motions, *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir.1987), and docket sheets, *Hartford Courant Co.*, 380 F.3d at 93.

A.        **Disciplinary Proceedings Are Historically Open**

While secrecy associated with attorney disciplinary proceedings is now mandated in this state, such proceedings in New York, and across the country,[5] were open to the public for much of American history.  This tradition of openness for attorney disciplinary proceedings dates back to thirteenth century England.  *See* Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo.J. Legal Ethics 1, 10 n.47 (2014).  In this country, until the mid-twentieth century, New York, and other states, adopted England's practice of conducting attorney discipline through public proceedings.  In New York, petitions or complaints charging professional misconduct of an attorney were presented publicly to the General Term of the Supreme Court in New York and adjudicated as equity suits or contempt proceedings.  *Id.* at 4; *see also Wiener,* 22 N.Y.2d at 331; *Youmans v. Smith*, 153 N.Y. 214 (1897).  These proceedings were considered "*quasi*-criminal" matters "of a public nature," and bear a clear resemblance to that of the current disciplinary proceedings.[6]  *See In re Kelly*, 59 N.Y. 595, 596 (1875) (emphasis in original); *see also In re Spencer*, 122 N.Y.S. 190, 192 (1st Dep't 1910) ("The nature of such a proceeding to discipline an attorney . . .  have been spoken of as being of a public nature and of a quasi criminal or penal character").

It was not until 1945 that the Legislature adopted what is now Judiciary Law § 90(10).  *See* N.Y. Jud. Law § 88(8) (now codified at N.Y. Jud. Law § 90(10), Bill Jacket, L. 1909 (1945)).  At the time, there was considerable opposition to this unprecedented secrecy being imposed on attorney discipline.  The NYC Bar Association opposed the bill, arguing that "disciplinary records

---

[5]  In this historical analysis, the Supreme Court considers whether a proceeding has been open in many jurisdictions rather than focusing just on one.  *See El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150-51 (1993).

[6]  During these court proceedings, the accused attorney was given the opportunity to file a denial, supported by the affidavits of witnesses, and the court could then send the matter to be tried before a referee, who "had power to compel the attendance of witnesses, and to require them to answer under oath such questions as he should deem material." *Youmans v. Smith*, 153 N.Y. 214, 220 (1897); *see also In re Dunn*, 50 N.Y.S. 163 (3d Dep't 1898).

are compiled at the public expense," and there was "no reason why there should any secrecy about the records of the conduct of the discipline of attorneys."  Bill Jacket, L.1909, c. 35, The Association of the Bar of the City of New York Report No. 33, at 8.

In the decades since its enactment, there has been a steady drumbeat of criticism of New York's secret processes for attorney discipline.  In 1985, a committee of the NYS Bar Association concluded that New York's secrecy rules are "too stringent, have created undue suspicion, and have raised doubts about the integrity in the minds of the public."  N.Y. State Bar Ass'n Comm. on Prof'l Discipline, *A Comprehensive Study of the State of Discipline in New York* 50 (June 1985). In 1992, a City Bar committee likewise opined that New York's disciplinary process "advances the best interests of neither the public nor the bar" because it is "too restrictive", and that "proceedings should be opened at the earliest practical point" to avoid public suspicion. Committee on Prof'l Discipline, *The Confidentiality of Discipline Proceedings*, 47 Rec. Ass'n B. City N.Y. 48, 59 (1992).  In 1995, a committee created by Chief Judge Kaye "unanimously conclu[ded]" that "the confidentiality accorded attorney discipline in New York is an anachronism that burdens rather than enhances the profession."  Chief Judge's Comm. on the Profession and the Courts, *Final Report to the Chief Judge*, at 50, 51 (1995).  And in 2015, a committee created by Chief Judge Lippman reported that New York's process has "created an atmosphere of public suspicion and skepticism."  It recommended that the disciplinary process be made "more accessible to the public."  Chief Judge's Comm. on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 12, 67 (2015) ("2015 Chief Judge Report").

Today New York's secret system is a national outlier.  Since 1979, the American Bar Association has recommended that attorney disciplinary proceedings become public after a finding a lawyer committed misconduct.  *See* ABA, Model Rules of Lawyer Disciplinary Enforcement R.

16A (2002); Levin, *supra*, at 5.  Reflecting that advice, forty-one jurisdictions permit public access to information regarding attorney discipline, at the latest, upon a finding of probable cause.  *See* 2015 Chief Judge Report, at 62 (acknowledging that "New York is one of only 9 jurisdictions which do not permit public dissemination of information concerning disciplinary proceedings until, at the earliest, a recommendation that discipline be imposed, and usually upon a final adjudication.").

New York's uniquely opaque attorney discipline system has also generated scathing critiques in the academic literature and popular media, particularly in cases of prosecutorial misconduct, where there is no civil remedy for citizens who were wronged by prosecutors and where there is a heightened interest regarding the conduct of public officials.[7]

**B.    Public Access Would Play A Significant Positive Role In Attorney Discipline**

The logic prong of the *Press-Enterprise II* test is also clearly satisfied—at the very simplest level—because discipline proceedings are essentially the same as trial proceedings and, therefore, implicate all the same interests in promoting fairness, adherence to procedure, impartiality of adjudicators, and an enhanced performance of all involved in the process.  *See Richmond Newspapers*, Inc., 448 U.S. at 569 (noting that openness "gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and

---

[7]  *See, e.g.,* Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo.J. Legal Ethics 1, 13, 14 n. 249 (2007); Stephen Gillers, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 NYU J. L. PUB. POL. 485, 500, n. 68 (2014); New York Times Editorial Board, *How Can You Destroy a Person's Life and Only Get a Slap on the Wrist?*, N.Y. TIMES (Dec. 4, 2021), https://www.nytimes.com/2021/12/04/opinion/prosecutor-misconduct-new-york-doj.html ("New York shelters its lawyers from disciplinary measures more than most states in the country, even as it ranks near the top in total number of exonerations—a majority of which are the result of misconduct by prosecutors."); Joaquin Sapien & Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority?  Usually Nobody,* ProPublica (Apr. 3, 2013), https://www.propublica.org/article/who-polices-prosecutors-who-abuse-their-authority-usually-nobody ("A ProPublica analysis of more than a decade's worth of state and federal court rulings found more than two dozen instances in which judges explicitly concluded that city prosecutors had committed harmful misconduct … Disciplinary committees, an arm of the appellate courts, almost never took serious action against [the] prosecutors"); Nina Morrison, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018), https://www.nytimes.com/2018/06/18/opinion/kurtzrock-suffolk-county-prosecutor.html.

decisions based on secret bias or partiality") (plurality opinion); *Press-Enterprise I*, 464 U.S. at 508 ("The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known."); *Westmoreland*, 752 F.2d at 23 (same). These interests are all advanced by public access to disciplinary proceedings and associated records.

But the logic prong has added force when the proceedings involve attorneys who are licensed to practice law and even more so when the respondents are prosecutors sworn to enforce the criminal laws. "The primary concern of a disciplinary proceeding is the protection of the public in its reliance on the integrity and responsibility of the legal profession." *In re Rowe*, 80 N.Y.2d 336, 341 (1992); *see also Levy v. Ass'n of the Bar of the City of N.Y.*, 37 N.Y.2d 279, 282 (1975) ("primary focus" of attorney disciplinary hearings "must be on protection of the public").

Yet, New York's current secret system strikes the wrong balance. Its obsessive interest lies not in protecting the public, but in protecting the privacy interests of attorneys—even prosecutors and other public servants—accused of misconduct. That interest in secrecy negatively affects the public faith in the integrity of the disciplinary process. As decades of court decisions and legal commentary persuasively argue, public faith can only be remedied by public access. *See Richmond Newspapers, Inc.*, 448 U.S. at 572 ("People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."). And public faith is particularly important when those accused of misconduct are prosecutors, public servants invested with vast power. "Sunlight is the best disinfectant," as Justice Brandeis memorably observed. *Other People's Money* 13 (1913).

Public access to attorney disciplinary proceedings and associated documents is necessary to ensure that the intended beneficiaries of a well-regulated bar—the public—are able to assess the integrity of the legal profession, and play a "significant positive role" in enhancing the system. *Press-Enterprise II,* 478 U.S. at 8.  Public access will also enhance the quality and consistency of a notoriously inconsistent system. *See* Gillers, *Lowering the Bar, supra* n.7 at 503–04.  And where, as here, the accused are present and former public prosecutors, and the accusations have already attracted significant public attention, *see* NYT Editorial, *supra* n.7, public access is even more important. *See e.g., F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) ("The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch.").

Federal courts have endorsed this logic in expanding the First Amendment right to access to proceedings involving prosecutorial misconduct.  In *United States v. Stevens*, No. 08-CV-231, 2008 WL 8743218, at *8 (D.D.C. Dec. 19, 2008), the court found that the right of access applied to a post-verdict complaint that alleged misconduct by prosecutors.  The Court reasoned that, as here, the public "certainly had access to the defendant's trial" in which the alleged misconduct had occurred and that "access to the complaint and any resulting proceedings are likely to serve the important function of monitoring prosecutorial misconduct." *Id.*  Similarly, in *In re Special Proceedings*, 842 F. Supp. 2d 232 (D.D.C. 2012), the court determined that making public investigative reports into whether prosecutors had committed *Brady* violations at trial would "play a positive role in informing the public of the flaws in the criminal trial" and would "safeguard against future prosecutorial misconduct." *Id*. at 243-45.

18

III.     **The Dispositions Of Grievance Committee Proceedings Should Be Public**

Whether the First Amendment right of access to grievance committee proceedings flows from the fact that they are judicial proceedings or by application of the "experience" and "logic" test, the result is the same.  Plaintiffs (indeed, any interested member of the public) are all entitled to know the results of the grievance committee proceedings, even if there is no referral to the Appellate Division.  Whether the complaint is dismissed, or results in a Letter of Advisement, an Admonishment, a referral to the Appellate Division, or a decision on reconsideration, those decisions are in writing and represent the disposition of the complaint on the merits by the grievance committee or its counsel, acting under the delegated authority of the Appellate Division. Indeed, for the 98% of complaints that are disposed of without referral to the Appellate Division, those rulings by the grievance committee are "the final and most important step" in the attorney disciplinary system, and give a final "opportunity for public observation" of the work of attorney disciplinary system.  *Press-Enterprise II*, 478 U.S. at 12.  The decisional documents are provided to the respondent and to any complainant with standing, and both are free to disseminate them as they please, negating any legitimate interest in secrecy.  There is no compelling reason to keep such rulings secret from the general public and, to the extent that it does so, Judiciary Law § 90(10) violates the First Amendment.

As noted earlier, Plaintiffs are not seeking access to the investigative work done by the committee's counsel and staff.  Plaintiffs recognize the need for confidentiality with respect to most of that work (even though aspects of the work such as motion practice before the committee resemble trials and are not investigative).  Plaintiffs seek now only the written decisions of the committee or its counsel, sent to the respondent and to any complainant with standing, reflecting the culmination of the committee's work and available for publication by the recipients and complainants.  Here, history supports this distinction.  In 1928, the New York Court of Appeals

ruled that preliminary investigations into lawyer misconduct may be private. *See Karlin v. Culkin*, 162 N.E. 487, 492 (N.Y. 1928). Such preliminary investigations, at the time, were "without adversary parties, neither ending in any decree, nor establishing any right." *Id.* at 479. The result of such investigations was that the court "was then given information that could provoke further action." *Id.*

On the other hand, the decisions of the committee or its counsel are a different matter. To paraphrase, *Karlin*, they end in a written decree and establish rights about matters of public interest. As Ms. Kearse agreed, the grievance committee, "sits in judgment" and "renders a ruling" after reviewing the evidence. Pls.' 56.1 ¶ 23. The respondent is subject to the committee's ruling and must comply with any procedure, rule or discipline set forth therein. *Id.* ¶ 26. The respondent is also given a right to appeal. *Id.* ¶¶ 33–34. Once final, the dispositions are binding and relevant to future disciplinary action. *Id.* ¶¶ 35–37. They are then maintained forever by New York's Office of Court Administration, making them court records. *Id.* ¶ 38; *see also Mosby v. Ligon*, 418 F.3d 927, 931-32 (8th Cir. 2005) ("Because the Committee is created and appointed by the Arkansas Supreme Court, operates pursuant to rules promulgated by that court, and is subject to review by that court, the Committee's decision to discipline [the respondent attorney] is the functional equivalent of a state-court judgment.").

All of this makes such decisions by the grievance committee judicial rulings that should be accessible to the public. The First Amendment presumptive right of access applies to documents "necessary to understand the merits of [the] proceeding." *See Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013). This right clearly extends to judicial opinions, like the grievance committee dispositions. *See Hatzimihalis v. SMBC Nikko Sec. Am., Inc*., No. 20-CV-8037, 2023 WL 3736440, at *2 (S.D.N.Y. May 31, 2023) (First Amendment presumption of public access

applies to judicial opinions); *see also Hartford Courant Co.*, 380 F.3d at 92 (First Amendment right of access for court docket sheets providing "an index to the records of judicial proceedings"); *Newsday*, 730 F.3d at 165-66 (hearing transcript entitled to presumptive right of access).

The Second Circuit has consistently recognized a "strong presumption under the First Amendment that judicial documents—and especially judicial decisions, which are used to determine litigants' substantive legal rights—should be subject to public scrutiny." *In re Demetriades*, 58 F.4th 37, 45–46 (2d Cir. 2023) (cleaned up); *see also Moroughan v. Cty. of Suffolk*, No. 12-CV-0512, 2021 WL 280053, at *2 (E.D.N.Y. Jan. 24, 2021) ("[I]t is axiomatic that a court's orders and written opinions are 'judicial documents' to which the presumption of access applies. . . . [T]he weight given to that presumption . . . is extremely strong."); *Scheiner v. Wallace*, No. 93-CV-62, 1996 WL 633226, at *1 (S.D.N.Y. Oct. 31, 1996) ("The public interest in an accountable judiciary generally demands that the reasons for a judgment be exposed to public scrutiny.  Therefore, the presumption of public access to [judicial opinions] is particularly high." (citing *United States v. Amodeo*, 71 F.3d 1044, 1048–49 (2d Cir. 1995)).  The First Amendment requires the grievance committee to make public its dispositions of complaints in a timely fashion.

## IV.    The Records and Proceedings of Appellate Division Hearings Should Be Public

On the rare occasions when the grievance committee refers a complaint to the Appellate Division for trial, the trial (typically before a referee) and all associated pleadings and records should be public.  And that means public in *real time*, while it is occurring, so that interested members of the public may attend and the press may report on the proceedings, as happened in the nineteenth century (often colorfully) with trials in State Supreme Court and elsewhere.[8]  Now,

---

[8]  *See, e.g., Campbell's Case*, Chi. Daily Trib., July 17, 1884, at 2 (noting that when the proceedings to disbar an attorney were called "[t]he court-room was crowded with attorneys, and the keenest interest manifested"); *Domestic Intelligence*, Cohen's Lottery Gazette & Reg., May 23, 1822, at 66 (noting that Philadelphia Court of Common Pleas "was filled by persons anxious to ascertain what measures would be adopted by the Court against [two lawyers]");

Judiciary Law § 90(10) provides for retroactive access only after the fact and only if the charges are sustained. That is expensive, laborious and no substitute for contemporaneous access.[9]

It is well settled that the right of public access to judicial proceedings means live access in a public courtroom, not after-the-fact access to a cold transcript. "[O]ne cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access . . . ." *ABC, Inc. v. Stewart,* 360 F.3d 90, 99 (2d Cir. 2004); *see, e.g.*, *United States v. Antar,* 38 F.3d 1348, 1360 n.13 (3d Cir.1994)("[A] court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available. . . . [D]emeanor, non-verbal responses, and the like, is necessarily lost . . . ."). A case is referred to the Appellate Division only upon a finding of probable cause. 22 NYCRR § 1240.7(d)(2)(vi). That is sufficient reason for the resulting proceedings, and underlying documents, to be public as they are in any other trial and as they are in forty-one states in attorney disciplinary hearings.

---

*The Disbarment Case: The Defense Injects a Demurrer that Puts it Off*, L.A. Times, Oct. 14, 1888, at 1 (reporting that "[a] large crowd hung around the Supreme Court yesterday in the expectation of seeing a good legal fight ...."); *Charges Against Two Lawyers: Proceedings to Disbar the Firm of Hall & Webster*, N.Y. Times, Oct. 5, 1875, at 3; *A Charge Against An Attorney*, N.Y. Times, Oct. 2, 1877, at 2; *Motion to Disbar Attorneys*, N.Y. Times, Oct. 21, 1874, at 3; *Attempt to Disbar a Cincinnati Attorney—The Textile Fabrics Exposition*, Chi. Trib., July 29, 1869, at 1; *Charge Against Lawyer: J. J. Halligan Accused of Exacting an Exorbitant Fee*, N.Y. Times, Mar. 10, 1999, at 12; *Fellow-attorney Asks that John Patterson be Disbarred*, WASH. POST, Mar. 31, 1906, at 12; *Negro Lawyer in Trouble: To Disbar G.R. Brewster: Newberg Lawyer Accused of Using Funds Left in His Care*, N.Y. Times, Jan. 25, 1914, at 9; *An Attorneys' Fight: Horace Bell and Dunnigan & Dunnigan in Court*, L.A. Times, Dec. 13, 1898, at 11; *Attorney Attacked, Attempt to Disbar Earl Rogers*, L.A. Times, May 27, 1900, at III8; *Charge Against Lawyer: J. J. Halligan Accused of Exacting an Exorbitant Fee*, N.Y. Times, Mar. 10, 1999, at 12; *Club Feud, Now Suit to Disbar*, Chi. Trib., May 20, 1904, at 4; *The Defense Injects a Demurrer that Puts it Off*, L.A. Times, Oct. 14, 1888, at 1; *Threatens to Kill Accuser if Attorneys Disbar Him*, Chi. Trib., Feb. 11, 1908, at 3; all cited in Levin, *supra* n. 7, at nn. 67–71.

[9]  For example, once formal disciplinary charges were sustained against former Suffolk County prosecutor Glenn Kurtzrock, counsel for Plaintiffs submitted a request to the Appellate Division for all records related to his disciplinary proceeding, as permitted under § 90(10). After initially receiving a reply suggesting that the records were *still* confidential, counsel was able to obtain certain papers associated with the case, as well as access to the full record. The full record was large—728 pages of transcript and 3,064 pages of exhibits presented during the hearing. The clerk's office said they were available for copying, at a cost of $1.00 for every first page and $.50 for every page following. A friendly clerk agreed to review the record at counsel's request and to answer questions about its contents, sparing the expense of about $2000.00 to review this supposedly public record. *See* Wells Decl. ¶¶ 24–35, Exs. 21–22.

Although the presumption of access under the First Amendment is not absolute, it places a "heavy burden on those who seek to limit public access." *United States v. Doe*, 629 F. App'x 69, 72 (2d Cir. 2015); *Globe Newspaper Co.*, 457 U.S. at 606 (1982) ("[T]he State's justification in denying access must be a weighty one."); *Lugosch,* 435 F.3d at 126 (noting that the First Amendment "gives rise to a higher burden on the party seeking to prevent disclosure"). This includes access not only to the live proceedings, but to the motions and other documents submitted in the case. *In re N.Y. Times Co.*, 828 F.2d at 114 (right of access to "documents submitted in connection with judicial proceedings that themselves implicate the right of access"); *Lugosch,* 435 F.3d at 120 (right of access to documents that are "a necessary corollary of the capacity to attend the relevant proceedings"). This standard is "strict" and "well established", requiring "specific, on the record findings" that "closure is necessary to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 14 (quoting *Press-Enterprise I*, 464 U.S. at 510).

Here, the State has already determined that the proceedings before the Appellate Division should be public—but only after the fact. The only conceivable reason for secrecy up to that point is the risk of harming the reputation of an innocent attorney who is later vindicated. That is not sufficient. Indeed, this Court made no mention of that interest as a reason to prevent a complainant from making public—or, indeed, from posting on the internet—the grievance complaint that he or she had filed. June 13 Order, ECF. No. 94 at 26–29. That such an interest is insufficient has been the unanimous conclusion of the many state courts that have ruled that unproved complaints themselves should be public. *See e.g., R.M. v. Supreme Ct.*, 883 A.2d 369, 378 (N.J. 2005); *Doe v. Doe,* 127 S.W.3d 728 (Tenn. 2004): *In re Warner,* 21 So.3d 218 (La. 2009); *Doe v. Supreme Ct.,* 734 F. Supp. 981 (S.D. Fla. 1990); *Petition of Brooks*, 678 A.2d 140, 143 (1996); *see also In*

*re Demetriades,* 58 F.4th at 46 (interest in avoiding "reputational harm" "cannot meet the 'weighty' standard for overriding the presumptions of open records and public access."); *In re Gitto Global Corp.*, No. 05-CV-10334, 2005 WL 1027348, at *12 (D. Mass. May 2, 2005), *aff'd*, 422 F.3d 1 (1st Cir. 2005) (interest in "avoiding embarrassment and protecting a measure of privacy" insufficient to overcome First Amendment interest in permitting public access to bankruptcy report).

If an unproved complaint can be made public under the First Amendment, it follows automatically that whatever interest in confidentiality the attorney may have is insufficient to keep proceedings secret *after* the grievance committee has concluded that there is "probable cause" to believe that the accused attorney has "engaged in professional misconduct warranting the imposition of public discipline" and referred the matter to the Appellate Division.   § 1240.7(d)(2)(vi).  The historical record confirms the legitimacy of public disclosure of misconduct charges against attorneys, whether they are vindicated or not.  Before the enactment of Judiciary Law 90(10), the courts published and the press reported acquittals as well as convictions.[10] Meanwhile, a public hearing leading to exoneration also serves the public interest because the "revelation that the grievance was baseless should in most cases reassure clients and the public that the attorney did nothing wrong."  *R.M.,* 883 A.2d at 378.[11]

---

[10]  *See, e.g., In re Dunn*, 50 N.Y.S. 163 (detailing the charges against the accused attorney and affirming the referee's decision dismissing them); *In re Harding*, 125 N.Y.S. 264 (3d Dep't 1910) (detailing charges and dismissing them where there was "no competent evidence of any misconduct on the part of the respondent").  *See also Court Clears an Attorney: Appellate Division Finds No Ground to Disbar O'Neill*, N.Y. Times, July 12, 1918; *Proceedings to Disbar Attorneys Dismissed*, N.Y. Times, May 30, 1874, at p. 2; both cited in Levin, *supra* n.7 at n. 70.

[11]  As an ABA committee concluded in the 1992, in those states where the disciplinary process is open, concerns that lawyers are unnecessarily damaged have not been substantiated. *See* ABA Commission on Evaluation of Disciplinary Enforcement, *Lawyer Regulation for a New Century* (Feb. 1992), https://www.americanbar.org/groups /professional_responsibility/resources/report_archive/mckay_report/, ("[W]e find in Oregon, Florida and West Virginia ample experience to demonstrate that public proceedings or public records of dismissed complaints do no harm to innocent lawyers' reputations. On the contrary, secrecy does great harm to the reputation of the profession as a whole.").

In *Landmark Commc'ns, Inc. v. Virginia Risk*, 435 U.S. 829, 841–42 (1978), the Supreme Court held that "injury to official reputation is an insufficient reason for repressing speech that would otherwise be free." For all the above reasons, the State cannot satisfy its burden of showing that Judiciary Law § 90(10) is narrowly tailored to support any compelling interest. Attorney discipline proceedings in the Appellate Division or before a referee, and related documents, should occur in a public courtroom and be open and available to the public in real time.

## CONCLUSION

Judiciary Law § 90(10) is unconstitutional insofar as it restricts the public's access to the attorney disciplinary proceedings and records in the Grievance Committee and the Appellate Division. For the reasons set forth above, the Court should grant Plaintiffs' Motion for Summary Judgment.

Dated: July 28, 2023
New York, New York

Respectfully submitted,

/s/ Gregory L. Diskant
Gregory L. Diskant
Elisabeth Shane
Shelley Attadgie
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel:212-336-2000
Fax:212-335-2222
gldiskant@pbwt.com
eshane@pbwt.com
sattadgie@pbwt.com

*Attorneys for Plaintiffs*

**Certificate of Service**

I hereby certify that on July 28, 2023, I caused the foregoing document to be served upon counsel of record via ECF.

/s/ Gregory L. Diskant
Gregory L. Diskant