USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  07/22/24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIVIL RIGHTS CORPS, et al.

                    Plaintiffs,

        - against -

HECTOR D. LASALLE, in his official
capacity as Chief Justice of the Second
Judicial Department of the Appellate
Division of the Supreme Court of the
State of New York,

                    Defendant.

21 Civ. 9128 (VM)

<u>DECISION AND ORDER</u>

**VICTOR MARRERO, United States District Judge.**

    The state of New York, by statute, deems most attorney disciplinary proceedings and related records "sealed," "private and confidential." N.Y. Jud. Law § 90(10). On May 3, 2021, Plaintiffs Civil Rights Corps, Cynthia Godsoe, Nicole Smith Futrell, Daniel S. Medwed, Justin Murray, Abbe Smith, and Steven Zeidman (together, "Plaintiffs") filed twenty-one formal complaints (the "Grievance Complaints") with an Attorney Grievance Committee ("Grievance Committee") appointed by the Appellate Division of the Supreme Court of the State of New York (the "Appellate Division"), alleging unethical conduct of New York state prosecutors in particular cases and requesting that those lawyers be disciplined. Plaintiffs allege that to date they know nothing about how the Committee acted on their Grievance Complaints.

Plaintiffs brought this suit under 42 U.S.C. § 1983, alleging that Section 90(10) was applied to them in violation of the United States Constitution (the "Constitution"). More specifically, Plaintiffs allege that the First Amendment entitles them to access the proceedings and records of their state courts related to the Grievance Complaints and that Section 90(10) unconstitutionally restricts their access thereto.

Now before the Court is Plaintiffs' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") on their Fourth Claim for Relief (hereinafter the "Fourth Claim") against Defendant Hector D. LaSalle (hereinafter "Defendant," "Justice LaSalle," or "the State"),[1] Chief Justice of the Appellate Division's Second Judicial Department (the "Second Department"), the state court that oversees the Committee's work. Plaintiffs seek declaratory judgment stating that they have a First Amendment right (1) to attend any hearings in the Second Department that may result from the Grievance Complaints, (2) to view records of the Second Department necessary to understand those hearings,

---

[1] As explained herein, at Section III.A.3, Plaintiffs sued Justice LaSalle in his official capacity as Presiding Justice of the Second Department pursuant to established Eleventh Amendment doctrine. However, the New York Attorney General entered an appearance on Justice LaSalle's behalf, and Plaintiffs seek relief that would be effective against the Second Department itself; the Court accordingly uses "Defendant," "Justice LaSalle," and the "State" interchangeably.

and (3) to view the final dispositions of the Grievance Complaints reached by the particular Grievance Committee that reviewed them. Also before this Court is the State's cross-motion for summary judgment on the Fourth Claim. The State seeks judgment in its favor to resolve allegations of jurisdictional defects and Justice LaSalle's absolute immunity from suit.

The Court holds that it has jurisdiction to decide this case, that Justice LaSalle does not possess absolute immunity from suit, and that Section 90(10) of the New York Judiciary Law has been applied to Plaintiffs in violation of the Constitution. The First Amendment presumption of access applies to disciplinary hearings in the Second Department, to Second Department records necessary to understand those hearings, and to some (but not all) of the final dispositions by the Committee. Accordingly, Plaintiffs' motion is hereby **GRANTED IN PART** and **DENIED IN PART,** and Defendant's motion is hereby **DENIED.**

## I. <u>BACKGROUND</u>[2]

### A. <u>ATTORNEY DISCIPLINE IN THE SECOND DEPARTMENT</u>

New York law authorizes its intermediate appellate
courts, the four Appellate Divisions of the Supreme Court, to
regulate the practice of law and discipline attorneys for
professional misconduct occurring within their respective
jurisdictions. (<u>See</u> Def. 56.1 ¶ 1; <u>see also</u> N.Y. Jud. Law
§ 90(2).) New York's Appellate Divisions jointly adopted the
Rules of Professional Conduct, the substantive standards that
govern the behavior of attorneys. (<u>See</u> Def. 56.1 ¶ 4.) The

[2] Except as otherwise noted, the following background derives from the
undisputed facts as set forth by the parties in their Local Rule 56.1
Statements of Undisputed Material Facts and responses thereto. These
include Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts
("Pls. 56.1," Dkt. No. 174); Defendant's Rule 56.1 Statement of Undisputed
Material Facts ("Def. 56.1," Dkt. No. 198); Plaintiffs' Counter-Statement
to Defendants' Rule 56.1 Statement ("Pls. 56.1 Counter," Dkt. No. 200);
and Defendant's Counter-Statement to Plaintiffs' Rule 56.1 Statement
("Def. 56.1 Counter," Dkt. No. 203). The Court has also considered the
full record submitted by the parties, including the following declarations
and their accompanying exhibits: the Declaration of Andrew H. Wells in
support of Plaintiffs' Motion ("Wells Decl.," Dkt. No. 176); the
Declaration of Andrea E. Bonina in support of Defendant's Motion ("Bonina
Decl.," Dkt. No. 192); the Declaration of Diana Maxfield Kearse in support
of Defendant's Motion ("Kearse Decl.," Dkt. No. 193); the Declaration of
Darrell M. Joseph in support of Defendant's Motion ("Joseph Decl.," Dkt.
No. 194); the Declaration of Hector D. LaSalle in support of Defendant's
Motion ("LaSalle Decl.," Dkt. No. 195); the Declaration of Catherine A.
Sheridan in support of Defendant's Motion ("Sheridan Decl.," Dkt. No.
196); the Declaration of Joya C. Sonnenfeldt in support of Defendant's
Motion ("Sonnenfeldt Decl.," Dkt. No. 197); and the Declaration of Shelley
R. Attadgie in Support of Plaintiffs' Motion ("Attadgie Decl.," Dkt. No.
204). The Court construes any disputed facts discussed in this section
and the justifiable inferences arising therefrom in the light most
favorable to the non-movant for each motion, as required under the
standard set forth in Section II below. Some legislative and historical
facts submitted by the parties for adjudication of Plaintiffs'
constitutional claim will be described only in the First Amendment
discussion, below in Section III.D.

Rules of Professional Conduct regulate attorneys' duty of candor; fees they may charge; communication with clients, adversaries, third parties, and courts; confidentiality; conflicts of interest; and recordkeeping. (See id. ¶ 4; see generally 22 N.Y.C.R.R. § 1200.) The Rules of Professional Conduct also impose special duties that apply to prosecutors and other government lawyers. See 22 N.Y.C.R.R. § 1200.3.8.

Each Appellate Division appoints Attorney Grievance Committees as it deems appropriate. (See Def. 56.1 ¶ 20-21; see also 22 N.Y.C.R.R. § 1240.4.) The Committee involved in this litigation — the Attorney Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts (the "Committee") — is one of three such Attorney Grievance Committees in the Second Department. (See Pls. 56.1 ¶ 15.) By regulation, Attorney Grievance Committees must be composed of at least twenty-one members, with at least three of those members being non-lawyers. See 22 N.Y.C.R.R. § 1240.4. As Presiding Justice, Justice LaSalle has authority to select and appoint Attorney Grievance Committees members. (See Def. 56.1 ¶ 20.) The Second Department may also appoint staff for each of the Attorney Grievance Committees as it deems appropriate, including a Chief Attorney and staff attorneys to support the Chief Attorney. 22 N.Y.C.R.R. § 1240.5. Committee members are volunteer practitioners, but the Chief

Attorney and staff attorneys are employees of the Second Department. (See Ex. 8 to Wells Decl., at 7-8.)

The Second Department, the Committee, and the staff (including the Chief Attorney) operate as the three tiers of New York's attorney disciplinary mechanism. At the first tier, Committee staff review allegations of professional misconduct submitted by the public for basic facial sufficiency. At the second tier, the staff conduct a factual investigation and present their results to the Committee, which can dismiss the allegations, impose private discipline, or recommend public discipline. At the third tier, the Second Department considers whether to impose public discipline if the Committee has so recommended. All stages of the three-tiered system are governed by duly promulgated procedural rules (see Def. 56.1 ¶¶ 8-9; see generally 22 N.Y.C.R.R. § 1240) as well as the Second Department Grievance Committee Manual & Forms (the "Manual") (see Pls. 56.1 ¶ 19; Def. 56.1 ¶ 10; see generally Ex. H to Sonnenfeldt Decl.).

The attorney disciplinary process begins with a grievance complaint. Any person can make allegations of attorney misconduct to the Committee. (See Def. 56.1 ¶ 24.) The "person or entity that submits a complaint" to a Grievance Committee is the complainant. See 22 N.Y.C.R.R. § 1240.2(e). In the typical case, grievance complaints concern the

respondent attorney's representation of the complainant and may reveal personal information about the complainant's legal affairs. (See Def. 56.1 ¶ 26.)

Upon receipt of a grievance complaint alleging professional misconduct, the Committee staff access the respondent attorney's registration information and ascertain the respondent attorney's disciplinary history. (See id. ¶ 32.) Staff counsel then screen grievance complaints to make threshold determinations of jurisdiction, venue, and standing. (See id. ¶ 33; Pls. 56.1 Counter ¶ 33.)

Grievance complaints without jurisdiction (i.e., grievance complaints that do not concern a New York attorney) or proper venue (i.e., complaints that concern a New York attorney outside the geographic jurisdiction of the Grievance Committee that received the grievance complaint) are dismissed pursuant to 22 N.Y.C.R.R. § 1240.7(d)(1). (See Def. 56.1 ¶¶ 33-34.) A lack of standing occurs "in matters where the complainant has no connection to the respondent and/or the underlying matter from which the complaint evolves, and/or has no personal knowledge of the underlying facts and circumstances, and/or is simply relaying to the Committee information that the complainant learned from some other source." (Ex. H to Sonnenfeldt Decl. at '016.) Grievance complaints for which the complainant has no standing are still

evaluated for their substance; if the Chief Attorney determines that the grievance complaint merits further investigation, then the staff proceeds with the investigation as if it had been initiated *sua sponte* — that is, as if there were no complainant at all. (Pls. 56.1 Counter ¶ 33; Ex. H to Sonnenfeldt Decl. at '016.)

At the screening stage, the Chief Attorney can dispose of the matter by declining to investigate further if "(A) the matter involves a person or conduct not covered by [22 N.Y.C.R.R. § 1240]; (B) the allegations, if true, would not constitute professional misconduct; (C) the complaint seeks a legal remedy more appropriately obtained in another forum; or (D) the allegations are intertwined with another pending legal action or proceeding." (Def. 56.1 ¶ 34; 22 N.Y.C.R.R. § 1240.7(d)(1)(i).) The Chief Attorney may also dispose of the grievance complaint by referring it to another forum (for instance, mediation for fee disputes). (See Def. 56.1 ¶ 35; 22 N.Y.C.R.R. § 1240.7(d)(1)(ii).) When the Chief Attorney disposes of a complaint in this way, the complainant and the respondent attorney "shall be provided with a brief description of the basis of any disposition." 22 N.Y.C.R.R. § 1240.7(d)(1)(i)(D).

The second tier of the disciplinary process begins if the Chief Attorney opens an investigation. (See Pls. 56.1

¶ 23.) Staff provide the respondent attorney with notice of the allegations and an opportunity to respond in writing. (See Pls. 56.1 ¶ 24; Def. 56.1 ¶ 36.) The Chief Attorney and staff may also interview witnesses, obtain records, direct the respondent attorney to appear, direct the respondent attorney to produce records, and — if necessary — request the issuance of a subpoena or conduct a deposition-style examination of the respondent attorney. (See Pls. 56.1 ¶ 24, Def. 56.1 ¶ 37.) A respondent attorney has a duty to respond to the Committee's and the Chief Attorney's requests promptly and truthfully; if an attorney fails or refuses to cooperate, the Committee may obtain an interim suspension of the respondent attorney's law license from the Second Department pending completion of disciplinary proceedings. (See Pls. 56.1 ¶ 26; see also 22 N.Y.C.R.R. § 1240.9.)

When the investigation is complete, the Chief Attorney and staff together compile a report with recommendations to the Committee regarding appropriate dispositions for the grievance complaint. (See Pls. 56.1 ¶ 27; Def. 56.1 ¶ 40.) The report is "comprehensive" and presents "the respective positions and supporting evidence of both the complainant and the respondent, the results of any further investigation, and an analysis of the issues and applicable legal authorities." (Pls. 56.1 Counter ¶ 40.)

Once the staff provides its report to the Committee, the Committee members may ask questions of the staff members familiar with the investigation and may also request additional materials. (See Def. 56.1 ¶ 42.) The Committee then deliberates as a body. (See Def. 56.1 ¶ 42.) The Committee may dispose of the grievance complaint in one of four ways relevant to this case. (See Pls. 56.1 ¶ 29; Def. 56.1 ¶ 45.) First, the Committee may dismiss the grievance complaint. (See Pls. 56.1 ¶ 29; Def. 56.1 ¶ 45; see also 22 N.Y.C.R.R. § 1240.7(d)(2)(i).) Second, the Committee may issue a "Letter of Advisement" to the respondent attorney if it finds the respondent "engaged in conduct requiring comment that, under the facts of the case, does not warrant imposition of discipline." (Pls. 56.1 ¶ 29; See Def. 56.1 ¶ 45; 22 N.Y.C.R.R. § 1240.7(d)(2)(iv).) Third, the Committee may issue a "written Admonition" if it finds, by "a fair preponderance of the evidence," that "the respondent has engaged in professional misconduct, but that public discipline is not required to protect the public." (Pls. 56.1 ¶ 29; see Def. 56.1 ¶ 45; 22 N.Y.C.R.R. § 1240.7(d)(2)(v).) Fourth, the Committee may authorize the staff to initiate a formal disciplinary proceeding before the Second Department if the Committee "finds that there is probable cause to believe that the respondent engaged in professional

misconduct warranting the imposition of public discipline." (22 N.Y.C.R.R. § 1240.7(d)(2)(vi); see Pls. 56.1 ¶ 29; Def. 56.1 ¶ 45) Crucially, the Committee may not, on its own, impose suspension or disbarment on any attorney. (See Pls. 56.1 ¶ 39; 22 N.Y.C.R.R. §§ 1240.7(d)(2)(vi), 1240.8.)

The respondent and in some cases the complainant receive notice of the Committee's disposition. (See Def. 56.1 ¶¶ 54, 56.) Both the respondent and complainant enjoy reconsideration and review rights with respect to Committee dispositions. The complainant (subject to procedural limitations not relevant here) may request reconsideration of the staff's decision to decline to investigate a grievance complaint or the Committee's dismissal of a complaint.[3] (See Def. 56.1 ¶ 56; 22 N.Y.C.R.R. § 1240.7(e)(3).) Similarly, the respondent may seek reconsideration of the Committee's decision to issue a Letter of Advisement. See 22 N.Y.C.R.R. § 1240.7(e)(1). The respondent may also seek review by the Second Department of a written Admonition or a Letter of Advisement. (See Def. 56.1 ¶ 34; 22 N.Y.C.R.R. § 1240.7(e).) An adversely affected respondent or complainant is also entitled to a "brief description of the basis for the

---

[3] In the case of a Letter of Advisement, the respondent attorney must first seek request reconsideration before the Committee and may request Second Department review pertaining only to the Committee's denial of reconsideration. 22 N.Y.C.R.R. § 1240.7(e).

determination" of the reconsideration or review petition, depending on which party prevails on reconsideration or review. 22 N.Y.C.R.R. 1240.7(e)(4).

The third tier of the disciplinary process begins if the Committee authorizes a disciplinary proceeding before the Second Department. The Committee may authorize Second Department proceedings where, for example, there is an ongoing history of similar misconduct, there has been misappropriation of client or third-party funds, the respondent attorney refuses to cooperate with an investigation, or the behavior in the complaint raises a concern that the respondent is a danger to the public. (See Def. 56.1 ¶ 49.)

If the Committee authorizes disciplinary proceedings in the Second Department, staff counsel — under the supervision of the Chief Attorney — drafts, files, and serves a petition and notice of petition on the respondent attorney. (See Def. 56.1 ¶ 50; 22 N.Y.C.R.R. § 1240.8(a)(1).) The Committee is the "petitioner" in Second Department proceedings. (See Def. 56.1 ¶ 51; see also N.Y. Jud. Law §§ 90(6), (8).) However, it is the Chief Attorney and staff attorneys that represent the Committee and prosecute disciplinary proceedings in the Second Department. (See Def. 56.1 ¶ 47; Bonina Decl. ¶ 22; see also 22 N.Y.C.R.R. §§ 1240.7(d)(2)(vi), 1240.8.)

The Second Department petition served on the respondent attorney outlines the charges and provides the respondent attorney with an opportunity to answer. (<u>See</u> 22 N.Y.C.R.R. § 1240.8(a)(1)(i); Pls. 56.1 ¶ 42.) The respondent attorney has the right to counsel throughout proceedings before the Second Department. (<u>See</u> Pls. 56.1 ¶ 42.) The Committee (through staff) then files a statement of disputed facts, flagging any allegations for which a hearing is necessary to resolve a factual dispute. (<u>See</u> 22 N.Y.C.R.R. § 1240.8(a)(2); <u>cf.</u> Pls. 56.1 ¶ 43.) After the respondent attorney provides a written response to the charges, there is a period of discovery during which staff counsel may subpoena witness testimony as necessary. (<u>See</u> Pls. 56.1 ¶ 44; 22 N.Y.C.R.R. § 1240.8(a)(4).)

The disciplinary proceedings in the Second Department are "special proceeding[s]" governed by New York Civil Practice Law and Rules (the "C.P.L.R."), Article 4. (Pls. 56.1 ¶ 41.) C.P.L.R. Article 4 sets forth rules on pleadings, motions, hearings, trial, and judgment. (<u>See</u> Pls. 56.1 ¶ 41; N.Y.C.R.R. § 1240.8(a)(1).) The Second Department hearing, which typically occurs before a special referee, proceeds with opening statements, witness testimony, and summations. (<u>See</u> Pls. 56.1 ¶¶ 45-46.) After the hearing and any post-hearing submissions, the special referee files a written

report in the Second Department with factual findings and legal recommendations. (See Pls. 56.1 ¶¶ 45, 47; 22 N.Y.C.R.R. § 1240.8(b)(1).) The respondent attorney or the prosecuting staff attorney may make a motion requesting the Second Department to confirm or disaffirm the special referee's report. (See Pls. 56.1 ¶ 48; see also 22 N.Y.C.R.R. § 1240.8(b)(1).)

The Second Department may accept or reject the special referee's findings. (See Pls. 56.1 ¶ 49.). The Second Department may dismiss the grievance complaint, remand the complaint to the Committee for private discipline, or publicly censure, suspend, or disbar the respondent attorney. (See Pls. 56.1 ¶ 50.)

B.  DISCIPLINARY RECORDKEEPING AND CONFIDENTIALITY

Unless and until a disciplinary matter requires action from the Second Department, the records of that matter reside with the Committee staff. In cases where the Second Department acts, the records of its involvement in a particular disciplinary matter reside within the Attorney Matters Section of the Second Department Clerk's Office.[4] Section

---

[4] The record indicates that the New York State Unified Court System/Office of Court Administration ("UCS/OCA") is the official custodian of Committee records. (See Ex. 17 to Wells Decl., at 8; Ex. 18 to Wells Decl., at 9.) However, it is not entirely clear whether the Committee relinquishes control over its records to a separate office within UCS/OCA, or whether the Committee staff (whose official employer is UCS/OCA) retains their own records. (See LaSalle Decl. ¶ 6; Ex. 18 to Wells Decl., at 9). Here,

90(10), the constitutionality of which is at issue in this litigation, deems "all papers, records and documents . . . upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys" to be "sealed," "private and confidential." Section 90(10) therefore codifies a general policy of nondisclosure with respect to attorney disciplinary matters. Pursuant to that statute, the Committee, its staff, and the Second Department Clerk's office do not release attorney disciplinary records — or permit nonparties to view attorney disciplinary proceedings — absent an applicable exception to Section 90(10). (See Kearse Decl. ¶¶ 5-6; Bonina Decl. ¶ 23; Joseph Decl. ¶ 11; Sheridan Decl. ¶ 36; see also Ex. H to Sonnenfeldt Decl. at '016, '082.) Those exceptions are limited.

The first relevant exception relates to the case of public discipline: "[I]n the event that charges are sustained by the justices of the appellate division having jurisdiction in any complaint, investigation or proceeding relating to the conduct or discipline of any attorney, the records and documents in relation thereto shall be deemed public

---

to the extent there is some dispute of fact regarding this question, it is not material; whether housed in the Clerk's Office, with the Committee, or with some other office housed in UCS/OCA, the applicable records are within the control of the Second Department and its justices, including Justice LaSalle. (See Ex. 18 to Wells Decl., at 9; Joseph Decl. ¶¶ 2-3.)

records." N.Y. Jud. Law § 90(10). (<u>See</u> <u>also</u> Pls. 56.1 ¶¶ 52-53.) Only after the Second Department has imposed public discipline do the records of that proceeding become available upon request from the Second Department Clerk. (<u>See</u> Pls. 56.1 ¶¶ 51-52; Joseph Decl. ¶ 11; Wells Decl. ¶¶ 28-29.) The Second Department does not provide contemporaneous access to its proceedings considering whether to impose public discipline.

The second relevant exception entails a request to the Second Department known as a "Good Cause Application." (<u>See</u> Def. 56.1 ¶¶ 17, 53.) This exception, too, is created by statute: "[U]pon good cause being shown, the justices of the appellate division having jurisdiction are empowered, in their discretion, by written order, to permit to be divulged all or any part of such papers, records and documents [relating to attorney discipline.]" N.Y. Jud. Law § 90(10). The Appellate Division adjudicates Good Cause Applications according to its discretion. (<u>See</u> Def. 56.1 ¶ 53; <u>see</u> <u>also</u> N.Y. Jud. Law § 90(10).)

Pursuant to 22 N.Y.C.R.R. § 1240.18(d), a Good Cause Application must also specify the nature and scope of the inquiry or investigation for which disclosure is sought; the papers, records, or documents sought to be disclosed, or the proceedings that are sought to be opened; and why any other

methods for obtaining the requested information are unavailable or impractical. (See Def. 56.1 ¶ 17.) Depending on the applicant, the Presiding Justice may require the Good Cause Application to be made upon notice to interested parties — that is, the Committee and respondent attorney. (See id. ¶¶ 18-19.) Law enforcement agencies and attorney disciplinary authorities filed the majority of Good Cause Applications in the Second Department over the past ten years. (See Joseph Decl. ¶ 13-14.) Good Cause Applications from the public are rare. (See id. at ¶ 15.)

The third relevant exception arises when the Committee or its Chief Attorney provide notice to a complainant or respondent attorney of action on a grievance complaint pursuant to 22 N.Y.C.R.R. § 1240. Such notifications include, for instance, information that a complaint has been dismissed by the Chief Attorney, that an investigation has been opened by the Chief Attorney, or that the Committee has reached a particular disposition with respect to the respondent's actions. (See Def. 56.1 ¶ 36.) However, the notices to complainants and respondent attorneys differ. Only notices of disposition to respondent attorneys contain the Committee's opinion and findings. (See Pls. 56.1 ¶ 31.) Notices to complainants provide only a brief description of the basis of any disposition of a complaint and may alert the complainant

17

to the fact of the Committee's decision but do not provide details of the investigation or the Committee's determinations. (See Pls. 56.1 ¶ 32; Def. 56.1 ¶ 58.) Complainants and respondent attorneys also have certain notification rights when a Committee disposition changes on reconsideration or review. (See Def. 56.1 ¶ 59; Pls. 56.1 Counter ¶ 59.)

The fourth exception concerns the consent of the respondent attorney. Respondent attorneys may obtain certain records of their own disciplinary history from the Second Department Clerk's Office or request such records to be sent to another jurisdiction. (See Joseph Decl. ¶ 10.) Respondent attorneys may also waive confidentiality with respect to their own disciplinary proceedings, though in at least one such instance the Second Department determined that there was "due cause demonstrated" for some or all of that proceeding to remain closed to the public despite the respondent attorney's consent to waive confidentiality. (See Def. 56.1 ¶ 13; Pls. 56.1 Counter ¶ 13.)

C.  PLAINTIFFS' GRIEVANCE COMPLAINTS

Plaintiffs Cynthia Godsoe, Nicole Smith Futrell, Daniel S. Medwed, Justin Murray, Abbe Smith, and Steven Zeidman (hereinafter the "Law Professors") are law professors with

academic interests in (among other topics) criminal law, criminal procedure, wrongful conviction litigation, post-conviction relief, legal ethics, and professional responsibility. (See Complaint, Dkt. No. 59 [hereinafter "Compl."], ¶¶ 13-18.) Plaintiffs Nicole Smith Futrell, Abbe Smith, and Steven Zeidman lead criminal defense-oriented clinical programs at their respective law schools, where they represent defendants in criminal proceedings and post-conviction relief litigation. (See id. ¶¶ 14, 17, 18.) All of the Law Professor Plaintiffs (except Justin Murray) are also active members of the New York bar. (See id. ¶¶ 13-18.)[5]

On May 3, 2021, the Law Professors filed twenty-one complaints (the "Grievance Complaints") against individual attorneys currently or formerly employed by the Queens County District Attorney's Office for misconduct committed while working as an assistant district attorney. (See Pls. 56.1 ¶ 2.) The Law Professors asked that the Second Department investigate and publicly discipline each attorney for his or her misconduct. (See id. ¶ 3.) The Law Professors also published their own Grievance Complaints online at AccountabilityNY.org. (See Dkt. No. 94 at 3.)

---

[5] To the extent these factual statements are not substantiated by the record, the Court takes judicial notice of them. See Fed. R. Evid. 201(b)(2) and (c)(1).

On June 2, 2021, James Johnson ("Johnson"), then-Corporation Counsel for the City of New York, wrote a letter (the "Johnson Letter") to the Committee, with copies to the Law Professors, expressing his view that publication of the Grievance Complaints online was an "abuse of the grievance process to promote a political agenda" in violation of Section 90(10). (Ex. 1 to Compl. at 3; see also Dkt. No. 94 at 4-5.) Johnson also expressed his view that publication of his own letter criticizing the Law Professors would be a violation of the same law. (See Ex. 1 to Compl. at 3 n.4.) Within a week, the Committee,[6] through its Chief Attorney, Diana Maxfield Kearse ("Kearse"), responded to the Grievance Complaints with its own letter (the "Kearse Letter"), advising the Law Professors that, because the complaints were "based on information derived from public sources, specifically, court decisions and court records," the Committee would initiate any investigation *sua sponte*. (See Pls. 56.1 ¶ 5; Def. 56.1 ¶ 60; see also Ex. 2 to Compl.) Accordingly, pursuant to Second Department policy, none of the Law Professors would receive notice of action or inaction on their Grievance

---

[6] The twenty-one Grievance Complaints were at first filed in the Grievance Committee where venue was proper; all were transferred to the Committee involved in this litigation as related cases. (See Ex. 3 to Wells Decl.)

Complaints. (See Pls. 56.1 ¶¶ 6-7; Def. 56.1 ¶¶ 54, 63; Ex. H to Sonnenfeldt Decl. at '016.).

To date, not one of the twenty-one original Grievance Complaints has resulted in a public form of discipline. (See Pls. 56.1 ¶ 4.) Whether the Grievance Complaints are still pending, were dismissed, or resulted in nonpublic discipline is not known. Plaintiffs have never made a Good Cause Application to review the records or proceedings related to their Grievance Complaints. (See Def. 56.1 ¶¶ 64.) However, the Law Professors wrote to the Committee complaining that the Committee had given the Law Professors "no information whatsoever" and "request[ed] an update about each grievance that [they] filed" pursuant to complainants' rights set forth at 22 N.Y.C.R.R. §§ 1240.2(e) and 1240.7(d). (Ex. 2 to Attadgie Decl.) This letter did not result in any disclosure of information about the Grievance Complaints.

D.    THIS LITIGATION AND RELEVANT PROCEDURAL BACKGROUND

Plaintiffs initiated this suit pursuant to 42 U.S.C. § 1983 on November 4, 2021, against Georgia Pestana, Corporation Counsel of the City of New York; Melinda Katz, Queens County District Attorney; Andrea Bonina, Chair of the Committee; Kearse; and Justice LaSalle (together,

"Defendants").[7] (See Sealed Complaint, Dkt. No. 1.) Especially relevant to the instant motions, Justice LaSalle was named as a defendant in his official capacity as Presiding Justice of the Second Department. (See id.) Plaintiffs named five claims for relief: (1) that Defendants retaliated against the Law Professors in violation of their First Amendment rights; (2) violations of the Fourteenth Amendment's Equal Protection Clause; (3) that Section 90(10) violates the First Amendment of the United States Constitution and Article I, Section 8 of the New York Constitution, both facially and as-applied (the "Third Claim"); (4) Defendants violated the Constitutions of the United States and of New York by denying Plaintiffs their right to access government proceedings and records (the "Fourth Claim"); and (5) if the Court finds that Section 90(10) is not unconstitutional, that Defendants must allow access to the records at issue under the statute's good-cause exception. (See id.) They seek declaratory and injunctive relief. (See id.) The exhibits to the Complaint — including the Johnson Letter and the Kearse Letter — were, at first, filed under seal. (See id.)

---

[7] Plaintiffs dismissed by stipulation all claims other than the Fourth Claim and all Defendants other than Justice LaSalle. (See Dkt. No. 158; Dkt. No. 208.) Accordingly, the Court's decision on the parties' instant motions for summary judgment on the Fourth Claim against Justice LaSalle resolves all outstanding matters in this case.

Shortly thereafter, this Court issued an order upon
Plaintiffs' motion, authorizing the exhibits to the Complaint
to be unsealed. See Civil Rights Corps v. Pestana, No. 21
Civ. 9128, Dkt. No. 58, 2022 WL 220020 (S.D.N.Y. Jan. 25,
2022) ("CRC I"). Plaintiffs then filed an unsealed Complaint
with all exhibits visible to the public. (See Compl.) This
Court later considered and mostly denied Defendants' motions
to dismiss, reserving some issues raised by those motions for
future consideration. See Civil Rights Corps v. Pestana, No.
21 Civ. 9128, Dkt. No. 90, 2022 WL 1422852 (S.D.N.Y. May 5,
2022) ("CRC II").

In a subsequent decision, this Court ruled in favor of
Plaintiffs as to all the reserved issues on Defendants'
motions to dismiss and granted Plaintiffs' motion for partial
summary judgment on their Third Claim. See Civil Rights Corps
v. Pestana, No. 21 Civ. 9128, Dkt. No. 94, 2022 WL 2118191
(S.D.N.Y. June 13, 2022) ("CRC III"). More specifically, the
Court held that "Section 90(10)'s prohibition on (1)
publication of attorney grievance complaints by the private
individuals who filed the complaints, and (2) publication of
correspondence related to grievance complaints or . . .
Committee business by the private recipients of that
correspondence" to constitute a prior restraint on
constitutionally protected speech, and that the restraint was

not narrowly tailored to protect a compelling governmental
interest. CRC III, at *7; see also id. at *10. The Court
denied summary judgment on the Third Claim to the extent it
raised a facial challenge to Section 90(10). Id. at *10.

After the close of discovery, Plaintiffs moved for
summary judgment on the Fourth Claim with an attached
memorandum of law and evidentiary submissions. (See Dkt. No.
174 ("Plaintiffs' Motion"); Dkt. No. 175 ("Pls. Mem."); see
also Pls. 56.1; Wells Decl.) Amicus curiae Floyd Abrams
Institute for Freedom of Expression ("Amicus") filed a brief
in support of Plaintiffs' Motion. (See Dkt. No. 184 ("Amicus
Br.").) Following the Court's approval of an extended
briefing schedule and memoranda of law with excess pages,
Justice LaSalle filed his opposition to Plaintiffs' Motion
and filed a cross-motion for summary judgment on the Fourth
Claim, with an attached memorandum of law and evidentiary
submissions. (See Dkt. No. 191 ("Defendant's Motion"); Dkt.
No. 199 ("Def. Mem."); see also Def. 56.1; Def. 56.1 Counter;
Bonina Decl.; Kearse Decl.; Joseph Decl.; LaSalle Decl.;
Sheridan Decl.; Sonnenfeldt Decl.)

Plaintiffs' response opposed Defendant's Motion and
offered reply arguments in further support of Plaintiffs'
Motion. (See Dkt. No. 202 ("Pls. Response Mem."); see also
Pls. 56.1 Counter; Attadgie Decl.) Defendant's response

offered reply arguments in further support of Defendant's Motion. (<u>See</u> Dkt. No. 205 ("Def. Response Mem.").)

Plaintiffs seek two forms of relief on their Fourth Claim. First, Plaintiffs seek a declaration that they may access the "dispositions" of the Grievance Complaints that may have reached disposition pursuant to 22 N.Y.C.R.R. § 1240.7(d)(1) or (d)(2), <u>i.e.</u>, "where the [G]rievance [C]ommittee or its Chief [Attorney] disposes of" a Grievance Complaint. (Pls. Mem. at 1.) This access would include "letters of dismissal, advisement or admonishment, opinions authorizing formal disciplinary hearings and/or decisions on reconsideration or review." (<u>Id.</u>) Second, Plaintiffs seek a declaration that they may have "live access to any hearings and related submissions and decisions before the Appellate Division (including those before a special referee)." (<u>Id.</u>)

## II.  <u>LEGAL STANDARD</u>

Rule 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, "[s]ummary judgment is proper if, viewing all facts of record in [a] light most favorable to [the] non-moving party, no genuine issue of material fact remains for adjudication." <u>Samuels v. Mockry</u>,

77 F.3d 34, 35 (2d Cir. 1996) (per curiam). The role of the Court in ruling on the motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the nonmovant, no rational jury could find in favor of the nonmoving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223–24 (2d Cir. 1994). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Liberty Lobby, Inc., 477 U.S. at 247–48 (1986).

Though a party opposing summary judgment "may not rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing

party. See <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

### III. <u>DISCUSSION</u>

The Court must consider the threshold jurisdictional and immunity issues raised by Defendant's Motion before it can consider the merits of Plaintiffs' First Amendment claim. The Court proceeds first with issues that could affect jurisdiction. See <u>Lance v. Coffman</u>, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits."). The Court then addresses the issues of abstention (which are discretionary but implicate jurisdiction) and the affirmative defenses of absolute immunity before turning to Plaintiffs' constitutional claims.

A.    <u>JURISDICTION</u>

The State makes three arguments asserting that this Court does not have jurisdiction to decide the Fourth Claim: (1) that Plaintiffs do not have standing to bring their claim (<u>see</u> Def. Mem. at 13-17), (2) that Plaintiffs' claim is unripe (<u>id.</u> at 16, 30-31), and (3) that Justice LaSalle is entitled to sovereign immunity under the Eleventh Amendment (<u>id.</u> at 17-18). The Court finds none of these points availing and holds that it has jurisdiction to rule on the Fourth Claim.

1.    <u>Standing</u>

The federal judicial power extends only to "Cases" and "Controversies." U.S. Const. art. III § 2; see <u>United States v. Texas</u>, 599 U.S. 670, 675 (2023); <u>Nat'l Coalition on Black Civic Participation v. Wohl</u>, 661 F. Supp. 3d 78, 108 (S.D.N.Y. 2023). "[A] case or controversy can exist only if a plaintiff has standing to sue." <u>Texas</u>, 599 U.S. at 675; see <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016); <u>Wohl</u>, 661 F. Supp. 3d at 108.

Standing requires the existence of "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," plus that the injury was caused by the defendant's conduct and that judicial action would redress the injury. <u>Wohl</u>, 661 F. Supp. 3d at 108 (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000)); see also <u>Spokeo</u>, 578 U.S. at 339. When seeking prospective declaratory or injunctive relief against future harm, as in this case, "threatened injury must be *certainly impending* to constitute injury in fact." <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 409 (2013) (emphasis in original) (quoting <u>Whitmore v. Arkansas</u>, 459 U.S. 149, 158 (1990)); see also <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive

relief to prevent the harm from occurring, at least as long as the risk of harm is sufficiently imminent and substantial."). When First Amendment principles are at stake, the rules of standing are "somewhat relaxed" to avoid an irreparable chilling effect on protected speech. Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013).

First turning to whether Plaintiffs' injury-in-fact is sufficiently concrete and particularized, the ongoing refusal of access to government proceedings and public records can itself satisfy the Article III inquiry. Denial of information to which a plaintiff is otherwise entitled constitutes a concrete and particularized injury-in-fact. See Fed. Election Comm'n v. Akins, 524 U.S. 11, 21 (1998) ("The 'injury in fact' that respondents have suffered consists of their inability to obtain information."); Public Citizen v. Dep't of Just., 491 U.S. 440, 449 (1989) (acknowledging "a sufficiently distinct injury to provide standing" where plaintiffs were denied information that would allow them to "scrutinize" the activities of government); see also N.Y. Civ. Lib. Union v. N.Y.C. Transit Auth., 684 F.3d 286, 295 (2d Cir. 2012) ("NYCTA") (holding that denial of access to administrative hearings constituted injury-in-fact); Am. Canoe Ass'n Inc. v. City of Louisa Water & Sewer Comm'n, 389 F.3d 536, 542 (6th

Cir. 2004) (holding that denial of access to statutorily required disclosures constituted injury-in-fact).

At the outset, the Court rejects the State's view that the informational injury suffered by Plaintiffs is not an injury to a legally protected right. Without passing premature judgment on Plaintiffs' constitutional claim, the First Amendment as a general matter embodies a "qualified . . . right of access" to certain proceedings. Press-Enter. Co. v. Superior Court, 478 U.S. 1, 9 (1986). That right is enforceable in Court and forms the basis of this action.[8]

The Court likewise rejects the view that this case implicates the holdings of Linda R.S. v. Richard D., 410 U.S. 614, 617-18 (1973), and In re Att'y Disciplinary Appeal, 650 F.3d 202, 204 (2d Cir. 2011), which stand for the simple proposition that no person has standing to compel the government's prosecution or discipline of someone else. Those cases are inapposite where, as here, Plaintiffs have not asked this Court to order disciplinary authorities to take any action with respect to suspected prosecutorial misconduct.

---

[8] The State, oddly, also cites to Section 90(10) for additional support that Plaintiffs have no legal entitlement to the Sealed Records and Proceedings. Whether Section 90(10) is constitutionally valid as applied to Plaintiffs is the central issue that the Court has been asked to decide. Section 90(10) cannot itself bar consideration of Section 90(10)'s constitutionality.

Rather, Plaintiffs ask the Court to declare only that they have a right to see how the State has handled Plaintiffs' Grievance Complaints — whatever ultimate result the State reaches. Accordingly, the relief requested on the Fourth Claim complies with the rule of Linda R.S. and related cases. See 410 U.S. at 618.

Finally, the Court is not bound to reject Plaintiffs' assertion of informational injury under the Supreme Court's holding in TransUnion LLC v. Ramirez, which clarifies that loss of access to information does not suffice to establish standing absent "downstream consequences" or "adverse effects." 594 U.S. at 442. In Ramirez, the plaintiffs could not demonstrate the "downstream consequences" or the "adverse effects" of the defendant's failure to maintain certain information in a particular format pursuant to the Fair Credit Reporting Act, and therefore had no standing to sue. Id. at 442. Though Congress could facilitate lawsuits by passing the disclosure requirements of the Fair Credit Reporting Act, the defendant credit agency could not be liable if its violations of that statute did not affect the plaintiff's money, property, health, reputation, or a similar legally protectible interest recognized at common law. See id. at 440.

The effect on Plaintiffs' ability to meaningfully participate in governmental processes is the downstream consequence that follows from Defendant's enforcement of Section 90(10).[9] See Akins, 524 U.S. at 21; Public Citizen, 491 U.S. at 449-50 (accepting injury-in-fact where information was relevant to public scrutiny of judicial appointment process); NYCTA, 684 F.3d at 295 (accepting injury-in-fact where information was relevant to advocacy and representation of clients in government hearings).

Akins, for instance, acknowledged that a lack of information concerning a political action group would impact the plaintiffs' abilities to understand the source of funding for political candidates and, accordingly, the informational injury impaired the plaintiffs' ability to make informed decisions at the ballot box. 524 U.S. at 21. The instant case involves a similar injury. The judges who oversee the Second Department's attorney disciplinary apparatus are elected to the bench and subsequently appointed to the Appellate Division by New York's governor, who is also elected. Further, the Grievance Complaints at the heart of this case concern

---

[9] Plaintiffs are wrong to advance the proposition that a violation of any provision of the Constitution is sufficient to confer standing upon those affected. (see Pls. Response Mem. at 2-3.) See, e.g., United States v. Richardson, 418 U.S. 166 (1974) (dismissing on standing grounds of a suit alleging violation of Congress's constitutional responsibility to make a regular statement of all public expenditures).

the allegedly unethical conduct of practicing attorneys in the course of their work for the Queens County District Attorney, who likewise is elected to that role. Democratic processes assure those officials' accountability to the public, and the democratic process functions poorly in the absence of relevant information.

Just as in <u>Akins</u>, Plaintiffs have suffered a real, non-conjectural injury to their ability to "participate more effectively" in the democratic process, either by voting or advocating for candidates. 524 U.S. at 21; <u>see</u> <u>Public Citizen</u>, 491 U.S. at 449. Democratic restraints on the conduct of government officers are critically weakened when the government does not allow the public to review or discuss its work. <u>See, e.g.,</u> <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 604 (1982) (acknowledging the public's right under the First Amendment to access criminal trials because "the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government"); <u>Houchins v. KQED, Inc.</u>, 438 U.S. 1, 14 (1978) ("A major purpose of the First Amendment was to protect the free discussion of governmental affairs." (cleaned up)). This is an especially important interest in the work of New York's Supreme Court justices, who are elected for lengthy fourteen-year terms and do not

regularly answer to democratic restraints on public power. Accordingly, the Court finds Plaintiffs' injury is concrete and particularized.

To complete the injury-in-fact inquiry, the Court must next consider whether the threat of future injury is sufficiently imminent — that is, "certainly impending" — for standing to exist. Clapper, 568 U.S. at 401 (requiring imminence of harm to a plaintiff when prospective declaratory relief is sought). The Court finds that the injury here is ongoing and certain to continue. See NYCTA, 684 F.3d at 295 (past and ongoing denial of constitutional rights sufficed to show imminence of future denial of constitutional rights).

Second Department policies promulgated in furtherance of Section 90(10) and codified in both the Manual and 22 N.Y.C.R.R. § 1240 require total confidentiality of attorney disciplinary proceedings absent limited exceptions. (See Pls. 56.1 ¶ 35 (Grievance Committee dispositions are confidential); id. ¶¶ 52, 53 (Second Department disciplinary proceedings and related documents are confidential unless and until charges are sustained).) Second Department personnel have already deployed those policies to seal the proceedings and records at issue in this case, including taking the affirmative step of denying Plaintiffs of their status as "complainants," which would have otherwise entitled them to

34

certain information concerning the dispositions of their Grievance Complaints under 22 N.Y.C.R.R. § 1240. (See Pls. 56.1 ¶ 5; Def. 56.1 ¶ 60; see also Ex. 2 to Compl.) Plaintiffs have lodged further requests with the Committee for information on the Grievance Complaints, with no success. (See Ex. 2 to Attadgie Decl.) There is no reason to believe secrecy in disciplinary matters in the instant case will end without intervention from this Court. Plaintiffs' injury is ongoing and continuing, and they have made all necessary showings for an injury-in-fact sufficient to bring their Fourth Claim.

The parties did not brief or dispute the other two elements of Article III standing: that the injury in fact is "fairly traceable" to Defendant and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Allco Fin. Ltd. v. Klee, 861 F.3d 82, 95-96 (2d Cir. 2017) (citations omitted). However, a minor factual dispute has emerged concerning Justice LaSalle's authority to effectuate a ruling in favor of Plaintiffs from this Court. More specifically, Justice LaSalle at times suggests that he does not have control over the records and proceedings in dispute as Presiding Justice, and therefore is unable to authorize their release. (See Def. Mem. at 17-19, 21; Def. Response Mem. at 8; Def. 56.1 Counter

¶¶ 20-21.) Plaintiffs, in response, point to an email from Justice LaSalle's counsel, which states: "Justice LaSalle . . . is the only defendant . . . with control over the records and information Plaintiffs seek."[10] (See Ex. 1 to Attadgie Decl.) Redressability is a requirement of jurisdiction, so the Court must briefly address the issue.

The factual disagreement just described is not "genuine" as that term is understood in the context of Rule 56, and there is no reason to withhold summary judgment and conduct a trial on this issue. Liberty Lobby, Inc., 477 U.S. at 247-48; cf. Hartford Courant v. Pellegrino, 380 F.3d 83, 97-98 (2d Cir. 2004) (vacating dismissal of First Amendment challenge to Connecticut state-court confidentiality policy when record evidence and statutes were unclear whether named defendants had legal authority to unseal records sought).

It is not in dispute that the records and information sought by Plaintiffs are in the custody of either the Committee staff or the Second Department Clerk's Office. (See Def. 56.1 Counter ¶¶ 20-21.) The staff and employees of those

---

[10] For added context, Counsel's statement without any alteration reads as follows: "The relief Plaintiffs seek in Claim IV is the disclosure of information or records within the Grievance Committee, which is controlled by the Second Department. Justice LaSalle who is sued in his official capacity on behalf of the Second Department is the only defendant necessary to defend against Claim IV and, if Plaintiffs prevail, with control over the records and information Plaintiffs seek." (Ex. 1 to Attadgie Decl.) Counsel made this statement during negotiations to dismiss Justice LaSalle's then-co-defendants by stipulation. (See id.)

offices work for the Second Department and carry out the policies set forth by the Presiding Justice. (Sheridan Decl. ¶ 2; Joseph Decl. ¶¶ 1-2, 7; Ex. 8 to Wells Decl. at 8; <u>see also</u> LaSalle Decl. ¶¶ 3-4, 6.) The relevant staff of the Committee and the Clerk's Office have likewise acknowledged that they would release the relevant information upon an order from a justice of the Second Department. (<u>See</u> Kearse Decl. ¶ 5; Joseph Decl. ¶¶ 12-15.) In addition, Justice LaSalle's authority to so direct Second Department staff is consistent with the delegation of plenary responsibility over the "[s]upervision of the administration and operation" of "disciplining of lawyers" to the Appellate Divisions or their Presiding Justices. N.Y. Ct. R. 80.3(c).[11] Despite intimating otherwise, Justice LaSalle has not set forth any evidence that his directions to the staff of the Committee or Clerk's Office would be disregarded or are otherwise legally insufficient to effect relief here. Accordingly, the Court finds redressability no bar to jurisdiction. Plaintiffs have established standing to bring their Fourth Claim.[12]

---

[11] Exhibit 1 to the Attadgie Declaration is not evidence one way or the other on the issue of Justice LaSalle's ability to implement a ruling of this Court. Exhibit 1, which is an email from defense counsel, is hearsay. Moreover, neither the email nor counsel's separately filed declaration (<u>see</u> Sonnenfeldt Decl.) establishes counsel's basis to state facts about the internal operations of the Second Department.

[12] The Court does not separately discuss Civil Rights Corps' standing because the Law Professors have standing to bring the Fourth Claim. Only one plaintiff with standing is required for a claim to proceed. <u>See</u>

2.  <u>Ripeness</u>

The State further contends that this action should be dismissed under the principle of ripeness, "a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" <u>Nat'l Park Hosp. Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 807 (2003) (quoting <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967)). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." <u>Nat'l Park Hosp. Assoc.</u>, 538 U.S. at 808 (quotation marks omitted) (quoting <u>Reno v. Catholic Social Servs., Inc.</u>, 509 U.S. 43, 57 n.8 (1993)).

The Court examines the jurisdictional question first. "To be justiciable, a cause of action must be ripe — it must present a real, substantial controversy, not a mere hypothetical question." <u>Nat'l Org. for Marriage, Inc.</u>, 714 F.3d at 687 (quoting <u>AMSAT Cable Ltd. v. CableVision of Conn.</u>, 6 F.3d 867, 872 (2d Cir. 1993)). "Ripeness overlaps in some respects with standing" in that, if there has not already been an injury, the threat of injury must be "imminent rather than conjectural." <u>Bronx Household of Faith v. Bd. of Educ.</u>

_____

<u>Village of Arlington Heights v. Metro. Hous. Dec. Corp.</u>, 429 U.S. 252, 264 n.9 (1977).

of City of N.Y., 492 F.3d 89, 111 (2d Cir. 2007). The ripeness
analysis assumes that an injury will accrue; the Court here
evaluates only whether "*at the time* of the litigation the
issues in the case are 'fit' for judicial decision." Bronx
Household of Faith, 492 F.3d at 111 (emphasis in original)
(quotation marks omitted) (quoting Nat'l Park Hosp. Ass'n,
538 U.S. at 814).

Here, a real and substantial controversy exists to
support ripeness, for many of the same reasons that the Court
addressed in its discussion on standing. (See supra, Section
III.A.1.) The injury to Plaintiffs' constitutional right to
the documents and proceedings related to the Grievance
Complaints is ongoing. As the Court has already noted, the
Chief Attorney for the Committee determined that Plaintiffs
had no "standing" (as a matter of Second Department policy)
to bring the Grievance Complaints and denied them ongoing
access to dispositional information that complainants would
otherwise be entitled to receive. (See Pls. 56.1 ¶ 5; Def.
56.1 ¶ 60.) At least one other request did not result in the
Second Department releasing the requested information. (See
Ex. 2 to Attadgie Decl.) Enforcement of Section 90(10)
against Plaintiffs establishes a "non-speculative" threat of
injury. See Huminsky v. Corsones, 396 F.3d 53, 80 n.27 (2d
Cir. 2005). Barring an unexpected change in the Second

39

Department's enforcement of Section 90(10)'s confidentiality requirements at the direction of Justice LaSalle, "[e]ach passing day" the proceedings and records at issue remain inaccessible to Plaintiffs "may constitute a separate and cognizable infringement of the First Amendment." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 126 (2d Cir. 2006) (quoting Grove Fresh Distrib., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994)). It is not speculation to conclude that Plaintiffs are suffering an ongoing injury, which is certain to continue.

The State takes a different view: that "denial of information" is not imminent because Plaintiffs never made a Good Cause Application for the proceedings and records they wish to have unsealed, and that therefore the question is (at least in theory) still open. The Court is not persuaded. It is well-established that exhaustion of remedies under state law is not required to make a Section 1983 claim ripe. See, e.g., Knick v. Twp. of Scott, Pa., 588 U.S. 180, 185 (2019) ("[T]he settled rule is that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983." (brackets and quotation marks omitted)); Heck v. Humphrey, 512 U.S. 477, 480 (1994) (similar); Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982) (similar); Monroe v. Pape, 365 U.S. 167, 183 (1961) (similar). Section 1983 provides

"dual or concurrent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief." Patsy, 457 U.S. at 506; see also Knick, 588 U.S. at 185 (overruling the doctrine that required exhaustion of state-law remedies in Takings Clause cases, noting the dual-forum purpose of Section 1983 and its importance to Fourteenth Amendment principles). A Good Cause Application was not required as a matter of law.

Moreover, Plaintiffs make a persuasive case that a Good Cause Application would have been futile. (See Pls. Response Mem. at 4 n.2.) Neither Section 90(10) nor 22 N.Y.C.R.R. § 1240 supply a standard to decide Good Cause Applications other than the "discretion" of the Second Department. The typical Good Cause applicant is a law enforcement agency or an attorney disciplinary authority in another jurisdiction. (See Joseph Decl. ¶¶ 13-15.) Plaintiffs are neither. In analogous circumstances, the Second Department denied a Good Cause Application that sought to unseal the disciplinary hearing of a former prosecutor whose misconduct had already been reported in the media. In re The Innocence Project, Inc., Index No. 2019-05674, Decision & Order on Application (App. Div. 2d Dep't July 12, 2019), lv. denied, 141 N.E.3d 954 (N.Y. 2020). Indeed, the State does not contest Plaintiffs' observation that only three Good Cause Applications by the

41

general public have been granted since 1945 in any Appellate Division. See In re Aretakis, 791 N.Y.S.2d 687 (App. Div. 3rd Dep't 2005); In re New York News, 495 N.Y.S.2d 181 (App. Div. 1st Dep't 1985); In re Capoccia, 453 N.E.2d 497 (App. Div. 3rd Dep't 1983). It would be an academic exercise to ask Plaintiffs to first make Good Cause Applications before they can bring a civil rights action under Section 1983.

The State's more forceful argument is that Plaintiffs present no evidence that the hearings to which there is a purported right of access will ever occur because Second Department hearings do not occur in the majority of cases, which are handled by the Committee without Second Department involvement. (See Def. Mem. at 30.) Thus, declaratory judgment now that Plaintiffs may access Second Department hearings would constitute a premature, advisory opinion. (See id.)

This matter is not unripe simply because of the uncertainty over whether hearings will occur, or when. Uncertainty exists only because of Section 90(10), which does not allow the State to disclose even the pendency of disciplinary proceedings until they end in disbarment or suspension, let alone the stage to which those proceedings have progressed to date. Absent the rare imposition of public discipline in the Second Department, there is no future stage

42

of the disciplinary process where Plaintiffs will know more than they do now. As a matter of fundamental fairness, the State's position is untenable because it would allow Section 90(10) to stand in the way of a federal court's jurisdiction to hear a challenge to Section 90(10)'s constitutionality. The Second Circuit rejected a similar argument in Hartford Courant Co., LLC v. Carroll, 986 F.3d 211, 223 (2d Cir. 2021), when it noted that docket sheets of juvenile proceedings could not be maintained under seal because, without access to a case's docket, the public would never know what additional court records exist and which of those records the public may be interested in seeing. Cf. also Pellegrino, 380 F.3d at 83 (applying similar logic to recognize a First Amendment right to access docket sheets in ordinary civil cases).

The Court rejects the State's similar argument here and finds the case ripe even without knowing how or when the Committee or the Second Department will dispose of the Grievance Complaints. There are settled constitutional grounds to do so. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 143 (1974). By operation of law, the

disciplinary actions initiated by the Grievance Complaints must reach some disposition; the nature of that disposition, and the exact day on which it is handed down, are immaterial, because the State is already enforcing its policy of near-total confidentiality. Accordingly, there is no constitutional reason to delay this decision. For purposes of Article III, the Fourth Claim is ripe.

Prudential ripeness concerns likewise do not require the Court to wait before deciding Plaintiffs' Fourth Claim. The Court's prudential ripeness inquiry "turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n, 461 U.S. 190, 201 (1983) (quoting Abbott Labs., 387 U.S. at 149).

As to the fitness of the issues for decision, the Fourth Claim presents a "purely legal question" about the applicability of the First Amendment right to access certain governmental proceedings and records, and whether that right has been infringed by the Second Department and the Committee. See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (recognizing "purely legal" questions as particularly fit for judicial decision); United States v. Olivencia, 689 F. Supp. 1319, 1323 (S.D.N.Y. 1988) (same). The State does not identify any future stage in its disciplinary proceedings

where additional facts will be available to assist the Court
in its decision.

The hardship to Plaintiffs of withholding judicial
decision is apparent. The longer that Plaintiffs are deprived
access to the proceedings and records at the heart of this
dispute, the longer their purported constitutional right to
view the work of government is violated. As the Court already
noted in the context of standing: "Each passing day may
constitute a separate and cognizable infringement of the
First Amendment." Lugosch, 435 F.3d at 126 (quoting Grove
Fresh Distrib., Inc., 24 F.3d at 897) Further delaying this
decision would delay Plaintiffs' ability to have informed
discussions about the work of their elected officials, an
interest closely guarded by the First Amendment. See Globe
Newspaper Co., 457 U.S. at 604 (explaining the First Amendment
right exists to "ensure that the individual citizen can
effectively participate in and contribute to our republican
system of self-government" and collecting cases).

3.   Sovereign Immunity

The State's next argument for dismissal raises the
possibility that the Eleventh Amendment deprives federal
courts of jurisdiction to hear Plaintiffs' Fourth Claim. The
Eleventh Amendment generally bars "federal suits against

45

state governments by a state's own citizens" or by citizens
of another state. Woods v. Rondout Valley Cent. Sch. Dist.
Bd. of Educ., 466 F.3d 232, 236 (2d Cir. 2006). As an arm of
the State, the New York state court system — including the
Second Department — is ordinarily entitled to this sovereign
immunity. See Napolitano v. Saltzman, 315 F. App'x 351, 351
(2d Cir. 2009); see also Gollomp v. Spitzer, 568 F.3d 355,
366 (2d Cir. 2009) (collecting cases that afford sovereign
immunity to New York courts).

Sovereign immunity under the Eleventh Amendment is
subject to three exceptions: "(1) Congress has abrogated
immunity, (2) the state has consented to suit, or (3) the Ex
parte Young doctrine applies." Brown v. New York, 975 F. Supp.
2d 209, 222 (N.D.N.Y. 2013) (citing Will v. Mich. Dep't of
State Police, 491 U.S. 58, 71 (1989)). The State's insistence
that it has not consented to suit is beside the point. The Ex
parte Young exception applies here, permitting this Court to
grant prospective relief against a State official sued in an
official capacity without the State's consent.

To determine whether a case can proceed under the Ex
parte Young exception to sovereign immunity, "a court need
only conduct a straightforward inquiry into whether the
complaint alleges an ongoing violation of federal law and
seeks relief properly characterized as prospective." Verizon

_Md., Inc. v. Pub. Serv. Comm'n of Md._, 535 U.S. 635, 645 (2002) (cleaned up) (quoting _Idaho v. Coeur d'Alene Tribe of Idaho_, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). Both requirements are satisfied here. Plaintiffs allege an ongoing violation of the First Amendment, namely that proceedings and records related to the Grievance Complaints have been sealed and are inaccessible. Moreover, Plaintiffs seek forward-looking declaratory or injunctive relief to prevent the Second Department from keeping those records and proceedings under seal in the future. (_See_ Pls. Mem. at 1.)

Justice LaSalle is not correct that _Ex parte Young_ cannot be applied to judges and court officials, like himself, pursuant to the Supreme Court's holding in _Whole Woman's Health v. Jackson_, 595 U.S. 30 (2021). (_See_ Def. Mem. at 17-18.) The Court does not read _Jackson_ to set forth such a categorical rule, and this action seems to comprise the atypical instance where _Jackson_ does not apply. _Jackson_ concerned a Texas law recognizing private civil actions against physicians for "knowingly performing or inducing an abortion" in certain circumstances. _Jackson_, 595 U.S. at 35 (brackets omitted). The Texas law did not fit neatly into the _Ex parte Young_ doctrine because the law did not provide for enforcement by state government officials (the typical

subjects of <u>Ex parte Young</u> injunctions) but rather by any private citizen. <u>Jackson</u>, 595 U.S. at 35-36.

In federal court, a group of plaintiffs sued a Texas state judge and a Texas court clerk (among others), seeking an injunction that would restrain those officials from adjudicating lawsuits under Texas's new private civil action or even accepting complaints that brought suit under the new Texas statute. <u>Jackson</u>, <u>id.</u> at 36-37. The injunction proposed by the <u>Jackson</u> plaintiffs was beyond the powers of federal courts under the <u>Ex parte Young</u> exception. <u>Ex parte Young</u> explicitly holds that the power to enjoin state officials from enforcement of the law "does not include the power to restrain a [state] court from acting *in any case brought before it*." <u>Ex parte Young</u>, 209 U.S. 123, 163 (1908) (emphasis added).

In its reasoning, <u>Jackson</u> underscores that the role of judges and clerks is not fairly characterized as enforcing statutes in the way executive or administrative officials might; rather, judges and their staffs "work to resolve disputes" between litigants pursuant to statutes. 595 U.S. at 39. Moreover, if state judges commit constitutional error, their decisions may be appealed, ultimately to the United States Supreme Court pursuant to 28 U.S.C. § 1257 to vindicate constitutional protections. <u>See</u> <u>Jackson</u>, 595 U.S. at 39. In

the typical Ex parte Young case, an injunction against state
executive or administrative officials is permissible to
prevent an enforcement action on the basis of an
unconstitutional law in the first place, so that federal
judges do not ever need to instruct state judges how to
adjudicate particular matters. Jackson, 595 U.S. at 39. Such
oversight of federal courts over state courts "would be a
violation of the whole scheme of our Government." Id. (quoting
Ex parte Young, 209 U.S. at 163).

Jackson does not change the result of a case where, as
here, a plaintiff does not challenge the adjudicatory acts of
a judge as unconstitutional, but rather a judge's
administrative and executive acts necessary to run the
business of court. Plaintiffs challenge only Justice
LaSalle's administrative implementation of Section 90(10),
pursuant to which all attorney disciplinary hearings in the
Second Department are conducted behind locked doors, and all
disciplinary records are kept under lock and key unless the
severe sanctions of disbarment or suspension occur. The
relief sought in this case would not compel Justice LaSalle,
the Second Department, or the Committee to take any specific
action in relation to the merits of the Grievance Complaints
(or any other dispute before the Second Department). See,
e.g., Bliven v. Hunt, 579 F.3d 204, 211 (2d Cir. 2009)

(observing that the "principal hallmark of the judicial function is a decision in relation to a particular case"). This distinguishes Justice LaSalle from the judges in Jackson, where plaintiffs sought an injunction barring judges from entertaining specific disputes under the Texas law.

The Eighth Circuit's decision in Courthouse News Serv. v. Gilmer supplies additional support for this conclusion. 48 F.4th 908 (8th Cir. 2022). In Gilmer, the plaintiff sought an injunction requiring Missouri state-court officials to provide immediate public access to electronically filed complaints, instead of delaying public access while the state court administratively processed the complaints. 48 F.4th at 910. Missouri state-court officials responded that the suit should be dismissed because Jackson denied a federal court the power to enjoin state court officials. 48 F.4th at 910-11. The Court of Appeals rejected that reading of Jackson, instead observing that Jackson simply reaffirms the ordinary rule that "state sovereign immunity shields state-court judges and clerks from prospective relief that will interfere with their ability to 'act[] in any case.'" 48 F.4th at 912 (quoting Ex parte Young, 209 U.S. at 163). Or, in other words, with respect to state judiciaries' sovereign immunity, a federal court's Ex parte Young analysis must turn on whether the federal court's injunction would impact the state court's

"exercise [of] jurisdiction" to decide the merits of particular cases. Gilmer, 48 F.4th at 912 (quoting Ex parte Young, 209 U.S. at 163).

In Jackson, an injunction preventing Texas courts from accepting certain complaints effectively barred the state courts from making their own determination on the merits of those complaints; that injunction violated the state's sovereign immunity. 595 U.S. at 39. In Gilmer, an injunction requiring Missouri courts to make civil complaints publicly available in a timely manner had no effect of preventing Missouri state judges from deciding the outcome of any complaint; the injunction was therefore permissible under Ex parte Young. 48 F.4th at 912. The facts of this case are far more similar to Gilmer than they are to Jackson; the relief sought by Plaintiffs would declare that Plaintiffs must be able to observe certain disciplinary hearings in the Second Department, and inspect certain disciplinary records. This relief would not impact how the Second Department or the Committee decides the merits of any of the Grievance Complaints, and their jurisdiction to reach a decision in any disciplinary matter would be untouched.

The Court concludes it has jurisdiction to enter prospective declaratory or injunctive relief against Justice

LaSalle in his official capacity, notwithstanding Eleventh
Amendment sovereign immunity.

    B.   <u>ABSTENTION</u>

    Though the Court has just concluded that it has
jurisdiction under Article III and the Eleventh Amendment to
hear this case, the United States Supreme Court has recognized
"certain instances in which the prospect of undue
interference with state proceedings counsels against federal
relief." <u>Sprint Commc'ns, Inc. v. Jacobs</u>, 571 U.S. 69, 72
(2013) (citing <u>New Orleans Pub. Service, Inc. v. Council of
City of New Orleans</u>, 491 U.S. 350, 368 (1989) ("<u>NOPSI</u>")).
Under these so-called abstention doctrines, a federal court
will refuse to enter relief that would interfere with critical
state government functions despite constitutional and
statutory subject matter jurisdiction to do so. <u>See</u> <u>NOPSI</u>,
491 U.S. at 359; <u>see also</u> <u>CRC II</u>, 2022 WL 1422852, at *3.
Abstention is warranted only in "exceptional" cases;
ordinarily, "a federal court's obligation to hear and decide
a case is virtually unflagging." <u>Trump v. Vance</u>, 941 F.3d
631, 637 (2d Cir. 2019) (quoting <u>Sprint Commc'ns</u>, 571 U.S. at
77).

    When it ruled on Defendant's motion to dismiss in <u>CRC II</u>,
this Court found three such abstention doctrines

inapplicable: <u>Younger</u> abstention, <u>O'Shea</u> abstention, and <u>Pullman</u> abstention.[13] <u>See</u> 2022 WL 1422852, at *3-7. Again at summary judgment, the State raises the <u>Younger</u> and <u>O'Shea</u> doctrines (<u>see</u> Def. Mem. at 21-24), and now the <u>Rooker-Feldman</u>[14] doctrine as well (<u>see</u> <u>id.</u> at 20-21). Only a brief reevaluation of <u>Younger</u> and <u>O'Shea</u> is necessary because <u>CRC II</u> is the law of the case, and the summary judgment record does not supply a reason to reach a different conclusion than before. <u>See</u> <u>Choi v. Tower Research Cap. LLC</u>, 2 F.4th 10, 21 (2d Cir. 2021) (instructing a court to follow its prior decisions in the same litigation absent a change in law, newly available evidence, clear error, or manifest injustice).[15] The Court likewise concludes that the <u>Rooker-Feldman</u> doctrine is inapplicable under the facts in this litigation.

---

[13] <u>See</u> <u>generally</u> <u>Younger v. Harris</u>, 401 U.S. 37 (1971); <u>O'Shea v. Littleton</u>, 414 U.S. 488 (1974); <u>R.R. Comm'n of Tex. v. Pullman Co.</u>, 312 U.S. 496 (1941).

[14] <u>See</u> <u>generally</u> <u>D.C. Ct. of Appeals v. Feldman</u>, 460 U.S. 462 (1983); <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923).

[15] Statements that the Court limited its abstention holding in <u>CRC II</u> to the relief requested on Plaintiffs' Third Claim — leaving an open question as to abstention on the Fourth Claim — are not accurate. (<u>See</u> Def. Mem. at 23-24.) Defendant's motion to dismiss was not limited to the Third Claim but rather discussed all forms of relief sought by Plaintiffs, including on the Fourth Claim. (<u>See</u> Dkt. No. 41.) The same is true of the Court's analysis on that motion to dismiss. <u>See</u> <u>CRC II</u>, 2022 WL 1422852, at *5 (citing and analyzing the Complaint's Prayer for Relief in its entirety).

1.  <u>Younger</u>

The Court first considers the State's argument (<u>see</u> Def. Mem. at 24) that <u>Younger v. Harris</u>, 401 U.S. 37 (1971), requires dismissal of the Fourth Claim. <u>Younger</u> and its progeny warn of federal injunctions dictating the course of ongoing state criminal proceedings, which would curb the state's ability to enforce its own laws and act independently of the federal government. <u>See</u> <u>Sprint Commc'ns</u>, 571 U.S. at 72-73. Attorney disciplinary proceedings are of a sufficiently similar character to criminal proceedings that the same notions of comity and federalism come into play. <u>See</u> <u>Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.</u>, 457 U.S. 423, 434-35 (1982); <u>see</u> <u>also</u> <u>CRC II</u>, 2022 WL 1422852, at *4.

The Court did not abstain from exercising jurisdiction in <u>CRC II</u> because it "would not be stepping in or directly interfering with such [attorney disciplinary] proceedings." 2022 WL 1422852, at *5. In its motion for summary judgment, the State makes no citation to any change in law or newly available evidence that would amount to a "cogent and compelling" reason to conclude otherwise. <u>Choi</u>, 2 F.4th at 21.

Given the State's apparent misunderstanding of Plaintiffs' Complaint, one additional point from <u>CRC II</u> is

worth emphasis. Plaintiffs have not asked for federal relief directing the Second Department or the Committee to discipline any attorney more harshly (or discipline any attorney at all); rather, Plaintiffs have asked for federal relief only to know how the Second Department and the Committee handle the Grievance Complaints, regardless of the result before the Committee or the Second Department on the merits of those Grievance Complaints. See CRC II, at *5. Incidental effects on the disciplinary process caused by the "increased attention and publicity" of disciplinary proceedings, CRC II, 2022 WL 1422852 at *5, are not the type of "undue interference with state proceedings [that] counsel[] against federal relief," Sprint Commc'ns, 571 U.S. at 72.

### 2.   O'Shea

Justice LaSalle likewise fails in his second attempt to raise O'Shea v. Littleton, 414 U.S. 488 (1974), as a reason this Court should not exercise jurisdiction over the Fourth Claim. (See Def. Mem. at 21-24.) Under O'Shea and "the principle known as comity[,] a federal district court has no power to intervene in the internal procedures of the state courts." Kaufman v. Kaye, 466 F.3d 83 (2d Cir. 2006) (quoting Wallace v. Kern, 520 F.2d 400, 405 (2d Cir. 1975)). Even if

there is no ongoing proceeding in state court that would trigger <u>Younger</u> abstention, "federal courts must abstain where failure to do so would result in an ongoing federal audit of state criminal proceedings" or would "legislate and engraft new procedures upon existing state practices." <u>Disability Rights N.Y. v. New York</u>, 916 F.3d 129, 134, 136 (2d Cir. 2019) (quotation marks and citations omitted).

In <u>CRC II</u>, the Court assumed all facts in the Complaint to be true and held that <u>O'Shea</u> and its progeny did not apply because "the injunctive relief Plaintiffs request does not ask the Court to change state procedure for handling misconduct proceedings or anything similar." 2022 WL 1422852, at *6. The State now argues that the Court should depart from its earlier ruling because granting Plaintiffs' motion would (1) effectively "usurp the state court's role" to adjudicate Good Cause Applications (Def. Mem. at 24), and (2) "require an extensive revamp of the procedures" for records of disciplinary proceedings "to make them available" to the public. (Def. Response Mem. at 9).[16] Neither is reason for the Court to abstain under <u>O'Shea</u>.

---

[16] The State also believes that a ruling in Plaintiffs' favor would eviscerate, without notice, any expectation of confidentiality held by the former prosecutors whose alleged misconduct is the subject of the Grievance Complaints. (<u>See</u> Def. Mem. at 23; Def. Response Mem. at 8-9.). As an initial matter, Plaintiffs' accusations against the former prosecutors are already public. <u>See</u> <u>CRC III</u>, 2022 WL 2118191, at *13 (declaring Plaintiffs' First Amendment right to publish the Grievance

The concern that a federal court would necessarily dictate the outcome of Good Cause Applications is not as dire as the State would like the Court to believe. Plaintiffs have requested declaratory relief on a question of constitutional law, not a question of what constitutes "good cause" for the purposes of the Good Cause Application process. (See Pls. Mem. at 1.) A determination by this Court of "good cause" under Section 90(10) was the subject of Plaintiffs' Fifth Claim for Relief, which Plaintiffs have since withdrawn. (See Compl. ¶¶ 106-107; see also Dkt. No. 158.) Assuming the Court rules against the State on Plaintiffs' constitutional claims, the procedural mechanism by which the State complies with the Constitution is not material. See Courthouse News Serv. v. Planet, 750 F.3d 776, 791 (9th Cir. 2014) (reversing O'Shea abstention where plaintiff sued a state court system and noting abundant options by which the state court could produce the public records at issue).

---

Complaints they authored); see also Kearse Letter (noting that the Grievance Complaints were based on public sources); *Queens: Grievances alleging prosecutorial misconduct in the State of New York, within Queens, New York City*, Accountability New York, accountabilityny.org/grievances/queens (publishing the Grievance Complaints). Moreover, the touchstone of a comity-based abstention analysis is friction between state and federal courts. See Disability Rights N.Y., 916 F.3d at 136. The reputational interests of individual attorneys are a minor factor that have not affected that abstention analysis in any case of which the Court is aware.

It is not clear why the State implies it will insist on a Good Cause Application to be made pursuant to Section 90(10) if the Court declares Section 90(10) to violate Plaintiffs' First Amendment rights. The affirmative requirement of "good cause" to access public records falls among the provisions of Section 90(10) that Plaintiffs find constitutionally offensive to the First Amendment's presumption of access to governmental proceedings. (See, e.g., Compl. ¶¶ 41-42; Pls. Response Mem. at 4 n.2.) Moreover, Plaintiffs seek declaratory relief, which — unlike injunctive relief — mitigates federal-state friction because it allows the state court "the widest latitude in the dispatch of their own affairs." Gilmer, 48 F.4th at 915 (cleaned up) (quoting Rizzo v. Goode, 423 U.S. 362, 378-39 (1976)) (reversing dismissal pursuant to O'Shea where plaintiffs sought modifications to a state court system's electronic filing system); see Planet, 750 F.3d at 791 (same).

The State also argues that relief in Plaintiffs' favor will, in effect, "require an extensive revamp" of Court procedures. (Def. Response Mem. at 9.) Plaintiffs seek access to discrete records and legal proceedings in twenty-one particular matters, and they expressly disclaim a facial challenge to Section 90(10) or its implementing policies and regulations. (See Compl. ¶¶ 96-105.) Contrary to the State's

fears, it is not obvious that every future case challenging the confidentiality of New York attorney disciplinary proceedings will be presented on indistinguishable facts. Section 90(10) may well be consistent with the First Amendment applied in other circumstances — for instance, if a plaintiff had notice rights as a complainant, or where a case does not involve alleged misconduct of state law enforcement officials, which implicates core First Amendment interests that "counsel[] against abstaining." Pellegrino, 380 F.3d at 100.

Yet, even crediting Justice LaSalle's fears as conceivable, reworking certain recordkeeping procedures (even if cumbersome) would not amount to the type of interference with a state court that O'Shea prohibits. O'Shea itself concerned a sweeping permanent injunction that prohibited two state judges from doing their work in a racially discriminatory way, including with respect to bail and sentencing proceedings. 414 U.S. at 501. Abstention was warranted there because the injunction sought would have been unworkable: it would have required "continuous supervision by the federal court" over a state court; it would have raised "inherent difficulties in defining the proper standards" for discrimination by which those judges' individual decisions could be evaluated; and it likewise would have risked leaving

the federal court without any mechanism for enforcing its injunction. Id. at 501-502.

The Supreme Court was wary that every future decision by the defendant judges in O'Shea would be re-litigated (with no clear legal standard) for compliance with the federal injunction. Id. It is continuous, indefinite, and intrusive oversight that runs counter to O'Shea. See Disability Rights N.Y., 916 F.3d at 131, 136-37 (abstaining under O'Shea where a federal court would oversee all future Article 17A guardianship proceedings in state courts); Kaufman, 466 F.3d at 86-87 (abstaining under O'Shea where a federal court would oversee all case assignment decisions in Second Department appeals); Miller v. Silbermann, 951 F. Supp. 485, 488 (S.D.N.Y. 1997) (abstaining under O'Shea where a federal court would oversee all city housing court cases). Moreover, the concerns of O'Shea are at their highest where a federal judge second guesses the good faith judgment and reasonable discretion of a state judge. 414 U.S. at 501 (discussing how federal courts could not second-guess bail and sentencing judgments in harmony with principles of comity).

Federal oversight of a state court's recordkeeping policies and the closure of a hearing room to the public are different. The scope of oversight is far smaller than in O'Shea, and the nature of oversight is far less intrusive.

The Ninth Circuit's decision in Planet is instructive on this distinction. 750 F.3d at 791. In Planet, a news organization alleged that the California state court system violated the First Amendment right of access by withholding civil complaints for administrative processing before releasing them to the public, delaying public access by hours or days. 750 F.3d at 791. Proposed injunctive relief required the defendant state court system to release most newly filed complaints by the end of the day, essentially imposing new procedural requirements on the state court that would prospectively apply in every new civil case. Id. at 791-92. The injunction bore some similarities to the type of prospective relief sought in O'Shea that applied in all future cases before the California state courts. 414 U.S. at 501-502.

Nevertheless, the Ninth Circuit held abstention to be inappropriate because there was little risk of continuous oversight by the federal court over California state courts.[17]

---

[17] Courthouse News Service, the plaintiff in Planet, brought near-identical suits in federal courts across the country seeking instantaneous access to civil complaints filed in state courts. Every circuit that has had an opportunity to consider the issue has adopted Planet's analysis on O'Shea; both district courts in this circuit to have considered the issue have done the same. See Courthouse News Serv. v. N.M. Admin. Ofc., 53 F.4th 1245 (10th Cir. 2022); Courthouse News Serv. v. Gilmer, 48 F.4th 908 (8th Cir. 2022); Courthouse News Serv. v. Schaefer, 2 F.4th 318 (4th Cir. 2021); Courthouse News Serv. v. Glessner, 549 F. Supp. 3d 169 (D. Me. 2021), rev'd on other grounds sub. nom. Courthouse News Service v. Quinlan, 32 F.4th 15 (1st Cir. 2022); Courthouse News Serv. v. Gabel, 2021 WL 5416650 (D. Vt., Nov. 19, 2021); Courthouse News Serv. v.

Future compliance with the federal court's ruling could be measured with a "bright-line" rule: either the state provided same-day access to complaints or not. Planet, 750 F.3d at 791. The concern that a federal court would have no discernable legal standard by which to measure compliance was therefore absent. Moreover, recordkeeping policies — i.e., whether and when to make court records public — were different in kind from the decisions subject to federal oversight in O'Shea. Planet, 750 F.3d at 791. Unlike the ministerial recordkeeping policies in Planet, O'Shea concerned (among other issues) bail and sentencing determinations, decisions in which a judge's discretion, intuition, and experience play vital roles. See id.; cf. O'Shea, 414 U.S. at 501-502.

This case involves prospective relief no more intrusive than the relief granted in Planet. See 750 F.3d at 791.

---

Tingling, 2016 WL 8505086 (S.D.N.Y. Dec. 16, 2016). The only outlier is Courthouse News Serv. v. Brown, 908 F.3d 1063 (7th Cir. 2018).

Moreover, the Seventh Circuit's reasoning in Brown counseled that the federal courts should give state courts an opportunity to pass on the constitutionality of their own administrative policies in the first instance. See 908 F.3d at 1075. New York courts have signaled approval of Section 90(10)'s strict confidentiality regime in First Amendment challenges. See In re The Innocence Project, Inc., Index No. 2019-05674, Decision & Order on Application (App. Div. 2d Dep't July 12, 2019) (denying Good Cause Application to attend disciplinary proceedings on First Amendment gorunds), lv. denied, 141 N.E.3d 954 (N.Y. 2020); cf. also Johnson Newspaper Corp. v. Melino, 564 N.E.2d 1046, 1051 (N.Y. 1990) (affirming closure of dentist's disciplinary hearing and citing Section 90(10) in support); J.P. v. Chassin, 594 N.Y.S.2d 930, 933-34 (App. Div. 4th Dep't) (same, concerning closure of medical doctor's disciplinary hearing), aff'd 619 N.E.2d 651 (N.Y. 1993); Anonymous v. Arkwright, 170 N.Y.S.2d 535, 537-38 (App. Div. 2d Dep't).

Plaintiffs seek a declaration concerning recordkeeping policies rather than discretionary substantive or procedural judicial decisions; they also request access to only twenty-one specific cases, rather than every future case. Even if further disputes arise over the extent of access granted to Plaintiffs concerning the Grievance Complaints, the burden on this Court to resolve such disputes would be no more onerous than discovery in civil litigation regularly before this Court. Again, assuming a result in Plaintiffs' favor, any compliance concerns over production of records related to the twenty-one Grievance Complaints at issue and access to any related hearings would not be so unworkable as to properly warrant invoking O'Shea and departing from the Court's duty to decide matters brought before it.

### 3. Rooker-Feldman

Justice LaSalle fares no better urging abstention under Rooker v. Fid. Tr. Co., 263 U.S. 413 (1923) and D.C. Ct. of Appeals v. Feldman, 460 U.S. 462 (1983). (See Def. Mem. at 20-21.) The Rooker-Feldman doctrine exists to give full effect to the Supreme Court's appellate jurisdiction over state courts of last resort pursuant to 28 U.S.C. § 1257 by declaring that "a United States District Court has no authority to review final judgments of a state court in

judicial proceedings." Feldman, 460 U.S. at 482. Application of Rooker-Feldman depends on whether the District Court has been asked to review "state court decisions in particular cases arising out of judicial proceedings." Feldman, 460 U.S. at 486.

In similar circumstances seeking access to state court records, "where plaintiffs do not challenge specific closure orders but rather the sealing process as administratively implemented," the Second Circuit has confirmed that a District Court does not run afoul of Rooker-Feldman. Pellegrino, 380 F.3d at 101. In Pellegrino, the Second Circuit emphasized that Rooker-Feldman was inapplicable because the journalists seeking access to sealed proceedings "were not parties to — nor did they intervene in — the state litigations." 380 F.3d at 101. So too here.

An attorney grievance proceeding in New York, like a criminal proceeding, involves a dispute between the Committee and the respondent attorney. (See Def. 56.1 ¶ 47.) The complainant is not a party to the case but, at most, an interested observer. (See Def. 56.1 ¶ 25; Pls. 56.1 Counter ¶ 25.) See also 22 N.Y.C.R.R. § 1240.2(e); Morrow v. Cahill, 718 N.Y.S.2d 315, 316 (App. Div. 1st Dep't 2000).) Moreover, Plaintiffs are no longer complainants in any of the proceedings at issue. (See Kearse Letter.) Further

highlighting the similarity between this case and Pellegrino,
state court employees acting on Justice LaSalle's policies of
sealing certain records of the state court cannot be fairly
said to be a judicial function, which generally consists of
resolving a dispute between parties. 380 F.3d at 101. A state
court performing a judicial function is the key factor that
triggers Rooker-Feldman, and it is absent here where
Plaintiffs have alleged unconstitutional denial of access to
observe state court proceedings between two other parties.
Feldman, 460 U.S. at 479.

    C.    ABSOLUTE IMMUNITY

    Having considered and rejected Justice LaSalle's
arguments on jurisdiction and abstention, the Court now turns
to the two affirmative defenses raised by Justice LaSalle's
summary judgment motion: absolute judicial immunity and
absolute legislative immunity. (See Def. Mem. at 18-20.) The
Court concludes that neither defense applies.

        1.    Judicial Immunity

    When sued in their personal capacities, "[j]udges
generally have absolute immunity from suits for money
damages." Bliven, 579 F.3d at 209 (citing Forrester v. White,
484 U.S. 219, 225-26 (1988)); see also Sup. Ct. of Va. v.
Consumers Union of U.S., Inc., 446 U.S. 719, 734-35 (1980)

("[J]udges defending against § 1983 actions enjoy absolute immunity from *damages* liability for acts performed in their judicial capacities." (emphasis added)). Historically, judicial immunity has not "insulate[d] judges from declaratory or injunctive relief with respect to their judicial acts." Consumers Union, 446 U.S. at 735. Here, Plaintiffs seek declaratory judgment, not damages. Judicial immunity therefore does little to protect Justice LaSalle from relief granted against him in his official capacity in this case.

Justice LaSalle reads the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847 (1996) ("FCIA"), to say otherwise. (See Def. Mem. at 19.) The FCIA added a new clause to the text of Section 1983, which now specifies that in "any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

This Court rejected a similar interpretation of the FCIA in CRC II, which held that quasi-judicial immunity did not apply to Kearse, Chief Attorney to the Committee and a former named defendant in this case. See 2022 WL 1422852, at *11. The Court reasoned that "the amended text of Section 1983

66

explicitly allows for suits seeking declaratory relief"
against state judicial officers sued in their official
capacities. Id. (citing Brown v. City of New York, 210 F.
Supp. 2d 235, 239 n.6 (S.D.N.Y. 1999) ("The doctrine of
individual immunity does not protect against claims for
declaratory relief." (citing the Senate Report to the
FCIA))). The 1996 amendment to Section 1983 simply clarifies
that, when a state judge has been named as a defendant in a
civil rights suit seeking prospective relief, a plaintiff
must first obtain declaratory judgment before asking a
federal judge to enjoin the state judge.[18] The relief
Plaintiffs request on the instant motion is permissible under
the applicable judicial immunity doctrine.

## 2.   Legislative Immunity

Justice LaSalle next claims that he benefits from the
same absolute immunity accorded to legislators because, to
the extent he promulgates rules of professional conduct to
regulate attorneys or to administer the attorney disciplinary

---

[18] Defendant's last argument on this point is that injunctive relief is
unavailable here because "Plaintiffs have not demonstrated that a
declaratory decree was violated or unavailable." (Def. Mem. at 19.) This
argument makes no sense. Plaintiffs have not requested injunctive relief,
keeping with the FCIA's preference for declaratory relief in the first
instance as to judicial officers. Also, no declaratory decree has been
violated because the Court has not yet issued one. Whether declaratory
judgment is warranted is what the parties have asked the Court to decide
on the instant motion.

process, he performs a legislative function that must be free from interference from federal courts. (*See* Def. Mem. at 19-20.) The Court finds that this case does not implicate legislative acts or legislative immunity.

"[F]ederal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 46 (1998); see also State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71 (2d Cir. 2007). Plaintiffs insist that this type of personal immunity is unavailable to Justice LaSalle in this case because he has been sued in his official capacity, not his personal capacity. (*See* Pls. Response Mem. at 9 n.5.) Plaintiffs' position cannot be accepted because it glosses over a key distinction in this area of the law.

Plaintiffs' position is correct only as to local officials. "[D]ue to the historical unavailability of various immunity defenses to *local governments*, those governments . . . are not entitled to the benefit of any immunities that might be available to *local officials* sued under § 1983." Olma v. Collins, 499 F. App'x 98, 100 (2d Cir. 2010) (emphases added) (affirming propriety of injunction against local officials sued in official capacity); see also Altamonte v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007) (affirming an injunction against a local official,

"[i]mmunity, either absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities" (emphasis omitted)).

By comparison, state officials engaged in legislative acts are immune in both their personal and official capacities. And, in some circumstances, "legislative immunity may bar claims for injunctive relief against state officials." Rowland, 494 F.3d at 86; see also id. at 88 (describing the analysis a court must undertake to decide "whether the doctrine of legislative immunity is available to foreclose claims for injunctive relief in *official-capacity suits*" (emphasis added)); accord Alia v. Mich. Sup. Ct., 906 F.2d 1100, 1102 (6th Cir. 1990) ("The immunity granted is immunity from suit and applies whether the relief sought is money damages or injunctive relief.").

Even so, the Court is not convinced that Justice LaSalle is entitled to legislative immunity on this record. Legislative immunity applies only when (1) "committing the alleged violations, defendants were acting in their legislative capacities" and (2) "granting the requested relief would enjoin defendants in their performance of legislative functions." Rowland, 494 F.3d at 76 (cleaned up) (quoting Bogan, 523 U.S. at 54-56). In turn, to determine if an alleged act was made in a "legislative capacity," the Court

looks to "whether defendant['s] alleged acts were both: (1) substantively legislative, i.e., acts that involve policy making; and (2) procedurally legislative, i.e., passed by means of established legislative procedures." Rowland, 494 F.3d at 89-90 (citation and quotation marks omitted); see also Ass'n of Jewish Camp Operators v. Cuomo, 470 F. Supp. 3d 197, 212 (N.D.N.Y. 2020).

Defendant's argument fails to satisfy even the first element of legislative immunity: Justice LaSalle's conduct does not entail a substantive legislative decision. A "substantive legislative" decision is defined by "broad, prospective policymaking," as distinguished from administrative action, which affects "a single individual." Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003); see also Altamonte, 478 F.3d at 108. It is not an act of policymaking to withhold information pursuant to statute concerning the results of specific cases; rather, in this case, Justice LaSalle gives effect to the legislature's purported preferred policy of nondisclosure in twenty-one particular instances. Forbidding Plaintiffs access to government records and proceedings is the challenged action in this case, and it is quintessentially administrative. See Berlickij v. Town of Castleton, 248 F. Supp. 2d 335, 343 (D. Vt. 2003) (rejecting legislative

immunity for town council's denial to plaintiff of access to legislative meetings); cf. also Dean v. Town of Hempstead, 527 F. Supp. 3d 347, 414 (E.D.N.Y. 2021) (legislative immunity did not apply to council member's public advocacy campaign to oppose one specific pending land-use permit application).

Justice LaSalle's contention that he acts legislatively in the sphere of attorney discipline has some force, but it is another mischaracterization of Plaintiffs' lawsuit. Judges do engage in legislative activity in their official capacities when promulgating an attorney code of conduct or rules of procedure for their respective courts — activities for which they are entitled to absolute immunity from monetary damages and injunctions. See, e.g., Consumers Union, 446 U.S. at 731; Forrester, 484 U.S. at 227. For that reason, a federal court cannot order state judges to promulgate (or repeal) specific rules. See Consumers Union, 446 U.S. at 731 (denying injunctive relief that would have required repeal of attorney advertising rules); see also Jewish Camp Operators, 470 F. Supp. 3d at 212. Yet Plaintiffs do not ask for relief to change the rules of professional conduct. Plaintiffs instead ask for access to specific hearings and records sealed by state courts pursuant to Section 90(10) and related Second Department policies.

Justice LaSalle's argument seems to conflate two of his many roles related to managing the legal profession within the Second Department: to make rules "[i]n furtherance of the purpose of" confidentiality in disciplinary proceedings (Section 90(10)), and to generally supervise the "administration and operation" of the disciplinary system (N.Y. Ct. R. § 80.3(c)). Second Department officials denying public access to specific information on twenty-one specific disciplinary cases constitutes a case-specific administration of Second Department policy; such action is not legislatively immune.

Justice LaSalle and his predecessors may have enacted some of the policies that led to Plaintiffs' purported injury here, but state policies are not insulated from judicial review under legislative immunity "simply because the harm alleged originated, in some sense, with a legislative act." Rowland, 494 F.3d at 89; see also Jewish Camp Operators, 470 F. Supp. 3d at 212-13 (rejecting claim of legislative immunity where New York's Governor had power to promulgate executive orders related to the COVID-19 pandemic and enforce those same orders, and plaintiffs challenged the application of COVID-19 rules to their organization). This case does not concern Justice LaSalle's legislative authority in the

disciplinary process, and legislative immunity is thus unwarranted.

In sum, none of the State's many arguments on jurisdiction, abstention, and immunity is sufficient to prevail here. This lawsuit alleges that the degree of secrecy with which the State treats attorney disciplinary matters deprives interested observers of the right to know about the work of the State government, as long as supplying the information at issue does not does not does not unduly interfere with the proper administration of state functions. The Fourteenth Amendment and 42 U.S.C. § 1983 allow federal courts to inquire into the constitutionality of state government practices, and that is what Plaintiffs ask the Court to do here. Justice LaSalle is an unusual defendant in that he is a judge; however, that is only because the governmental process at the center of this dispute happens to be attorney discipline, a regulatory duty many states assign to their courts. The Court's decision takes great care not to be construed as instructing Justice LaSalle how to decide any particular cases and controversies brought before him involving attorney grievance complaints. In our federal system, however, when the constitutionality of a state judicial officer's exercise of administrative functions is called into question, the action is subject to a federal civil

rights suit, subject to the specific exceptions described above. With that, the Court turns to the First Amendment.

Defendant's Motion is hereby **DENIED**.

D.    THE FIRST AMENDMENT

The First and Fourteenth Amendments to the Constitution prohibit the states from abridging freedom of speech, expression, and the press. See U.S. Const. amd. 1; Gitlow v. New York, 268 U.S. 652 (1925). "These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575 (1980) (plurality opinion). The freedom to discuss matters of government "would lose much meaning" if states could arbitrarily withhold information from the public. Id. at 576-77. More succinctly: "[f]ree speech carries with it some freedom to listen." Id. at 576.

To that end, the First Amendment embraces a qualified right of public access to some governmental proceedings and records to "ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." Globe Newspaper Co., 457 U.S. at 604-605 (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)). Although the Supreme Court has spoken on the First Amendment right of access only in the

context of criminal cases, "there is no principle that limits the First Amendment right of access to any one particular type of government process." N.Y. Civ. Lib. Union v. N.Y.C. Transit Auth., 684 F.3d 286, 298 (2d Cir. 2012) ("NYCTA") (citation omitted); see also Newsday LLC v. County of Nassau, 730 F.3d 156, 163 (2d Cir. 2013) ("[W]e have noted that the First Amendment 'does not distinguish between criminal and civil proceedings,' but rather 'protects the public against the government's arbitrary interference with access to important information.'" (quoting NYCTA, 684 F.3d at 298)).

To determine whether the First Amendment applies to a particular government proceeding or record, the Court must consider (1) "whether the place and process have historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Carroll, 986 F.3d at 219 (quoting Press-Enter. Co. v. Superior Court, 478 U.S. 1, 8 (1986) ("Press-Enterprise II")). These considerations of "experience" and "logic" must be considered together, "for history and experience shape the functioning of governmental processes." Carroll, 986 F.3d at 219 (quoting Press-Enterprise II, 478 U.S. at 9). Separate from the experience-and-logic test, the First Amendment likewise protects access to judicial documents that "are derived from

or are a necessary corollary of the capacity to attend" open proceedings. <u>Newsday</u>, 730 F.3d at 164; <u>see also</u> <u>In re New York Times Co.</u>, 577 F.3d 401, 409 (2d Cir. 2009) ("<u>New York Times II</u>").[19]

Where it applies, the qualified First Amendment right of access creates only a presumption of openness rather than an absolute entitlement to proceedings and records. <u>See</u> <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 120 (2d Cir. 2006); <u>Under Seal v. Under Seal</u>, 273 F. Supp. 3d 460, 469 (S.D.N.Y. 2017). "[That] presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." <u>In re Grand Jury Subpoena</u>, 103 F.3d 234, 242 (2d Cir. 1996) (quotation marks omitted) (quoting <u>Press-Enterprise II</u>, 478 U.S. at 9). "'Broad and general findings' and 'conclusory assertion[s]' are insufficient to justify deprivation of public access." <u>Under Seal</u>, 273 F. Supp. 3d at 469 (quoting <u>In re New York Times Co.</u>, 828 F.2d 110, 116 (2d Cir. 1987) ("<u>New York Times I</u>")). Especially

---

[19] The common law also supplies a public right to access judicial proceedings and records, with a legal standard similar to the First Amendment right. <u>See</u> <u>Lugosch</u>, 435 F.3d at 120. The Court does not rely on the common law right of access in its holding today because Section 1983 empowers a federal court to examine only whether a state has "conformed to the requirements of the Federal Constitution and statutes," not whether a state has conformed to the common law. <u>Owen v. City of Independence</u>, 445 U.S. 622, 649 (1980).

with respect to judicial proceedings, the power to conduct
hearings behind closed doors "is one to be very seldom
exercised, and even then only with the greatest caution, under
urgent circumstances, and for very clear and apparent
reasons." In re Demetriades, 58 F.4th 37, 47 (2d Cir. 2023)
(quoting United States v. Alcantara, 396 F.3d 189, 192 (2d
Cir. 2005)).

     With these principles in mind, the Court now turns to
the proceedings and records sought by Plaintiffs in the case
at hand.

### 1.   Second Department Hearings and Documents

     Plaintiffs contend that the First Amendment entitles
them to "live access to any hearings and related submissions
and decisions before the [Second Department]," including
hearings, submissions, and decisions of a court-appointed
special referee. (See Pls. Mem. at 1.) Experience and logic
confirm that Second Department hearings and any documents
necessary to understand those hearings are subject to the
First Amendment right of access.

     First, looking to whether the "place and process have
been historically" open to the press and to the public, Press-
Enterprise II, 478 U.S. at 8, proceedings to make a final
determination to remove or suspend a lawyer from the bar have

77

historically taken place before judges in open court. Since common-law England, judges have been vested with plenary authority to discipline attorneys who appear before them. See, e.g., Ex parte Burr, 4 F. Cas. 791, 791 (C.C.D.C. 1823) (justifying authority to suspend an attorney by referring to common-law practice adopted by North American colonies and, eventually, the states); In re Gephard, 1 Johns. Cas. 134, 134 (Sup. Ct. N.Y. 1799) (referring to disbarment order entered by a New York court); see also In re Rowe, 604 N.E.2d 728, 730 (N.Y. 1992) ("[C]ourts are charged with the responsibility of . . . insuring that only those fit to practice law are admitted to the Bar."); Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 11-12 (2007). The Second Department's exclusive authority to make final determinations concerning disbarment or suspension within its geographical jurisdiction is a direct continuation of that tradition. (See Def. 56.1 Counter ¶ 30.)

Moreover, history shows that proceedings to disbar or suspend attorneys were historically prosecuted by private parties as ordinary equity suits or contempt proceedings. See, e.g., Saxton v. Stowell, 11 Paige Ch. 526, 526 (N.Y. Ch. 1845) (describing procedural requirements to initiate a disbarment proceeding, with reference to a private

"complainant" represented by counsel); <u>Smith v. State</u>, 9
Tenn. 228, 231 (1829) (following English practice, upon a
sufficient petition, "the attorney notified to appear and
answer, as in case of a contempt"); <u>see also</u> Levin, 20 Geo.
J. Legal Ethics at 11 & n.57. Despite its penal character,
attorney disciplinary proceedings were not treated much
differently than ordinary civil litigation of the day. <u>See Ex
parte Burr</u>, 4 F. Cas. at 796.

The proceeding began with a petition or complaint, made
by an aggrieved party, and an order to show cause served on
the accused attorney. <u>See, e.g.</u>, <u>Saxton</u>, 11 Paige Ch. at 526;
<u>Smith</u>, 9 Tenn. at 231; <u>People v. Justices of Del. Common
Pleas</u>, 1 Johns. Cas. 181, 181-82 (N.Y. Sup. Ct. 1799). Judges
developed factual and legal conclusions based on witness
testimony or other evidence. <u>See, e.g.</u>, <u>Smith</u>, 9 Tenn. at
230-31; <u>Ex parte Burr</u>, 22 U.S. 529, 531 (1824); <u>Justices of
Del. Common Pleas</u>, 1 Johns. Cas. at 182. If the charges could
be substantiated before the court, the lawyer's name could be
stricken from the roll of attorneys authorized to practice in
that court. <u>See Saxton</u>, 11 Paige Ch. at 526; <u>Ex parte Burr</u>,
F. Cas. at 795.

Striking an attorney from the law practice roll had the
serious effect of ending the attorney's practice in that court
and sullying the attorney's reputation. The consequences were

considered so grave that it was not obvious (at least to one early federal court) whether to apply the procedural safeguards owed to criminal defendants under the Fifth and Sixth Amendments of the then-new Constitution. See Ex parte Burr, 4 F. Cas. at 796; cf. In re Kelly, 59 N.Y. 595, 596 (1875) (describing disbarment proceedings as "quasi-criminal").

Modern-day disciplinary proceedings in the Second Department bear almost all the same key features as their historical antecedents. Procedural similarities include commencement with a petition (N.Y. C.P.L.R. § 403), service on the respondent (id. § 404), and hearing or trial before a special referee to determine issues of fact (id. § 410). (See also Pls. 56.1 ¶ 41.) More importantly, these proceedings originate from accusations of misconduct by a member of the public and result in formal, public disciplinary action. Early contempt proceedings, throughout history, thus accomplished the same "kind of work" that the Second Department does now. NYCTA, 684 F.3d at 299.

Historically, disciplinary proceedings before courts have also been public. Though historical evidence concerning attorney discipline going back to the founding is sparse on this question, the Second Circuit has observed that there is a sufficient history of holding civil contempt proceedings in

open court to support applying a First Amendment right of access to today's civil contempt proceedings because contempt actions are a species of civil litigation, which has always occurred public. See Newsday, 730 F.3d at 164 (holding civil contempt proceedings to be presumptively open); Westmoreland v. Columbia Broadcasting Sys., Inc., 752 F.2d 16, 23 (same, as to civil proceedings generally); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984) (same, as to civil proceedings generally, and collecting historical evidence); Richmond Newspapers, 448 U.S. at 590 (Brennan, J., concurring) ("[T]here is little record, if any, of secret proceedings, criminal or civil, having occurred at any time in known English history." (quoting Gannett Co., Inc. v. DePasquale, 443 U.S. 368, 420 (1979) (Blackmun, J., concurring in part and dissenting in part)).

    The record is clear that by the late nineteenth and early twentieth centuries, attorney disbarment proceedings were public affairs. See, e.g., In re Kelly, 59 N.Y. at 596 ("The proceeding is of a public nature."); In re Spencer, 122 N.Y.S. 190, 192 (App. Div. 1st Dep't 1910) ("These [disbarment] proceedings have been spoken of as being of a public nature."); see also Levin, 20 Geo. J. Legal Ethics at 12 n.67 (collecting articles in general-circulation newspapers, in one instance describing "filled" courtrooms and in another a

"large crowd" expecting "a good legal fight"). It is safe to conclude that the practice of allowing the public to view disciplinary hearings has strong roots in history.

The State maintains a different view of history, contending that "New York has a tradition of 'preserving the confidentiality of information pertaining to disciplinary proceedings until a determination has been reached.'" (Def. Mem. at 31 (quoting Johnson Newspaper Corp. v. Melino, 564 N.E.2d 1046, 1050 (N.Y. 1990)).) The State reasons that *inquisitorial* disciplinary proceedings have been private for their entire history since 1945, when the legislature reformed the Judiciary Law to abolish adversarial contempt proceedings as the vehicle for attorney discipline and, in the same reform, enacted Section 90(10), which seals proceedings until imposition of public discipline. (See Def. Response Mem. at 2-3.)

The State's argument is unavailing, however, because the focus of the experience-and-logic test's historical analysis is "not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake." NYCTA, 684 F.3d at 299. The shift from adversarial to inquisitorial proceedings in 1945 did not change the fundamental nature of the work being done before New York courts: government

discipline of attorneys and maintenance of the integrity of the bar for public benefit. See id. Moreover, the experience-and-logic test "does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing *throughout the United States*," so an exclusive focus on New York history would be improperly narrow. El Vocero de P.R. v. Puerto Rico, 508 U.S. 147, 150 (1993) (last emphasis added). Indeed, it is only since 1945's reforms that New York departed from national norms; even as recently as 2014, a state-created committee remarked that the confidentiality policies embodied in Section 90(10) remained an outlier among the states. See Chief Judge's Comm'n on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 62 (2015); see also Levin, 20 Geo. J. Legal Ethics at 38.

As another point of disagreement with Plaintiffs, the State contends that Plaintiffs specific request for "live access" has "no precedent" in the history of attorney disciplinary proceedings. (Def. Mem. at 31.) This position does not grapple with historical evidence that disbarment and suspension were "of a public nature." In re Kelly, 59 N.Y. at 596; see In re Spencer, 122 N.Y.S. at 192. The State has not cited any reason to believe that the "public nature" described in In re Kelly and In re Spencer would mean access to a cold

transcript rather than its natural meaning of contemporaneous presence. Further, "documentary access is not a substitute for concurrent access," and "a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available." ABC, Inc. v. Stewart, 360 F.3d 90, 99 (2d Cir. 2004) (quoting United States v. Antar, 38 F.3d 1348, 1360 n.13 (3d Cir. 1994) ("Such a transcript would not fully implement the right of access because some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript.").

Turning to logic, the Court finds that "public access plays a significant positive role in the functioning of" attorney disciplinary proceedings. Press-Enterprise II, 478 U.S. at 8. "The primary concern of a disciplinary proceeding is the protection of the public in its reliance on the integrity and responsibility of the legal profession," so public confidence in the reliability of those proceedings is of paramount importance. In re Rowe, 604 N.E.2d at 730 (citations omitted). Attorneys are officers of the courts to which they are admitted and are integral in administering justice; attorneys' acts of misconduct "guide [the public's] perception of the Bar" and the public's confidence in the justice system. Id.; see also In re Jaffe, 585 F.3d 118, 121

(2d Cir. 2009) (attorney discipline protects "the public, other attorneys and litigants, the Court, and the administration of justice"); <u>Ex parte Burr</u>, 4 F. Cas. at 794 ("Is not the respectability of the court in some measure connected with that of the bar? A regard to the purity of the administration of justice demands that the bar should be pure and honest."). The question is whether public access provides a substantial benefit to the proceeding's ability to carry out its purpose.

The Court finds that it does. The public cannot have faith in a process that it cannot see. <u>See Richmond Newspapers</u>, 448 U.S. at 572 ("[I]t is difficult for [the public] to accept what they are prohibited from observing."); <u>In re Demetriades</u>, 58 F.4th at 47 (declining to close appellate arguments in disciplinary appeal because "public censure or reprimand [are] an appropriate and valuable corrective measure in attorney-misconduct cases, in order to protect the public, other attorneys and litigants, the Court, and the administration of justice" (quotation marks and citation omitted)); <u>NYCTA</u>, 684 F.3d at 296 ("Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings: 'Without publicity, all other checks are insufficient.'" (quoting <u>In re Oliver</u>, 333 U.S. 257, 271 (1948))); <u>United States v. Amodeo</u>, 71 F.3d 1044,

1048 (2d Cir. 1995) ("Amodeo II") ("[P]ublic monitoring is an essential feature of democratic control.").

Two complementary observations support this conclusion. First, "the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud." Amodeo II, 71 F.3d at 1048; see also Richmond Newspapers, 448 U.S. at 595 (Brennan, J., concurring) (noting how openness inspires government officials to act with "conspicuous respect for the rule of law"). Second, "the public's ability to scrutinize such judicial decision-making helps assure its confidence in the orderly administration of justice" and, accordingly, confidence that they can turn to legal processes to resolve their disputes. United States v. Erie County, 763 F.3d 235, 240-41; NYCTA, 684 F.3d at 303. In other words, the law functions better on the whole when the public is "able to observe *for themselves* that the process is impartial and effective." Daily Gazette Co., Inc. v. Comm. on Legal Ethics of the W. Va. State Bar, 326 S.E.2d 705, 711 (W. Va. 1984) (emphasis in original) (granting right of access to attorney disciplinary proceedings under state constitution's free-speech guarantee). That the Second Department may delegate factfinding to a special referee does not affect this conclusion and does not permit a judicially appointed special

referee to conduct factfinding hearings in secrecy. See Erie County, 763 F.3d at 242 (attaching right of access to the factfinding work of court-appointed monitors); Amodeo II, 71 F.3d at 1047-48 (same).

The State advances a view that the First Amendment right of access attaches only once the Second Department has imposed public discipline on an attorney, and therefore Section 90(10) does not offend the Constitution, relying heavily on the New York Court of Appeals' approval of a similar confidentiality rule in disciplinary proceedings for professional misconduct of licensed dentists. (See Def. Mem. at 25. (citing Johnson Newspaper, 564 N.E.2d at 1050-51).) As an initial matter, "the Second Circuit has rejected the contention that the presumption of access is dependent upon the disposition of the underlying" matter. Under Seal, 273 F. Supp. 3d at 471 (citing Lugosch, 435 F.3d at 121-22); see also Bernstein v. Bernstein Litowitz Berger & Grossman, LLP, 814 F.3d 132, 140 (2d Cir. 2016) ("The fact that a suit is ultimately settled without a judgment on the merits does not impair the 'judicial record' status of pleadings.").

The misconduct of attorneys is uniquely harmful to administration of justice and the rule of law in our society, different from the misconduct of other professionals like doctors and dentists. Whereas the misconduct of a doctor or

a dentist may cause serious consequences — injury or even death — to their patients, the misconduct of attorneys can shake the public's confidence in the justice system and foundational legal institutions on which we all rely for protection. For instance, as relevant to the Grievance Complaints in this case, a lawyer serving as a state prosecutor who does not disclose exculpatory evidence to a criminal defendant may shake public confidence in the criminal courts' ability to ascertain truth in a criminal trial and, if left unremedied, can result in wrongful punishment and widespread doubts in many convictions.

In recognition of these dangers, English and American courts have for centuries conducted attorney disciplinary proceedings in public view. See Globe Newspaper Co., 457 U.S. at 605 ("[A] history of accessibility implies the favorable judgment of experience." (quoting Richmond Newspapers, 448 U.S. at 589 (Brennan, J., concurring)). In New York, that changed only in 1945, when New York's legislature amended the Judiciary Law to include Section 90(10)'s confidentiality rule (over considerable opposition) to protect attorneys from embarrassing intrusions into their professional work. (See Ex. 19 to Wells Decl.) By contrast, as the New York Court of Appeals noted in Johnson Newspaper, history does not teach

88

the same lessons with respect to the discipline of most other professionals. 564 N.E.2d at 1050-51.

The State suggests that Plaintiffs' focus on discipline of government lawyers — in this case, former prosecutors — "warps" the purpose of the disciplinary process. (See Def. Mem. at 32.) Not so. Prosecutorial misconduct "is of exceptional public interest" because it "bear[s] both on the fair administration of justice for criminal defendants and the efficacious prosecution" of penal laws. United States v. Nejad, 521 F. Supp. 3d 438, 443 (S.D.N.Y. 2021) (publicly referring suspected misconduct by federal prosecutors to the Department of Justice Office of Professional Responsibility); see In re Special Proceedings, 842 F. Supp. 2d 232, 235 (D.D.C. 2012) (publicly initiating disciplinary proceedings sua sponte and rebuking prosecutors' preference for private discipline). Indeed, the Supreme Court underscored this point when it first acknowledged the First Amendment right of access as a constitutional doctrine: "Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." Richmond Newspapers, 448 U.S. at 575 (plurality opinion). That Plaintiffs have asked to see how their state government handles suspected prosecutorial misconduct elevates the First Amendment interests at hand.

The State's other arguments challenging the logical benefits of public access to attorney disciplinary proceedings fare no better. The State first asserts that it must protect respondent attorneys from unsubstantiated accusations of misconduct, observing that attorneys' reputations, "once lost, [are] not easily restored." (Def. Mem. at 31 (quoting Karlin v. Culkin, 162 N.E. 487, 492 (N.Y. 1928) (Cardozo, J.)). The state's concerns are overstated in relation to proceedings in the Second Department, which do not take place absent probable cause that the respondent attorney committed a serious ethical transgression. See 22 N.Y.C.R.R. § 1240.7(d)(2)(vi).

The argument that the Second Department has "an interest in managing the attorneys [it] license[s]" is likewise unpersuasive. (See Def. Mem. at 31.) The administrative difficulties in licensing the many thousands of attorneys on the Second Department's rolls is obvious, and conducting disciplinary hearings in private may afford the Second Department's staff and judges some administrative flexibility given that scrutiny of public proceedings might attract public input, comment, and criticism. As the Court has already observed, however, the prospect of public criticism prompts adjudicators to exhibit a "conspicuous respect for the rule of law" and is constitutionally protected. Richmond

Newspapers, 448 U.S. at 595 (Brennan, J., concurring).
Scrutiny benefits the integrity of these proceedings.

The State's next point, that "potential witnesses and
complainants have an interest in a confidential forum for
full and frank discussions regarding alleged wrongdoing,"
does not explain why a confidential forum is more suitable
than an open forum to discuss attorney malfeasance.[20] (Def.
Mem. at 32.) The Supreme Court has acknowledged a "community
therapeutic value" to allowing the public to view trials.
Press-Enterprise II, 478 U.S. at 13 (quoting Richmond
Newspapers, 448 U.S. at 570). The benefits of such public
observation are especially important when the accused
misconduct of the attorneys relates to state-employed
attorneys' disregard for constitutional rights in criminal
prosecutions, which potentially could result in wrongful
imprisonment of innocent people.

---

[20] If the State is suggesting that witnesses and complainants would be
more hesitant to come forward to participate in an open disciplinary
process, its concern would be a serious consideration that might undermine
the functional benefits of openness in government proceedings to impose
discipline. Cf. In re Grand Jury Subpoena, 103 F.3d 234, 237 (2d Cir.
1996) (describing how secrecy benefits the grand jury process by offering
protection to the victims of and the witnesses to crimes). Yet, the
testimony of witnesses in civil and criminal courts is obtained regularly
on sensitive personal matters. The state has not shown that recalcitrant
witnesses are a "real" danger for disciplinary proceedings, however, and
speculation is not a "basis for a restriction of the public's First
Amendment rights." NYCTA, 684 F.3d at 303.

Finally, the state notes that it has concerns about the "unnecessary disclosure of information about medical issues, family matters, and attorney-client privilege that arise in disciplinary proceedings." (Def. Mem. at 32.) The State again has failed to note how the subject matter of disciplinary proceedings — even if they involve a client's private confidences — would affect how the proceeding itself functions toward its essential purpose of fairly imposing discipline and protecting the public. See Press-Enterprise II, 478 U.S. at 8. The State's concern may be a reason to close some aspects of Second Department hearings to the public upon an individualized showing, but it is not a reason to presume that every Second Department hearing should occur behind closed doors. The First Amendment counsels that courtroom closures should be "very seldom," and "even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons." In re Demetriades, 58 F.4th at 47; see also Under Seal, 273 F. Supp. 3d at 469.

The State has not provided a persuasive reason rooted in either experience or logic to support its view that it may keep its hearings closed with no justification. The qualified First Amendment right of access applies to disciplinary hearings in the Second Department, whether before Second Department justices or a special referee. Plaintiffs'

entitlement to "submissions and decisions" made in those hearings easily follows from this conclusion. (Pls. Mem. at 1.) The First Amendment right of access attaches to documents that "are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." Newsday, 730 F.3d at 164 (quoting Lugosch, 435 F.3d at 120).

Plaintiffs do not specify which specific Second Department papers related to disciplinary proceedings they wish to access (nor could they, given the State's refusal to acknowledge whether such proceedings or papers even exist). Applicable precedent makes clear that the First Amendment applies to documents "relevant to the performance of the judicial function and useful in the judicial process." Erie County, 763 F.3d at 240 (quoting Lugosch, F.3d at 119). The right of access presumptively encompasses court orders (Hardy v. Equitable Life Assurance Soc'y of U.S., 697 F. App'x 723, 725 (2d Cir. 2017)), the parties' motions and accompanying submissions (Lugosch, 435 F.3d at 120-21; New York Times I, 828 F.2d at 114), documentary evidence (Newsday, 730 F.3d at 164-65), and docket sheets (Pellegrino, 380 F.3d at 93).

As to hearings and related records of the Second Department, Plaintiffs' Motion is hereby **GRANTED**.

2.   Dispositions by the Grievance Committee

The Court now considers Plaintiffs' request for dispositions of the Grievance Complaints before the Committee pursuant to 22 N.Y.C.R.R. § 1240.7(d)(2), "whether in the form of letters of dismissal, advisement or admonishment, opinions authorizing formal disciplinary hearings and/or decisions on reconsideration or review." (Pls. Mem. at 1.) Because the Plaintiffs seek a presumption of access to dispositional *documents* of the Grievance Committee — and not Grievance Committee *proceedings* — the Court may apply one of two approaches. The presumption of access applies if the dispositional records either (a) satisfy the Supreme Court's experience-and-logic test, or (b) are derived from or are a corollary of the capacity to attend a proceeding to which the First Amendment right of access attaches. See Newsday, 730 F.3d at 164.

At the outset, Plaintiffs have provided no persuasive reason to apply the second approach. They do not assert a right to attend Committee proceedings (only Second Department proceedings), so dispositional documents are not presumptively public as a corollary of those proceedings. See id. Committee dispositions are likewise not necessary to understand Second Department disciplinary hearings, which the Court has already held are subject to a presumptive First

Amendment right of access. The Committee dispositions merely authorize Grievance Committee staff to initiate a disciplinary action in the Second Department to seek public censure; Committee dispositions are never filed or otherwise relied upon in the Second Department and are duplicative of the petition and supporting evidence in Second Department matters. (See Def. 56.1 ¶¶ 45, 50.) If the Committee's dispositions on the Grievance Complaints are subject to a presumption of access under the First Amendment, it is only because experience and logic so require.

The Court begins with experience. As before, the relevant historical analysis is whether "the place and process have historically been open to the press and general public." Press-Enterprise II, 478 U.S. at 8. The inquiry must "focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake." NYCTA, 684 F.3d at 299; see also Press-Enterprise II, 478 U.S. at 8.

The crux of the parties' dispute is how to characterize what kind of government "process" the Committee carries out. Plaintiffs view the Committee as an adjudicatory body, with its proceedings and decisions most closely resembling the work of courts. (See Pls. Mem. at 14-16.) On the other hand, the State views the Committee as an investigatory or

prosecutorial body that develops facts and authorizes prosecution before the Second Department, the judicial body that retains exclusive authority to impose public discipline. (See Def. Mem. at 26-30.) The disagreement here presents a close question, and neither comparison is perfect because the Committee acts in both capacities. Cf. Napolitano, 315 F. App'x at 351-52 (describing New York's attorney grievance committees as "quasi-public adjudicatory [or] prosecutorial") (quoting Barbara v. N.Y. Stock Exch., Inc., 99 F.3d 49, 58 (2d Cir. 1996)). Some of the Committee's responsibilities require it to act as a court. Others require it to act as a prosecutor.

Plaintiffs limit their request to Committee dispositions, so the Court likewise limits its analysis to the "kind of work" done and the "First Amendment principles at stake" in the Committee's dispositional records. NYCTA, 684 F.3d at 299. The Court need not decide whether the Committee's work, on the whole, more closely resembles the work of courts or the work of prosecutors. However, the record leaves no dispute that when the Committee issues dispositions, it makes an authoritative determination on accusations of misconduct and therefore acts in its adjudicative role, not in its prosecutorial role.

Several observations justify this conclusion. To start, the Committee issues its dispositions only on a completely developed factual record and after considering the positions of both its staff and the respondent attorney. (See Def. 56.1 ¶¶ 40, 42.) In this way, it is a forum that resembles an adversarial trial where attorneys within its geographical jurisdiction "confront the power of their government to judge and penalize their actions" as members of the legal profession. NYCTA, 684 F.3d at 303. Dismissals, Letters of Advisement, and written Admonitions are dispositions that establish whether or not unethical conduct has occurred, even if the respondent attorney's law license is not subject to suspension or revocation. See 22 N.Y.C.R.R. § 1240.7(d)(2)(v) (authorizing the Committee to issue a Letter of Advisement if it finds "by a fair preponderance of evidence, that the respondent has engaged in professional misconduct"); § 1240.7(d)(2)(iv) (authorizing the Committee to issue a written Admonition if it finds "that the respondent has engaged in conduct requiring comment").

Even though the Committee cannot suspend or disbar attorneys on its own, its actions are still the last and most important step in nearly every proceeding to handle suspected attorney misconduct, for the simple reason that very few matters are ever recommended for public discipline in the

Second Department. <u>Press-Enterprise II</u>, 478 U.S. at 12. In 2022, the Committee referred 15 matters to the Second Department and disposed of 217 others by Letter of Advisement or written Admonition; the Committee dismissed nearly a thousand more as failing to state a complaint. (<u>See</u> Ex. 7 to Wells Decl., at '817; <u>see also</u> Ex. 6 to Wells Decl., at '845 (documenting another attorney grievance committee's referral of 41 matters to the Second Department and issuance of 262 Letters of Advisement or written Admonitions in 2022).) The Supreme Court's holding in <u>Press-Enterprise II</u> acknowledged a similar fact about the criminal justice system when it extended the First Amendment right of access to preliminary hearings. 478 U.S. at 12. The right of access would be a dead letter if it extended only to jury trials, a stage to which exceedingly few criminal cases proceed. <u>Id.</u>

Moreover, dispositions are permanent records. (<u>see</u> Pls. 56.1 ¶¶ 38; Ex. 16 to Wells Decl.). The Committee's dispositions of attorney grievance proceedings are the State's official statement of whether misconduct occurred, and what the State did to address it. They remain in the records of the Second Department forever, and the underlying facts and conclusions can be considered in future disciplinary (and even criminal) proceedings, in New York and elsewhere. (<u>See</u> Sheridan Decl. ¶ 26; Joseph Decl. ¶ 13-14.)

They therefore function as the State's "judgment" on the attorney's conduct. (Pls. 56.1 ¶ 23.) See also Mosby v. Ligon, 418 F.3d 927, 931-32 (8th Cir. 2005) (observing that a disciplinary board's decision to impose discipline is the "functional equivalent of a state-court judgment"). Like judgments in civil or criminal matters before a court, some of the Committee's dispositions trigger reconsideration and review rights. See 22 N.Y.C.R.R. § 1240.7(e). These features of the Committee's dispositions render them far different from mere prosecutorial recommendations or charges.

Further, the Committee does its work as a neutral party, not for the benefit of the complainant, but "to protect the public by ensuring that lawyers adhere to the ethical standards set forth in the Rules of Professional conduct." (Ex. K to Sonnenfeldt Decl., at '296.) See also In re Branch, 165 N.Y.S. 688, 689-90 (App. Div. 1st Dep't 1917). The protective goals of the Committee are characteristic of judicial work, and they elevate the First Amendment principles at stake. Especially because the Committee's disposition is the State's final action on nearly all allegations of professional misconduct, it is important that the public has an opportunity to see what happens and is able to exert its power over that process by democratic means; after all, the public depends on the Committee to maintain

the high standards of the legal practice and for protection from malfeasant attorneys. It has a right to an informed understanding of that process.

The State offers an inaccurate characterization of the Committee's dispositions as investigative or prosecutorial records similar to an indictment returned by a grand jury. (See Def. Mem. at 29.) There may be surface similarities between a grand jury's vote to indict and the Committee's decision to refer a matter to the Second Department for public discipline, but the similarities end there. Critically, a grand jury has two choices — indict or dismiss — and in no case can make a final judgment that wrongdoing has occurred. Indeed, a grand jury's assessment that there is evidence of wrongdoing must in every case eventually come before a judge in open court; subsequent public proceedings justify strict grand jury secrecy. See, e.g., U.S. Const. amd. 6; Press-Enterprise II, 478 U.S. at 12 (establishing a presumptive public right to attend pretrial proceedings in criminal cases); Globe Newspaper Co., 457 U.S. at 603 (establishing a presumptive public right to attend trial in criminal cases); Waller v. Georgia, 467 U.S. 39, 46 (1984) (establishing the right of the accused to insist on a public trial).

The cases cited by the State confirm this principle. The Third Circuit's opinion in First Amendment Coalition v.

Judicial Inquiry and Review Board concerned closed proceedings by a state board formed to assess accusations of judicial misconduct. 784 F.2d 467, 473 (3d Cir. 1986) (en banc). Unlike the Committee's power to impose Advisement and Admonition (coupled with the practical reality that more serious punishment is rarely recommended), the state review board in First Amendment Coalition "cannot impose, but only recommend, punishment." 784 F.2d at 473. The same was true in Karlin v. Culkin, another case on which the State heavily relies. 162 N.E. at 492 (reserving disciplinary decisions for a court and noting that a special judicial inquisition into attorney misconduct, "neither end[s] in any decree nor establish[es] any right"). These distinctions justify a departure here from the grand jury analogies accepted in those two cases.

The Court likewise cannot accept the State's characterization of Letters of Advisement or written Admonitions as "private dispute resolution" like a private settlement agreement or a plea agreement. (See Def. Mem. at 28-29.) It is a poor comparison, factually, because of the Committee's apparent practice of releasing those dispositions in some circumstances, for instance to law enforcement and disciplinary authorities in New York and elsewhere. (See Joseph Decl. ¶ 13-14.) Moreover, private settlement

agreements and plea agreements, as the names imply, are likewise negotiated and entered upon consent of the accused. There is no indication that the same is true here.[21]

Accordingly, the Court looks to the historical antecedents of the process by which the states have adjudicated suspected attorney misconduct, not the process by which states investigate such misconduct. See Press-Enterprise II, 478 U.S. at 12; NYCTA, 684 F.3d at 299, 301.

In holding that the hearings of the Second Department were subject to a presumptive right of access (supra Section III.D.1), this Court has already found that states' discipline of attorneys has long been carried out in open court. See, e.g., In re Kelly, 59 N.Y. at 596 ("The proceeding

_____

[21] As a brief aside, even if there were a factual basis to draw a comparison between Committee dispositions and settlements or plea agreements, the State has provided no legal support that its preferred analogy would make a difference. The State cites Palmieri v. New York, which evaluated the enforceability of a protective order entered by a federal court pursuant to the Federal Rules of Civil Procedure upon a specific showing of individualized need for secrecy to obtain witness testimony; Palmieri did not pass on any constitutional questions. 779 F.2d 861, 863 (2d Cir. 1985).

By comparison, the courts that have examined the question more directly have concluded that a presumption of open access applies to judicial decisions even if the dispute ends by private agreement. See Bernstein, 814 F.3d at 141 (applying presumption of access to a civil complaint, despite private settlement agreement); see also Del. Coalition for Open Gov't, Inc. v. Strine, 733 F.3d 510, 521 (3d Cir. 2013) (applying presumption of access to consensual arbitration, where the arbitration took place before state judges and automatically resulted in judgment); The Washington Post v. Robinson, 935 F.2d 282, 288 (D.C. Cir. 1991) (applying presumption of access to plea agreements in criminal cases). Palmieri does not support that conclusion that the State may keep Committee dispositions sealed by default without a showing of individualized need. Id. at 864.

is of a public nature."); In re Spencer, 122 N.Y.S. at 192
("These [disbarment] proceedings have been spoken of as being
of a public nature."); cf. Ex parte Burr, 4 F. Cas. at 791
(describing the common-law practice of disbarring attorneys
in a publicly adjudicated contempt proceeding, and noting —
in 1823 — that such practice was centuries old). That the
orders and judgments of those proceedings were public is self-
evident from their contemporaneous publication in legal
reporters. See Hardy, 697 F. App'x at 725 ("There is a long
tradition of public access to court orders.").

The Court also considers the information in the
historical record about grievance committees more
specifically; this additional historical information does not
change the Court's conclusion on Committee dispositions.
Legal scholars note that states began to develop a practice
of delegating to bar associations the task of investigating
and prosecuting disciplinary actions in state courts in the
1870s, with Chicago and New York City being the first
jurisdictions to do so. See, e.g., Levin, 20 Geo. J. Legal
Ethics at 13-14 (collecting sources).[22] Scholars likewise

---

[22] The earliest reference, to this Court's knowledge, of a state committee
to accumulate complaints about attorney misconduct comes from 1727 and
1728, when New York colonial Governor William Burnet appointed a
"Committee to Hear Grievances in the Practice of Law." See Anton-Hermann
Chroust, *The Rise of the Legal Profession in America* 173-74 (1965) (citing
an ordinance found in 15 *Minutes of the Council of New York* 200-21, as
reprinted in P.M. Hamlin, *The First Grievance Committee in New York*, 1

report that New York City's bar association from the outset "adopted procedures to keep the proceedings secret" until the bar association took allegations of misconduct to a court. Id. at 15. Yet the early history of bar associations' involvement in the disciplinary process confirms that their role was to develop the factual record about suspected misconduct in particular cases; judges held the exclusive power to conclude that an attorney violated ethical duties. See Karlin, 162 N.E. at 493 (acknowledging the norm of secrecy "in the stage of preliminary investigation").

The power of bar associations to effect coercive discipline arose only in the first half of the twentieth century. It was not until the 1930s that most states granted bar associations subpoena power to compel testimony, along with the power to impose private forms of discipline that were not as drastic as disbarment or suspension. See Levin, 20 Geo. J. Legal Ethics at 14 & nn.78-79 (citing A.B.A., *Disciplinary Proceedings: A Survey of Methods Used to Discipline Unethical Lawyers* 42-58 (1935)); see also id. at 15 & nn.86-88 (collecting sources)).

---

Anglo-American History Series (1939)). There is little reason to believe one way or the other that the work of this grievance committee was public; indeed, scholarly descriptions of that committee do not make clear whether its purpose was to propose legislative reforms or to prosecute attorney misconduct in individual cases. See id.

There is no evidence, however, that such private forms of discipline functioned as a permanent judgment made after an adversarial hearing. Rather, the general practice was to keep minimal records or no records at all. Id. at 16 & n.92 (quoting a 1952 report on attorney discipline, compiled by the American Bar Association: "[W]e can only accept the complete absence of disciplinary records in those states as indicating an extraordinary disinterest on the part of the Bar and the courts in the character and professional conduct of the practicing lawyer."). There is also no evidence that private discipline had a positive impact on the efficacy of attorney self-regulation. Within a few decades of adopting secretive private discipline, the legal profession's disciplinary mechanisms were viewed as overly lenient, self-serving, and therefore ineffective at protecting the public. See A.B.A. Special Comm. on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement 1-2 (1970) (cataloging problems with bar discipline nationwide, including that "members of the disciplinary agency simply will not make findings against those with whom they are professionally and socially well acquainted") ; see also Levin, 20 Geo. J. Legal Ethics at 16; cf. Carroll, 986 F.3d at 219 ("experience" and "logic" must be considered together).

In conclusion, even if there is a decades-old history of private bar association proceedings to discipline attorneys, that history is outweighed by the preceding centuries of public discipline and the ill effects that exclusively private discipline have had on the legal profession.

The next consideration is logic. As already discussed, the Committee performs a largely adjudicatory function over accusations of attorney misconduct. The Court has also already discussed the logical benefits that flow from public monitoring of judicial work. (See supra Section III.D.1.) The logical reasons for public observation of Second Department hearings are all equally forceful when considering whether the Committee process would function better with its dispositions made public. (See id.) In particular, given that Committee dispositions represent the State's final action in nearly all accusations of attorney misconduct, public observation diminishes the possibilities for "injustice, incompetence, perjury, and fraud." Amodeo II, 71 F.3d at 1048; see also Richmond Newspapers, 448 U.S. at 595 (Brennan, J., concurring). The Court incorporates its earlier findings here.

However, some differences between the Second Department process and the Committee process merit evaluation. Those differences give the Court pause but do not change the

conclusion that public access to Committee dispositions significantly benefits the relevant process, such that a presumption of sealing would be permissible.

Four of the six possible Committee dispositions do not entail an evidentiary finding that actionable misconduct has occurred. Compare 22 N.Y.C.R.R. § 1240.7(d)(2)(i)-(iv) with § 1240.7(d)(2)(v) ("[W]hen the Committee finds, by a fair preponderance of the evidence, that the respondent has engaged in professional misconduct . . . .") and § 1240.8(d)(2)(vi) ("[W]hen the Committee finds that there is probable cause to believe that the respondent engaged in professional misconduct. . . ."). The possibility of Committee action without an evidentiary finding of misconduct elevates the risk that innocent attorneys may be impacted by public knowledge of the Committee's decision on accusations of misconduct that turn out to be unwarranted. Cf. Karlin, 162 N.E. at 492.

This concern, on its own, does not merit a presumption of sealing all dispositions. Of the four actions that the Committee may take without an evidentiary finding of professional misconduct, three are unlikely to have a negative effect on the attorney's reputation. A disposition under § 1240.7(d)(2)(i) dismisses a grievance complaint, vindicating the attorney's innocence; dispositions under

§ 1240.7(d)(2)(ii) and (d)(2)(iii) respectively refer the grievance complaint to another forum or stay the Committee's proceedings pending diversion and communicate nothing one way or the other about the matter's underlying accusations or their substantiation.

A Letter of Advisement disposition under § 1240.7(d)(2)(iv) is more problematic. A Letter of Advisement requires no finding of professional misconduct, merely a finding that "the respondent has engaged in conduct requiring comment." 22 N.Y.C.R.R. § 1240.7(d)(2)(iv). The only consequence of a Letter of Advisement is that the letter remains in the attorney's file and may be an aggravating factor in future disciplinary proceedings. However, a Letter of Advisement entails the Committee determining that the respondent attorney's conduct was ethically problematic but that the conduct did not violate the Rules of Professional Conduct. First Amendment principles do not warrant presuming those assessments should be secret.

The First Amendment acknowledges the logical benefit of making such decisions available for public review, because "legitimate questions could be raised about the court's inaction," just as they could be raised about the court's formal intervention. Erie County, 763 F.3d at 241. "[T]he public's ability to scrutinize such decision-making helps

assure its confidence in the orderly administration of justice" and is not contingent on content of the record. <u>Id.</u> at 240; <u>see also Bernstein</u>, 814 F.3d at 140. Sealing may still be appropriate in individual cases upon a sufficient individualized showing by the Committee.

The Court accordingly concludes that experience and logic both support a presumptive right of access to Committee dispositions. As to dispositions of the Committee made pursuant to 22 N.Y.C.R.R. § 1240.7(d)(2), Plaintiffs' motion is hereby **GRANTED.**

### 3. Dispositions by the Chief Attorney

Finally, Plaintiffs ask this Court to declare that the First Amendment right of access applies to "dispositions" made by the Chief Attorney pursuant to 22 N.Y.C.R.R. § 1240.7(d)(1). As before, the parties disagree on how to characterize dispositions made by the Chief Attorney. Also as before, the Court must "focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake." <u>NYCTA</u>, 684 F.3d at 299; <u>see also Press-Enterprise II</u>, 478 U.S. at 8.

Neither party distinguishes the Chief Attorney's role from the Committee's. Plaintiffs contend that both are

adjudicatory; the State contends that both are investigatory. However, Plaintiffs and the State have overlooked a key distinction between the Chief Attorney and the Committee. Whereas the Committee decides the appropriate outcome for a case and, when able, imposes final discipline on a respondent attorney, the Chief Attorney's role is purely investigatory. The Chief Attorney interviews witnesses and reviews documents to assemble a "written report with recommendations," which is then presented to the Committee for the Committee's decision. (Def. 56.1 ¶ 40.) The Chief Attorney does not make any substantive decision about what the appropriate action is for a grievance complaint. Even when the Chief Attorney makes a recommendation to the Committee, the Committee is not bound by those recommendations in any sense, and the respondent may resist those recommendations before the Committee. (See id.) The function and objective of the Chief Attorney is to develop the factual record and attain truth, not to decide an appropriate outcome. Dismissals pursuant to 22 N.Y.C.R.R. § 1240.7(d)(1) are the Chief Attorney's determination that there is nothing she can or should investigate. They are similar to a letter from a criminal prosecutor declining to prosecute a case, which is private correspondence from the prosecutor.

Accordingly, the Court looks to the historical antecedents for investigatory proceedings and related documents to be sealed. A lengthy recitation of historical instances in which investigative materials were excluded from public view is unnecessary: the Second Circuit has held that investigative inquiries have a long history of being conducted *ex parte* and out of public view. <u>New York Times II</u>, 577 F.3d at 403; <u>In re Grand Jury Subpoena</u>, 103 F.3d at 242 (2d Cir. 1996); <u>Ayala v. Speckard</u>, 131 F.3d 62, 72 (2d Cir. 1997) (en banc); <u>see also</u> <u>Douglas Oil Co. v. Petrol Stops Nw.</u>, 441 U.S. 211, 242 (1979); <u>First Amend. Coal.</u>, 784 F.2d at 472-73; <u>Karlin</u>, 162 N.E. at 492-93.

The effect of public viewing, too, on the functioning of investigatory proceedings has been described many times in the context of evaluating the First Amendment right of access. Close re-examination of these principles is likewise unnecessary. As is relevant here, secrecy (1) allows for investigative flexibility to facilitate efficient work by the Chief Attorney, and (2) protects respondent attorneys from malicious or otherwise unsubstantiated accusations. <u>See</u> <u>In re Grand Jury Subpoena</u>, 103 F.3d at 237; <u>Kamasinski v. Jud. Rev. Council</u>, 44 F.3d 106, 112 (2d Cir. 1994); <u>cf.</u> <u>Landmark Commc'ns, Inc. v. Virginia</u>, 435 U.S. 829, 848 (1978); <u>Douglas Oil Co.</u>, 441 U.S. at 218-19.

The Court concludes that neither experience nor logic demand access to dispositional documents issued by the Chief Attorney. As to dispositions of the made by the Chief Attorney pursuant to 22 N.Y.C.R.R. § 1240.7(d)(1), Plaintiffs' motion is hereby **DENIED**.

### 4.    Higher Values and Narrow Tailoring

The First Amendment right of access is a presumption, and the State may continue to seal its proceedings and records if "essential to preserve higher values and . . . narrowly tailored to serve that interest" Press-Enterprise II, 478 U.S. at 13-14 (citation omitted). It is the State's burden to justify sealing. See New York Times I, 828 F.2d at 116; Under Seal, 273 F. Supp. 3d at 469. The State cannot meet its burden without showing (1) an overriding interest that is likely to be prejudiced, (2) closure is no broader than necessary to protect that interest, (3) reasonable alternatives were considered, and (4) specific findings supporting closure are stated on the record. United States v. Cohen, 366 F. Supp. 3d 612, 627 (citing NYCTA, 684 F.3d at 304).

The State has generally asserted privacy and confidentiality as important interests it must protect. (See, e.g., Def. Mem. at 3.) Privacy and confidentiality in the lives of attorneys and their clients are no doubt important

values, and Section 90(10) exists to protect attorneys and
their clients from unwarranted and embarrassing intrusions
into their lives. As the Court has noted, however, the
consequences that attorney misconduct can have on public
faith in the foundations of the legal system are dire. Those
dangers are especially weighty as First Amendment
considerations when the work of government is at stake. The
State's assertions in this case do not justify sealing every
Second Department proceeding and Committee disposition
related to the Grievance Complaints in its entirety. The
Constitution instead requires a presumption of openness,
unless the State can explain why a person's privacy interests
are a "higher value" than First Amendment protections and
that its proposed seal on public information is narrowly
tailored to protect those interests. Press-Enterprise II, 478
U.S. at 13-14.

In this case, considering the proceedings and records
relating to Plaintiffs' twenty-one Grievance Complaints, the
State falls far short of meeting its burden. As an initial
matter, the State's defense of its sealing process makes no
reference to the twenty-one specific cases, and
individualized findings are required to maintain secrecy. See
NYCTA, 684 F.3d at 304. There is no indication on this record
that any of the Grievance Complaints concern private matters;

indeed, each concerns publicly known facts about public prosecutions. (<u>See</u> Kearse Letter.) If the proceedings and records related to the Grievance Complaints may embarrass state prosecutors, the Supreme Court long ago acknowledged that public officials' reputations are not a higher value that supersedes the First Amendment. <u>See</u> <u>Press-Enterprise II</u>, 478 U.S. at 13-14; <u>Landmark Commc'ns, Inc.</u>, 435 U.S. 829; <u>Erie County</u>, 763 F.3d at 241 (emphasizing the importance of First Amendment access in matters involving public institutions and criminal law).

Moreover, no effort has been made to narrowly tailor the State's restriction on public access to the hearings and records sought here. The State's contentions amount to "general findings" that do not pass constitutional muster. <u>New York Times I</u>, 828 F.2d at 116. Shrouding every aspect of the disciplinary process in every case not resulting in disbarment or suspension is "overly broad and contrary to the general requirement of narrow tailoring." <u>Under Seal</u>, 273 F. Supp. 3d at 472; <u>see also</u> <u>Kamasinski</u>, 44 F.3d at 109 (citing <u>Landmark Commc'ns, Inc.</u>, 435 U.S. at 829).

As a different, possible justification for sealing, the State believes that nonpublic discipline may make the attorney disciplinary process more effective on the whole in regulating the profession and ensuring the availability of

qualified lawyers for the public's benefit. Varying gradations of punishment have the benefit of allowing for discipline in proportion to the seriousness of a respondent attorney's misconduct; lenient or private punishment for minor offenses may even have a reformative effect on attorneys that greatly benefits the legal practice and the public. In some ways, the key distinction between a Letter of Advisement or written Admonition on the one hand, and a referral to the Second Department for prosecution on the other, is public disclosure. See 22 N.Y.C.R.R. § 1240.7. Requiring the Committee to make these three dispositions equally public might collapse the distinction among them. The public may see the Committee's determination of facts underlying the attorney's unethical conduct but may overlook the legal standards at play in each decision, which differ only in the Committee's discretionary assessment of the severity of the conduct: "conduct requiring comment" (id. § 1240.7(d)(2)(iv)) versus "professional misconduct" for which "public discipline is not required" (id. § 1240.7(d)(2)(v)) versus "professional misconduct warranting the imposition of public discipline" (id. § 1240.7(d)(2)(vi)).

The State may have named an important value in its effort to effectively regulate the legal profession, but that value must be considered in light of the interests the First

Amendment protects, and the harm to legal institutions that can follow if attorneys are not adequately monitored for observance of the high ethical standards of the bar. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." Richmond Newspapers, 448 U.S. at 572. As noted, the Grievance Complaints raise matters of exceptional public interest. Nejad, 521 F. Supp. 3d at 443. Further, narrow tailoring requires the State to consider "reasonable alternatives" to secrecy and that confidentiality is "no broader than necessary" to protect that interest. Cohen, 366 F. Supp. 3d at 628 (quoting NYCTA, 684 F.3d at 304). On this record, the State has again failed to meet its burden. Keeping every record sealed indefinitely, so that the public knows nothing of the result or even the pendency of a disciplinary case, is not narrow tailoring. Under Seal, 273 F.3d at 469 (quoting In re New York Times Co., 828 F.2d at 110.). The State has not explained why less restrictive alternatives — like disclosing particular dispositions anonymously,[23] or issuing redacted or short-form dispositions

---

[23] See Karlin, 162 N.E. at 492-93 ("There is a practice of distant origin by which disciplinary proceedings, unless issuing in a judgment adverse to the attorney, are recorded as anonymous.") (citing In re an Att'y, 83 N.Y. 164 (1880), and In re H--, 87 N.Y. 521 (1882)); see also Anonymous Nos. 6 & 7 v. Baker, 360 U.S. 287 (1959); Anonymous v. Ass'n of the Bar of the City of N.Y., 515 F.2d 427 (2d Cir. 1975); Anonymous, 7 N.J.L.

similar to those issued to complainants — would be insufficient to protect its interests.

## IV.  <u>ORDER</u>

For the foregoing reasons, it is hereby

**ORDERED** that motion for summary judgment (Dkt. No. 191) filed by Defendant Hector D. LaSalle ("Defendant") is **DENIED**; and it is further

**ORDERED** that the motion for summary judgment (Dkt. No. 174) filed by Plaintiffs Civil Rights Corps, Cynthia Godsoe, Nicole Smith Futrell, Daniel S. Medwed, Justin Murray, Abbe Smith, and Steven Zeidman (together, "Plaintiffs") is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**DECLARED** that a presumptive First Amendment right of access attaches to (1) all disciplinary hearings in the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York (the "Second Department"), whether before Justices of the Second Department or a special referee, considering imposition of public discipline related to the twenty-one grievance complaints (the "Grievance Complaints") that Plaintiffs filed on May 3, 2021, and (2) documents necessary to understand those hearings, including

---

162, 162 n.a1 (N.J. 1824) (determined anonymous by the reporter, not the court).

court orders, motions and related submissions, documentary evidence, and docket sheets; and it is further

**DECLARED** that a presumptive First Amendment Right of Access applies to dispositions made by the Attorney Grievance Committee for Second, Eleventh and Thirteenth Judicial Districts (the "Committee") pursuant to 22 N.Y.C.R.R § 1240.7(d)(2) related to the Grievance Complaints; and it is further

**DECLARED** that Plaintiffs' access to the proceedings and records referenced herein may not be restricted absent specific, on-the-record findings by either the Committee or the Second Department, as appropriate, that (1) restrictions serve higher values that would be prejudiced by disclosure; (2) restrictions on disclosure are no more extensive than necessary to protect those higher values; and (3) that alternatives to restriction have been considered and would not reasonably protect those higher values.

The Clerk of Court is respectfully directed to enter declaratory judgment to the effect of the foregoing Order and to close all outstanding motions and close this case.

**SO ORDERED.**

Dated:    22 July 2024
          New York, New York

                                              Victor Marrero
                                                 U.S.D.J.